# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION



United States Courts
Southern District of Texas
FILED

APR 0 2 2004

Michael N. Milby, Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **ERIC DEWAYNE CATHEY,**<br>          **Petitioner,** | §<br>§<br>§ |
| **VS.** | §<br>§ **MISC. ACTION NO. MC-03-165** |
| **DOUG DRETKE, Director,**<br>**Texas Department of Criminal Justice -**<br>**Institutional Division,**<br>          **Respondent.** | §<br>§ **H-04 -1306**<br>§<br>§<br>§ |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PETITION FOR WRIT OF HABEAS CORPUS (CAPITAL)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**K.S. "GATOR" DUNN**
**LEAD COUNSEL**
**594 SAWDUST RD., SUITE 332**
**THE WOODLANDS, TX 77380**
**Telephone: (281) 362-7156**
**Fax: (936) 321-8643**
**State Bar No. 00789266**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| ERIC DEWAYNE CATHEY,<br>Petitioner, | §<br>§<br>§ | |
| VS. | §<br>§ | MISC. ACTION NO. MC-03-165 |
| DOUG DRETKE, Director,<br>Texas Department of Criminal Justice -<br>Institutional Division,<br>Respondent. | §<br>§<br>§<br>§ | |

### PETITION FOR WRIT OF HABEAS CORPUS - CAPITAL

Petitioner ERIC DEWAYNE CATHEY (T.D.C.J.-I.D. #999228), by and through

his attorney of record, K.S. "Gator" Dunn, files this Petition for Writ of Habeas Corpus

pursuant to 28 U.S.C. §2254, seeking his conviction and sentence of death be vacated and

set aside and in support shows the following:

### I. PROCEDURAL HISTORY

Petitioner was charged by indictment with the offense of capital murder in the

State of Texas v. Eric Dewayne Cathey, Harris County Cause No. 713189. The felony

offense of capital murder was alleged to have been committed on or about

September 12, 1995, at which time, it was alleged petitioner unlawfully while in the

course of committing and attempting to commit the kidnapping of Christina O. Castillo,

intentionally caused the death of Castillo by shooting her with a firearm.[1]

The jury found petitioner guilty of capital murder in the 176th Judicial District Court after answering the following three special issues submitted under the Texas Code of Criminal Procedure applicable at the time of trial.

1. "Yes" as to the Special Issue #1. "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Eric Dewayne Cathey, would commit criminal acts of violence that would constitute a continuing threat to society?"

2. "Yes" as to Special Issue #2. "Do you find from the evidence beyond a reasonable doubt that, Eric Dewayne Cathey, the defendant himself, actually caused the death of Christina O. Castillo, on the occasion in question, or if he did not actually cause the death of Christina O. Castillo , that he intended to kill Christina O. Castillo, or that he anticipated that a human life would be taken?"

3. "No" as to Special Issue #3. "Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Eric Dewayne Cathey, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?"

Petitioner was sentenced to death by Judge Brian Rains on March 14, 1997.[2]  The

---

[1]Exhibit 1:  Harris County Cause No. 713189, Indictment.

judgment of conviction and sentence of death was subject to automatic review by the

Court of Criminal Appeals.  By opinion delivered on April 21, 1999, the Court of

Criminal Appeals affirmed petitioner's conviction and mandate issued on June 16, 1999

for CCA #72,772.  Petitioner filed a petition for writ of certiorari with the United States

Supreme Court, which was denied on January 10, 2000.  A State Application for Post-

Conviction Writ of Habeas Corpus, CCA #55161-01, was filed on March 15, 1999 and

denied by the Court of Criminal Appeals on April 2, 2003.

Petitioner has filed no prior federal petitions for Writ of Habeas Corpus on this

case and has exhausted state remedies.  All issues presented in this Petition for Writ of

Habeas Corpus have previously been before the Texas Court of Criminal Appeals.  Said

issues were either reviewed by direct appeal or by application for State Writ of Habeas

Corpus.  All claims in the present petition are substantially equivalent to the factual and

legal issues previously presented to the Texas Court Criminal Appeals.

---

[2]Exhibit 2:  Harris County Cause No. 713189, Judgment and Sentence.

## II. STATEMENT REGARDING THE APPLICATION
## OF 28 U.S.C. § 2254 (D)

Although prior state court litigation in a criminal case may often require federal deference to state court fact-findings,[3] such deference is not required with respect to questions of law or "mixed questions" of law and fact, and is required with respect to fact findings only when  the state court hearing was "full and fair."[4]  Section 2254 recognizes numerous situations when a state court hearing would not be " full and fair."[5]  When a state court hearing is inadequate under § 2254 (d), a federal habeas court is required to make de novo factual findings. Furthermore, when there are genuine issues of material facts and the state court fact-findings are not entitled to § 2254 (d) deference, a federal evidentiary hearing is required.[6]

In this case, no evidentiary hearing on Petitioner's State Writ of Habeas Corpus constitutional claims was conducted in the Texas court system. Under well-established Fifth Circuit precedent, a federal habeas court may not afford § 2254 (d) deference to the factual findings entered by the State Judge.  The findings of facts made by the State Judge were simply based on his purported "review" of the filings of Petitioner and Respondent.

---

[3] See 28 U.S.C. § 2254 (d).

[4] See Sumner v. Mata, 449 U.S 539 (1981).

[5] See 28 U.S.C. § 2254 (d) (1)-(8).

[6] See Guice v. Fortenberry, 661 F. 2d 496, 500-01 (5th Cir. 1981) (en banc) ("[i]f the facts necessary to support [a] constitutional challenge are disputed" and "if no . . . [full and fair] hearing has been held in state court," a federal "evidentiary hearing is essential to the resolution of the claim"); Townsend v. Sain, 372 U.S. 293 (1963).

5

Therefore, under <u>Guice v. Fortenberry</u>, <u>supra</u>, and <u>Townsend v. Sain</u>, <u>supra</u>, this Court should be required to conduct a further evidentiary hearing on Petitioner's complex and multi-faceted claims and enter de novo factual findings.  Even assuming this Court otherwise was inclined to defer to the state habeas trial court's findings, this Court should still conduct a federal evidentiary hearing on many of Petitioner's allegations because the state trial court simply did not address many pivotal factual issues.[7]  The state trial court's findings, which were ghostwritten by counsel for the State, are nothing but cursory statements unsupported by the trial record.  As the discussion of Petitioner's various allegations will reveal, the majority of Petitioner's specific allegations were not addressed by the state courts.  In sum, because this petition presents numerous genuine issues of material facts that were either unresolved in the state court proceedings or were resolved in a manner that does not warrant § 2254 (d) deference by the federal courts, this Court should stay Petitioner's execution and conduct a full and fair evidentiary hearing on the following issues.[8]

---

[7] <u>See</u> 28 U.S.C.  § 2254 (d) (1).

[8] <u>See</u> <u>Guice v. Fortenberry</u>, 661 F.2d 496, 500-01 (5th Cir. 1981) (en banc) ("If the facts necessary to support [a] constitutional challenge are dispute," and " if not . . . [full and fair] hearing has been held in state court," a federal "evidentiary hearing is essential to the resolution of the claim."); <u>Townsend v. Sain</u>, 372 U.S. 293 (1963).

## III.  ARGUMENT AND AUTHORITIES

### 1.  PETITIONER WAS DENIED DUE PROCESS WHEN THE JURY WAS NOT TOLD ABOUT THE STATE'S ACCOMPLICE WITNESS HAVING AN "UNDERSTANDING" OF A STATE PROMISED DEAL LIMITING HIS SENTENCE

### STATEMENT OF FACTS

Defense counsel, Mr. Kurt B. Wentz, filed "DEFENDANT'S MOTION TO REQUIRE THE STATE TO REVEAL ANY AGREEMENTS OR OFFERS WITH A WITNESS THAT COULD INFLUENCE HIS TESTIMONY" before the beginning of trial.[9]  The motion was granted by the Judge and stated the State was to advise the Defendant of any agreements or offers the exist between the State and any witness at that time or immediately as soon as such agreement or offer was tendered.  Further, the Motion stated this information was to insure the Defendant's right to due process as well as his right to confront the witness against him and his right to effective assistance of counsel.  Finally, the word "agreement" within the Motion was defined as any understanding between the State and the witness as to the testimony of the witness in the case other than that the witness would uphold his oath.  This was to include any benefit that was to be received to the witness for his testimony, including the reduction or reconsideration of any criminal case or charges that might be pending against him.[10]

---

[9] Exhibit 3:  Trial Motion to Require State to Reveal Agreements.

[10] Id at 1-2.

7

On December 31, 1996, Prosecutor Dolan told the Court there was an agreement with the Accomplice Witness Bonner, of which defense counsel was aware. The agreement as stated by this prosecutor, was dependent upon Bonner's past and continuing cooperation with the State but did not contain anything specific in regard to Bonner's sentence.[11] Next, a defense motion in limine was presented and the prosecutor indicated during the hearing he intended to establish the state's accomplice witness Bonner had no understanding that the state made an offer as to the amount of punishment he was going to receive.[12]

Bonner subsequently testified in great detail at petitioner's trial and identified petitioner as Castillo's killer. Bonner's credibility was the lynch pin in petitioner's case. This was evident when reviewing the arguments of trial counsel (20, 22-99) and the arguments on appeal. During the testimony, Prosecutor McClellan asked Bonner if an agreement to testify had been made between Bonner's attorney Connie D. Williams, in exchange for the state reducing his charge to aggravated kidnapping. Bonner answered "yes." (20, 99) It was established by the prosecution that Bonner plead guilty to kidnapping already and through his lawyer, had filed a motion for probation. Bonner advised he understood the range of punishment as being 5-99 years but also said:

    1. he did not know the punishment he would receive;

----

[11] Exhibit 4: Supplemental Record, Pretrial Motions at 7.

[12] Exhibit 5: Clerk's Record: (1-A, 360-363); (17, 18-19)

8

2. there was no deal for the amount of time he would receive;

3. that Judge Rains would make the time decision during sentencing, and

4. there was no special deal or set punishment he was going to receive depending on the outcome of petitioner's case. (20, 99-100)

Defense counsel established Bonner was given the following benefits for his testimony:

1. his charge was reduced from capital murder;

2. the government did not oppose the reduction of bond from no bond to $25,000.00;

3. his release on bond and giving up the state's right to jury trial on the reduced charge, and

4. allowing Bonner to request probation from the trial court, which he could have not done in front of a jury. (20, 107-111)

Bonner lead the jury to believe that all he knew for sure was the court was going to sentence him after a pre-sentence investigation was completed and no other deal existed with the state. (20, 111) But this statement was proven to be untrue and necessitates a federal evidentiary hearing to fully develop the current information. Sworn statements from Bonner, Connie Williams – Bonner's attorney, and Lonnie Nunn – Bonner's Father (who paid Williams legal fee) all contain supporting facts in the true story surrounding the deal that actually existed between the State of Texas prosecutors and Bonner.[13] These

---

[13] Exhibit 6: Sworn Affidavits from Connie B. Williams, Lonnie Nunn and Lionel Bonner.

affidavits were filed in support of Bonner's motion for new trial after he received a 30-year sentence subsequent to his guilty plea.

Williams states in his affidavit that Prosecutor McClellan contacted him about Bonner cooperating in the case. Williams was told Bonner's testimony was needed by the state and Williams persuaded Bonner to cooperate with the state. Prosecutor McClellan "debriefed" Bonner many times without Williams presence but with his knowledge and agreement. Prosecutor McClellan agreed not to oppose any sentence Williams suggested to the court and agreed not to make a recommendation in Bonner's case to the Judge in exchange for his cooperation. Williams described the agreement between Prosecutor McClellan and himself as a "tacit" one since under Brady and Giglio, any such agreement would have to be made known to Bonner's attorney for use at his trial. Williams said he discussed a deferred adjudication and 10-year cap concerning his client to Prosecutor McClellan, who in turn stated he doubted a deferred would come to pass but an 8-10 range would be possible. Williams stated that there was a "meeting of the minds" between himself and Prosecutor McClellan concerning the understanding. See the Williams Affidavit attached as an Exhibit.

Bonner's Father, Lonnie Nunn, stated in his affidavit that he retained Williams to represent his son. Nunn said Williams telephoned him in reference to a deal in exchange for his son's testimony and further that Williams said he had discussed a 10-year probation with the prosecutor. Williams stated he was going to get them a 100%

guarantee on the deal and the worst sentence would be a 10-year cap. Nunn stated Williams said the deal could not be put into writing because it would then need to be turned over to the other lawyers.

The Accomplice Witness Lionel Bonner gave a sworn affidavit stating Williams talked to him about a plea bargain after talking with the District Attorney. After a court setting when Bonner's attorney was not there, Bonner states he was lead into a room and told by Prosecutor McClellan that if he cooperated, Bonner would receive a deal with a 10-year cap, whether that resulted in probation or pen time. After this agreement, Bonner told the prosecution about the offense. The prosecutors advised they would get with Williams to be more specific about the deal. Before the plea was taken in court, Prosecutor McClellan took Bonner out into the hall with his Mother and advised him he had spoke to Williams about the deal. Bonner stated the whole point of him testifying as an accomplice witness was in exchange for the fixed recommendation. See the Affidiavit of Lionel Bonner attached as an Exhibit.

## ARGUMENT AND AUTHORITIES

There was not a state evidentiary hearing conducted on this issue. Petitioner requests the Court order an evidentiary hearing so that the witnesses can testify in open court as to the truth of the matter asserted. Petitioner was denied his federal constitutional right to due process concerning the accomplice witness deal that was not disclosed to the jury.

Petitioner's attorney was not able to cross-examine Bonner about his deal with the state. Had the defense attorney known about the deal as the above affidavits explain Bonner's testimony would have been discredited and the true motive to testify – the deal could have been brought to light. Bonner even had a motive to testify falsely if he thought his testimony would assist the state and the assistance of his testimony was contingent on the outcome of his case. It is clear Bonner expected leniency on his case by the state and even thought probation was an option.

The jury should have been informed of the agreement between Williams, Bonner and the office of the district attorney. Following the ruling in Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), Bonner was promised leniency on punishment and testified accordingly. An outright promise of leniency or a specific benefit, which affects the witness's state of mind when testifying will both invoke a defendant's due process right to inform the jury of the circumstances as affecting the witness's credibility. Bonner testified against petitioner with an actual motive in his mind to falsify and this motive was not known by the jury. But the jury was entitled to know the true circumstances as a mater of due process and then judge Bonner's credibility for themselves. Bonner did not tell the truth to his lawyer, the trial judge or the jury when he stated he was not expecting any specific punishment because of any deal communicated to him by his lawyer. He also did not tell the truth when he testified that the state had not personally or through his lawyers, promised him anything or led him to expect a low

12

punishment.  His own affidavit on his motion for new trial contradicts his trial testimony.

Petitioner is entitled to reversal in this issue.

2.  **a. PETITIONER WAS DENIED DUE PROCESS WHEN MATERIAL
    EXCULPATORY INFORMATION WAS NOT PROVIDED TO HIM
    b. PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF
    COUNSEL WHEN TRIAL COUNSEL**

## STATEMENT OF FACTS

There was exculpatory evidence that Michael Paul named Montiego Jordan as the actual murderer of the victim, Castillo.  But this evidence was not submitted to defense counsel before trial and was therefore, unable to be used in petitioner's defense.  Such evidence directly contradicted the state's star accomplice witness testimony of Bonner.  Trial counsel filed a motion for the State to reveal exculpatory evidence pursuant to Brady on December 30, 1996.  Though there is no formal ruling or discussion on said motion, the prosecutor did mention, in connection with another motion, that counsel has seen the file.  The trial court noted another request should be covered by the request for Brady material.  See the Supplemental Record, pretrial motions at 13,16.  The record demonstrates the request for Brady material was made by defense counsel.

In January of 1996, Houston Police Department officers Avila and Guerro had arrested and charged six individuals with the murder at bar, including petitioner.  But the officers were still investigating the option that others may have been involved.  Monteigo Jordan, who was also known as Meco Jordan was one of the additional suspects.  Jordan name appeared on a list mailed to Guerro in September of 1995.  This was directly after the victim's body was found.

The list was written in Spanish and named the individuals responsible for

14

Castillo's murder, according to the unknown author.  Derrick Paul and Michael Paul were

on the list.  Michael Paul owned the vehicle found burned at the scene of the offense.

Trial counsel obtained officer Avila's notes while he was testifying and established the

officer had interviewed Derrick Paul in November of 1995.  (20, 7)  Derrick Paul "had

mentioned" the name Monteigo Jordon or Meco Jordan.  Avila also admitted he had

interviewed Michael Paul twice in a Beaumont jail and once by telephone.  When asked if

Michael Paul referred to Monteigo Jordon, Avila answered in the affirmative.  (20, 8-9)

Trial counsel then attempted to clarify what Michael Paul said about Monteigo Jordan but

was denied by the court upon objection.    No where by suggestion or offer of proof did

trial counsel say that in Avila's interview that Michael Paul told him that Monteigo

Jordan was the killer of Castillo. (20, 9-10)

    The police offense report stated Michael Paul told officers Avila and Guerrero that

he had loaned the car found at the scene to Monteigo Jordan.  Although Paul denied

involvement in the murder, the offense reported stated several times that Paul said

Monteigo was the killer.[14]  The report also stated that as the investigators were leaving,

Paul stated that Monteigo Jordan was the killer.  Paul never explained to the investigators

the reason he knew Jordan was involved.[15]  The next day, Paul said it was hard for him to

specify what he meant when he said Monteigo was the killer but that the officers should

_____

[14]Exhibit 7: HPD Offense Report at 2.073

[15] Id at 2.073-2.074.

go talk to Monteigo. He stated he could not tell the officers everything because he was afraid for his family. The vehicle had been loaned to Monteigo at Monteigo's Grandmother's house on Sauer Street.[16] An address book in the letter to Guerrero had listed the name Monteigo and an address at 3311 Sauer in Houston as Grandma's house.[17] The letter also contained documents reflecting inmate Meco Jordan having the same date of birth as Tim Harrison, home address 3311 Sauer in Houston and reflecting that Jordan/Harrison was arrested in Houston on September 12, 1995 and released on bond September 12, 1995 – the date of the offense.

During the trial of James Deleon, the co-defendant of petitioner testified that Montiego Jordan was the murderer of Castillo. Prosecutor McClellan called Jordan as a rebuttal witness and Jordan stated he did not even know any of the six defendants. Prosecutor McClellan established Jordan had been arrested on September 11, 1995 and suggested Jordan was still in jail at the time of Castillo's murder and therefore, could not have done it.[18] But trial counsel was in possession of Jordon's bail bond document, found in the trial attorney's notebook, showing that Jordan was released at 8:30 a.m. on his court setting on September 12, 1995.[19]

On January 9, 1996, Jordan's name was listed in the investigation as one that had

---

[16] Id at 2.076-2.079.

[17] Exhibit 8: HPD Offense Report at 2.052 #3 and 2.053 # 13.

[18] Exhibit 9: State v. Deleon, 7, 33-34)

[19] Exhibit 10: Trial Attorney's Notebook, section 4.

been developed. Guerrero had told Chief Joe Garcia of the Brookshire Police Department, who had just the day before obtained James Deleon's information implicating himself, that petitioner and four others had met to plan the robbery at a house next door to Sonny Baker's house on Sauer Street in Houston on the afternoon of September 12, 1995. Guerrero did not know some of the names but Jordan was a cousin of one of the members of the group that Garcia had developed.[20] James Deleon was called as a defense witness but invoked his Fifth Amendment right and remained mute. The offer of proof from the defense demonstrated his testimony would have name Jordan as the killer of Castillo. (21, 14; 24, 90)[21]

## ARGUMENT AND AUTHORITIES FOR 2a

The following information should have been provided by the State before trial:

1. the exculpatory information that Michael Paul named Monteigo Jordan as the killer;

2. that Jordan was the cousin of one of the six Brookshire defendants;

3. that Jordan was free on bond when the plan and murder occurred on Sauer street, and

4. that Jordan gave the address on Sauer Street as his address.

But none of this Brady information was turned over to the defense. The fact that trial counsel tried to cross-examine officer Avila about Michael Paul's relating Monteigo

---

[20] Exhibit 11: HPD Offense Report at 2.088 – 2.089.

[21] Exhibit 12: Defendant's Exhibit 14 from Petitioner's Trial.

Jordan's gang membership and the exchanging of weapons, based on Avila's notes turned over only at trial - but did not seek to cross examine him about Michael Paul's naming of Monteigo Jordan as the murderer of Castillo, proves several things. First, the state knew or was in charge of knowing that in November of 1995 and January of 1996 that Monteigo Jordan lived on Sauer street, was a cousin of one of the six Brookshire defendants, was free on bond on September 12th – the day of the offense, had been named in a letter sent to Investigator Guerrero as one who was responsible for the killing, and that Michael Paul who owned the burned out vehicle found at the scene of the offense, had named Jordan as the killer to the police. The prosecution provided none of this information in response to the Brady motion. Trial counsel never had the opportunity to find or respond to this exculpatory information except in response to Avila's testimony using his 2-inch think offense report. This "opportunity" to find and use exculpatory facts cannot satisfy Brady, as the opinion is construed in Agurs, Bagley and Kyles.[22] Due process was denied in petitioner's case and it is immaterial as to the good or bad faith of the prosecution. The inquiry for the court is whether the denial of the timely Brady request undermined confidence in the outcome of the trial.[23]

The fact is that Bonner's accomplice witness testimony would be shaken to the core had the Brady information come to light during the trial. The jury would not have deemed

---

[22] United States v. Agurs, 427 U.S. 97, United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d. 481 (1985) and Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d. 490 (1995).

[23] Kyles v. Whitley, supra, 514 U.S. at 434, citing Bagley.

Bonner's testimony as reliable. The testimony would have appeared contradicted and unbelievable. Coupled with the additional trial error of the secret deal with Bonner for his testimony, it becomes clear that the non-disclosure of Jordan being named as the killer by Michael Paul, in addition to other facts implicating him in the offense, would have made the jury doubt the testimony they heard that convicted petitioner. Petitioner should be granted a new trial based on this issue's error.

**ARGUMENT AND AUTHORITIES FOR 2b**

The right to counsel is a fundamental right of a defendant, which assures fairness, and thus the legitimacy of our system of criminal justice.[24] A defendant is entitled to "reasonably" effective assistance of counsel.[25] This standard applies with regard to both appointed and retained counsel.[26]

To prove ineffective assistance of counsel, the two-prong test of Strickland must be met. First, counsel's performance was deficient and second, the deficient performance so prejudiced the defendant that but for trial counsel's ineffectiveness at trial, a different result would have occurred.[27] In effect, a claim of ineffective assistance of counsel alleges the unprofessional errors by counsel so upset the adversarial balance as to render the trial unfair and the verdict suspect. A single, serious error may support a claim for

---

[24] Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574 (1986).

[25] Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984).

[26] Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708 (1980).

[27] Strickland v. Washington, 466 U.S. 668, 688, 104 S.Ct. 2052 (1984).

ineffective assistance of counsel.[28] The function of counsel is to "make the adversarial testing process work in the particular case."[29] This generally requires that counsel conduct some investigation into the State's case. "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."[30]

In the alternative to the argument in 2b, if the Court believed trial counsel knew about the exculpatory facts as discussed, yet did not make the facts known to the jury to assist petitioner, then petitioner did not receive effective assistance of counsel at trial. The fact that Michael Paul name Monteigo Jordan as the murderer of Castillo was admissible to challenge the credibility of Bonner's testimony and also would cast doubt on the entire police investigation. There would be no tactical decision to not present this information to the jury. Petitioner again requests this court to order an evidentiary hearing on this issue to obtain the truth relating to the matters asserted.

---

[28] Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574 (1986); United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).

[29] Strickland v. Washington, 466 U.S. 668, 690, 104 S.Ct. 2052 (1984).

[30] Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052 (1984).

### 3. PETITIONER'S EIGHTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE JURY INSTRUCTION AT PUNISHMENT CREATED AN UNACCEPTABLE RISK THAT THE DEATH PENALTY WAS IMPOSED IN AN ARBITRARY MANNER

#### STATEMENT OF FACTS

The jury instructions at punishment in petitioner's case stated the jury could not answer the future danger special issue "yes" unless the agree unanimously and could not answer this special issue "no" unless 10 or more of them agreed. The jury was told they could not answer the mitigation special issue "no" except by unanimous agreement and could not answer it "yes" unless 10 or more agreed. The jury was never informed that the effect of their failure to agree on a "yes' or "no" answer under these guidelines would be an automatic assessment of life sentence, with the same 40-year parole ineligibility condition. Such a prohibition constitutes an impermissible barrier against individual jurors being able to give effect to their evaluation of the mitigating evidence if in the juror's judgment a sentence of life imprisonment rather than a death sentence is warranted.

#### ARGUMENT AND AUTHORITIES

One of petitioner's jurors, Ms. Heather Bradford, was the holdout for life based on her own assessment of the evidence.[31] Bradford was mislead by the instructions into believing that if she maintained her vote, preventing the jury from reaching the 12-10 combination, the result would be a mistrial in the case and perhaps would even free

petitioner.

The Supreme Court case of *Jones v. United States*, cited *infra*, does not answer Petitioner's argument. Any supposed State interest in unanimity was satisfied when the law made an automatic life sentence the consequence of a "hung jury."

Petitioner did offer some evidence that was relevant as mitigation concerning the special issue. The jurors were free to consider the 40-year fact as mitigating. The jurors were free to assign mitigating effect to all this evidence, to decide that life was a more appropriate punishment than death.

These circumstances make it far more likely that one or more jurors would be in the position of a holdout for life, not wishing to join others in sentencing Petitioner to die, but also certainly not wishing to risk a mistrial that might result in the immediate release into free society of the person they had just found guilty of capital murder, under circumstances that showed he might be dangerous in that society.

Informing the jury, that a failure to reach a 12-10 answer on either special issue would in fact result in the immediate imposition of a life sentence, with its 40-year parole ineligibility, would have removed any likelihood that the jury would return a death verdict on an improper basis, to avoid a situation that did not exist. The Eighth Amendment requirement of heightened reliability in a death case cannot tolerate the risk of an improper death verdict in this case. That risk is certainly not outweighed by any State interest in "unanimity," which interest the State surrendered in the

---

[31] Exhibit 13: Affidavit of Investigator Cynthia Patterson.

legislation of the automatic life sentence, rather than a mistrial, as a consequence of a hung jury at punishment in a capital case.

These grounds of error are ones with which this Court is familiar. The arguments have been expanded in various death penalty briefs over the last few years but the Court has taken no account of them. Some encouragement could be taken from the Supreme Court's grant of certiorari in a federal death penalty case, as evidencing that Court's interest in the "truth in sentencing" issue that is the basis for Petitioner's arguments here. Alas, five members of the Supreme Court found that the Eighth Amendment does not require a capital jury be instructed as to the consequences of a "deadlock" during punishment deliberations, and that, at least in the federal weighing scheme, an instruction failing to inform them of such consequence did not "affirmatively mislead" the jury regarding its role in sentencing. *Jones v. United States*, ___ U.S. ___, 119 S.Ct. 2090, 1999 WL 401258, *2 (Tex.)

The *Jones* opinion did gain four dissenters, who believed that the majority's tolerance for the flawed proceedings violated the most basic guideline of the Eighth Amendment: "[A]ccurate sentencing information is an indispensable prerequisite to a [jury's] determination of whether a defendant shall live or die." 1999 WL 401258 at *18 (Ginsberg, J., dissenting) citing *Gregg v. Georgia*, 428 U.S. 153, 190, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)

After describing the federal scheme's weighing process, the four dissenters

invoked other instances in which the risk of an unreliable sentencing decision in a capital case was serious enough to require a reversal and a warning that such potentially misleading procedures would not be tolerated, *e.g., Simmons v. South Carolina*, 512 U.S. 154, 163, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (plurality opinion) in which the Court found that it would be entirely reasonable for jurors to view a defendant who is eligible for parole as a greater threat to society than one who is not, so that when they were misled (by the prosecutor's argument) into believing the defendant was eligible, there was an unacceptable risk that they may have been persuaded to change their vote to death to prevent what no juror wanted: a chance of the defendant's release; *Beck v. Alabama*, 447 U.S. 625, 643, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1988), in which the Court found that the omission from the charge of a lesser included offense instruction created an unacceptable potential to confuse the jury about the consequences of their deliberations, tilting towards death. This risk, the Court found, was intolerable. "Capital sentencing should not be . . . a game of 'chicken,' in which life or death turns on the . . . happenstance of whether a particular 'life' juror or 'death' juror in each case will be the first to give in, in order to avoid a perceived third sentencing outcome unacceptable to either set of jurors." *Jones v. United States*, supra at *22 (Ginsberg, J., dissenting) quoting Jones's Reply Brief in connection with the citations to *Simmons* and *Beck*.

Petitioner submits that the risk of a verdict based upon the perceived outcome of a

mistrial and retrial, which is an erroneous perception necessarily created by the charge omitting that consequence, creates an even greater risk of arbitrariness in the sentencing decision in a non-weighing state like Texas. Even if the risk were tolerable in *Jones* the Eighth Amendment cannot tolerate it in a Texas case.

In the federal scheme as in other weighing schemes, the defendant obtains at least a threshold benefit from the juror who may become the "holdout" juror. In Texas the defendant does not, cannot receive any affirmative benefit except by that juror's one chance to vote under our procedure; if that juror is misled the defendant gains no benefit, to any degree, from the juror's defense leanings.

In the weighing scheme the jury may move an aggravating factor onto the scale only if they find, unanimously and beyond a reasonable doubt that it has been proven. *Jones, supra* at *18. A single juror, however, may move a mitigating factor onto the scale on the defendant's side if he finds, by a preponderance of evidence, that factor exists. Once the mitigating factor is on the scale (as many factors as any single juror may find) the entire jury must at least consider those factors when they engage in the weighing process. *Id.*

Under a weighing scheme, then, in the first stage of the process the juror leaning toward mitigation feels none of the pressure to join the majority or reach a unanimous "verdict" because there is no requirement of unanimity (for a mitigation finding) at that stage. The defendant in such a case has had the full benefit of any juror's

decision to put his mitigating evidence on the scale.

Under the non-weighing procedure in Texas, the defendant has no such benefit. Instead, having found the aggravating factor, unanimously, the jurors are put under the immediate requirements that they reach either a unanimous verdict for death or that ten of them agree for life. No individual "vote" on mitigation officially "counts" under the instructions, only the correct formula of votes has an official recognition.

Petitioner submits that the State cannot claim any legitimate "entitlement" to unanimity in the traditional sense of protecting its verdict against the consequences of a hung jury. Indeed it was obviously the very fear of a mistrial and the perils of retrial which prompted the Legislature in 1981 to remove that consequence by making an automatic life sentence mandatory if the jury fails to reach a 12 or 10-vote verdict. The fact that the State wishes to tolerate fear, instead of removing it, in capital jury deliberation, suggests that they wish not only to tolerate it but also to exploit it, just as in the Simmons situation. In Petitioner's case they are apparently eager to exploit an inaccurate perception of the circumstances. The Supreme Court invoked constitutional protections to promote fairness and reliability in the death-sentencing decision, in *Simmons*, in *Beck* (on the guilt decision) and in the cases that specifically addressed the standard to be employed in evaluating claims that an instruction prevented a fair and reliable verdict, *e.g., Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), establishing the standard as "whether there is a

reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution." *Boyde, supra*, at 380, 110 S.Ct. at 1190. It is abundantly clear that in Texas, with its non-weighing procedure, there is an unacceptable risk that the jury will be swayed toward death by the desire to prevent a mistrial and possible retrial, which their instructions mislead them to perceive as a consequence of their failure to agree by a vote of 12 or 10.

With the foregoing summary as a basis for his argument, Petitioner presents what the Court has seen before, in the hope the Court will recognize its logical and persuasive force. The Court should consider this issue in light of the foregoing summary because the Supreme Court has at least expressed its interest in this kind of truth-in-sentencing issue in capital cases. Petitioner submits that in its majority and dissenting opinions in *Jones* the Supreme Court has recognized that any jury informed that they must reach a unanimous verdict (or any certain number of votes) to impose death or life will necessarily speculate upon the consequence of any failure to agree. The question is whether in such circumstances, it is better that they should be told the truth or better that they should guess, based upon whatever information or misinformation they have picked up from whatever sources. The Court has reached one decision in *Jones* in the context of weighing schemes, and Petitioner submits the dissenting opinion would prevail in the context of the Texas non-weighing procedure.

The Fifth circuit in *Jones, supra*, noted the Petitioner's reliance on the same

Louisiana Williams case, but distinguished the Louisiana statute on the basis that it (like the Texas statute in Petitioner's case) provided for the automatic life sentence rather than the retrial of punishment. The Supreme Court found that the federal consequence was an automatic life sentence, like the result in Louisiana and Texas, but did not address the distinction between a weighing and non-weighing scheme.

Petitioner submits, then, that while this issue has been repeatedly rejected it has not been conclusively rejected. Petitioner respectfully asks the Court to reconsider the following arguments and authorities in light of the fact that this issue has gained the Supreme Court's attention and is so closely tied to other issues, specifically victim impact. Petitioner stresses in his argument the holdout juror's logical apprehension that a retrial would result from the failure to agree, and that the victims would be put through their agony again, or that the defendant would go free. With the victim impact issue added to the analysis (which issue was not a factor in the analysis of the Court's *Draughon* and *Davis* opinions) and the Supreme Court's decision in *Jones*, the issue is especially deserving of reconsideration.

Because a Texas capital juror undertakes no obligation to agree or disagree with his fellow jurors in order to fulfill his responsibility to reach a verdict, there is no such thing, in effect, as a "deadlocked jury" or a "holdout juror" in the traditional sense in a capital case in Texas. Because, the law attaches a consequence of punishment immediately to every combination of twelve individual verdicts, there is no justifiable

reason to retain the 12-10 rule and to inform the jury of only two of those three automatic, mandatory results is to mislead them and to distort each juror's perception of his or her own responsibility to reach a rational, individual determination of the proper answer to the special issues.

Petitioner argues that by apparently requiring 10 votes for a "no," regardless of what the individual chooses for the "no," the charge and the statute mislead the juror who may be alone in holding out for a "no" answer and a life sentence. In fact, one holdout results in a life sentence. The juror does not know that. A juror, favoring life based on the evidence, may collapse knowing he will never convince nine others to join him. That juror would mistakenly believe holding out would be futile and that his "obstinacy" would put the State and all the witnesses to trial again.

Petitioner submits that the statutory structure as it stands: the 12-10 requirement with one of the three consequences concealed from the jury does not provide the juror in the gap, the holdout juror, with the clear avenue to effectuate his beliefs. There is a whole body of law approving of a "dynamite" charge to a hung jury informing them that if they fail to reach a verdict a new jury, after a retrial, will simply decide the issue again. The recognized object of this charge, as illustrated by its vivid description, is to remove obstacles to the unanimous verdict, to urge a verdict rather than incur the consequences of a mistrial. *See, e.g., Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed.2d (1896) as exemplifying a neutral, proper instruction.

Informing a capital juror that "inability" of the entire jury to reach a combination of individual verdicts that satisfies the 12-10 rule, rather than being a "failure" or a "mistrial" or a "hung jury" in the usual sense, actually has an immediate, affirmative effect -- an effect that corresponds with that juror's individual verdict -- would truly give the juror who believes mitigating circumstances exist a way to "effectuate his belief." That juror would then be able to meet his responsibility to answer the questions, rather than avoiding his responsibility. He would do so by maintaining his own individual judgment, without any temptation to alter it solely in order to conform to the 12-10 rule and to the answers of the other eleven jurors.

If the jurors know all three options there is no risk of a juror's changing his verdict for an improper reason. A juror who knows this jury cannot impose death without him does not know that some new jury may not hear the matter and impose death in the future, if he continues to hold out against the other eleven. Indeed, he may think it is likely that the views of the other eleven, being obviously in the majority, will be the views of all twelve in some new trial. Therefore, he is not justified in maintaining his lone opinion in the face of the time, expense and anxiety of another trial. In addition, he may harbor the fear that there may not even be a new trial, because of a missing witness or some other unforeseen problem. This juror, after all, has voted to convict the defendant of capital murder; he does think a life sentence is warranted, but he obviously does not want the defendant to go free. That possibility is one that would not disappear in the context of the

30

11-1 hung jury. In other words, he feels all the recognized pressures of the holdout juror in a usual case -- the verdict-urging, verdict-changing pressures the State willingly applies in the "dynamite charge."

Of course it may be that, at the other extreme, the holdout jurors are in the minority voting for death, in which case there would have to be three of them, making the life-voters one short of the number needed for a 10-2 life answer. The three will probably think it unlikely they could persuade all nine of the others to switch their votes to death (they know they need all 12 votes to impose death, the verdict they want). Yet they also know that by maintaining their own verdicts they can keep the life-voters from getting the ten votes they need for a life sentence. They are thus in the same position, to some extent, as the one holdout life-voter; in each case the holdout can prevent the other side from having the votes it needs for life or death. Each holdout also knows, however, that he cannot get what he wants, and the verdict he thinks is justified by maintaining his position.

In this standoff situation, the death-voting holdouts would have no reason to change their votes to life, whether they know of the "default life sentence" or not. Not knowing the rule, these death-voting holdouts might hope that the State would do a better job on retrial and the new jury would impose the death penalty. Not believing the evidence called for a life sentence, and placing some speculative faith in a retrial, they would have no reason to change their votes to life. Also, of course, if they did know the

rule that the court would automatically impose a life sentence because the 12-10 rule was not satisfied, the death holdouts would realize there was no possibility of the death penalty's being imposed, so there would still be no reason to change their votes.

So, at one extreme the death-voting holdouts have no incentive to change their verdicts for any improper reason, and on the other extreme the life-voting holdout suffers the logical pressures of numbers as well as the recognized and understandable fears that no retrial would be possible, so that the defendant might go free, or the pressures of not wanting to put the victim's survivors and the State through another long and agonizing court proceeding. If the jury has heard the victim impact testimony, as they did here, and has seen the survivors identify the remains of their loved ones, they surely have an idea what a retrial means to the families. The holdout juror can only speculate as to the result of his "obstinacy" in standing by his verdict, because the secret result is concealed from him.

Petitioner believes it is demonstrably true that providing the information can only further the legitimate end of encouraging jurors to change their personal decisions only in response to their own evaluation of the evidence or in response to persuasive observations of their fellow jurors; providing the correct information discourages a change in decision based on the improper consideration that the burden of decision will be shifted to another jury or judge and/or occasion a retrial with its necessary anxiety, delay and expense.

Petitioner submits that the jury selection process in Texas is sufficient to weed out

32

this second hypothetical juror, who is so "convinced of the appropriateness of a life sentence" out of "blind obstinance" that he would refuse to consider the evidence in support of the death penalty. Even if such a juror did manage to slip through the voir dire process, and if he is indeed so blindly obstinate as to refuse to consider the evidence, then he is hardly going to be more dangerous to the deliberation process if he knows he can force a life sentence by default. He already knows he can achieve that result by simply sticking by his life vote and preventing the unanimity needed for death. The giving or not of the informative instruction has no effect on the outcome and does not render the result more or less reliable, because it did not affect the bad juror's actions or, really, his motives.

If allowed to persist, this deception-in-sentencing approach can take its place alongside the opinions that sanctioned keeping the jury in the dark about the 35 or 40-year minimum parole ineligibility rule for capital offenders, before the legislature took action to see that the jury was instructed, on a defense request, about the parole ineligibility. There is a reason that the same prosecutors who championed truth-in-sentencing in non-capital cases came back to cry "none of the jury's business" in capital cases in 1995. There is a reason that the same prosecutors who want the strongest charge they can get to urge a verdict in a non-capital case want to hide the consequences of a deadlock from the capital punishment jury. That reason is not to assure the purity of the process, or the reliability of the verdict, because neither rule of

concealment furthers those ends.  The object of the concealment is to get the death penalty, and that end justifies, apparently, the diametrically opposite position the State has taken on these two issues.  For the State's purposes, an ignorant life-prone juror is almost as good as a death-prone juror.  To the extent that ignorance furthers the State's purpose, they will champion that ignorance.

**4. THE ADMISSIBLE EVIDENCE WAS LEGALLY INSUFFICIENT TO SUPPORT PETITIONER'S CONVICTION BECAUSE THE EVIDENCE FAILED TO PROVE, BEYOND A REASONABLE DOUBT, THAT THE TESTIMONY OF ACCOMPLICE WITNESS BONNER WAS CORROBORATED BY INDEPENDENT EVIDENCE TENDING TO CONNECT PETITIONER TO THE COMMISSION OF THE OFFENSE**

## STATEMENT OF FACTS

### GUILT PHASE

## STATE'S WITNESSES

### EVA CASTILLO

The victim's mother was the state's first witness. (19, 36) The victim was 20 years old at the time of her death and born in Houston, Texas. (19,37) Witness stated that victim lived with Hector Alicia at the time of disappearance. (19,37) Witness explained how she helped identified victim at the morgue by looking at photos of Christina's clothing and describing the two tattoos victim had on her body. (19,47) Witness also explained how she identified the jewelry the victim was wearing the day of the crime. (19, 48)

### CARLOTA GUTIERREZ

Witness testified that she found a girl's body on West Street on September 15, 1995 while looking for aluminum cans with several other family members. The witness stated they notified a police officer and showed him where the body was. (19,53-57)

### SERGEANT BRAD RUDOLPH

The witness testified that he was a Sergeant with Houston Police Department and

has been an officer for 17 years. Rudolph stated that he had worked in homicide division

for ten years. The witness' involvement in the investigation did not begin until September

21st and he was working with Sergeant Eric Mehl. Witness testified that a fired bullet

was found in the ground where the victim's head had been. His testimony included the

crime scene being on a public street and individuals were not precluded from going on the

scene since the body was initially discovered. (19, 61-74)

### OFFICER S.R. RAMIREZ

Officer Ramirez testified that he was Houston Police Officer and had been for 14 years.

He stated that he was working on September 18, 1995. The witness stated that on that day he

was working he was approached by three individuals who led him to the 1300 block of West

Street to the location of a dead female body, and then he contacted dispatch. (19, 80-84)

### OFFICER MARK CONNER

The witness testified that the Houston Police Department employed him as an

evidence technician or crime scene unit in the homicide division. The witness stated that

he was dispatched to 1300 West Street on September 18, 1995, where upon arrival he

expanded the crime scene area with more tape and he took video and still photography.

Witness testified there were three casings found near the victim's body and he submitted

them to the crime scene laboratory for examination by a firearms examiner. (19, 86-116)

**SERGEANT ERIC MEHL**

Witness testified that he is a Sergeant with the Houston Police Department and has been with the police department for almost 16 years, eight years with homicide. The witness stated that he was involved in the investigation of the found body in September 1995 in the 1300 block of West Street. The witness testified that he retrieved the tape that had been removed from the victim's body and submitted it into evidence at the Houston Police Department evidence room. Witness stated that the investigation was turned over to the Chicano squad and his involvement ended shortly after. (19, 125-134)

**RANGER JESSE MACK**

Witness is employed with the Department of Public Safety in the Texas Ranger division. He testified he has been with law enforcement with the DPS for 21 years, the last three being with the Ranger service. He became involved in the investigation in January of 1996. The witness testified that he spoke with chief of police Joe Garcia from Brookshire, Texas in January 1996 and made arrangements to meet regarding information he had received. The witness testified that he met with Garcia and that there was someone with him by the name of James DeLeon. (19, 148-157)

**THOMAS WOOD**

Witness was employed by the arson bureau division of the Houston Police Department and was currently assigned to the lab as a latent fingerprint examiner and has worked in the laboratory for 18 years. The witness testified that no usable prints were

37

found on the tape.  The witness stated there were some prints recovered on the paper products retrieved from the area of the burned vehicle, there was a bag found with a note written in Spanish inside.  (19, 159-169)

### OFFICER XAVIER AVILA

Witness testified that he has been assigned to the homicide division of the Houston Police Department for the past 15 years as a homicide investigator.  Avila stated that he and his partner did not go out the scene where the body was found.  They were assigned by Lieutenant Smith to assist Sergeant Mehl.  The witness testified that he spoke with some of the victim's family and went to visit the apartment where the victim had lived with Hector Alicia.(19, 171-173)  The witness stated they were contacted by the Kenner, Louisiana police department regarding information on the victim's death.  Detectives Guerrero and Benevitas went to Kenner and brought back a 9 millimeter Tec from the parties interviewed.  They were informed about a burned out car with a bag of evidence.  The witness stated that the registered owner of the burned out car was Derrick Paul and he was contacted and questioned in regards to Christina's death and then he was excluded as a suspect.  Derrick Paul provided the name Michael Paul as having possible involvement in the death of the victim.   Paul was located at the Jefferson County Jail in Beaumont, Texas.  Upon interviewing Paul, witness determined he was not involved in the death.  Witness stated he met with Ranger Mack to discuss information he had on the

case. After meeting with Ranger Mack, He testified meeting with James DeLeon on January 17, 1996 and took a statement. He also took a statement from Lionel Bonner and Sonny Baker. He had excluded Mr. Paul and Mr. Baker as suspects of Christina Castillo's killing. He received a letter addressed to Phil Guerrero with a list of names, the same names that were on the burned out car. (19, 171-183) Witness stated that he presented the case to the district attorney and filed charges in regard to Christina Castillo's death. Eric Dewayne Cathey was charged and James DeLeon, Anthony Riley, Sonny Baker, Lionel Bonner, and Patrick Brooks. (19, 184-196)

Upon cross-examination he states that in February 1996 he showed a witness a photo layout of 13 potential suspects, including: Eric Cathey, Anthony Riley, Sonny Baker, Michael Paul, Derrick Paul, Monteigo Jordan, and Sherman Baby Mattox. (20, 12-15)

### DR. TOMMY BROWN

Witness is assistant medical examiner who testified that after examination of the victim, it was his opinion that she came to her death as a result of three gunshot wounds of the head. (19, 197-209)

### LIONEL BONNER

Bonner was a material handler and a sandblaster for Valmont Industries in Brenham, Texas. He stated that he was married and had two children and lived in Bellville, Texas. Bonner stated his brother-in-law was Sonny Baker. (20, 25)   Bonner

stated that he had occasion to be in the presence of Patrick Brooks, Anthony Riley, James

DeLeon, Wayne Cathey, and Sonny Baker on Sauer Street in Houston, Texas. (20, 25-29)

Sonny Baker lived on Sauer Street. They had a conversation about robbing someone;

everyone listed was talking about it. Patrick Brooks was telling about the person who

would best to rob, as they lived by him. He said they were Spanish, a male and a female.

On prior occasions he had seen them pack bags to and from the house and from the car

back to the house. (20, 33) He believed there was money and drugs in the bags. Riley

came up with the plan to have James DeLeon knock on the door and pose as a

maintenance man and Sonny Baker and Wayne Cathey were to go in and get the drugs

and money, Bonner was to drive the car. They discussed the plan for an hour or so;

everyone was in agreement as to the plan. They left the location in a red car and blue van

to carry out the operation. Riley was driving the van with Patrick Brooks, Bonner, and

Baker inside. DeLeon with Cathey inside drove the car. In the car there was a handgun

and an automatic gun that looked like a Tec 9. Wayne had the handgun, it was a 9

millimeter. No one had weapons in the van. They stopped in an apartment project and

saw a woman across the street talking to someone inside a shopping center. (20, 41)

Brooks identified the girl and identified her boyfriend who was with her. The female got

into her car and drove off. She went to her residence and had a conversation with

someone. The group of men left and drove to a convenience store. Riley used the phone.

Riley then asked Bonner to get into the car. There were then three people in the van, and

40

three people in the car.  They all went back to the apartments.  Then they went to a

different apartment complex.

Wayne got out of the car and walked over to the girl.  She was standing at the door, on the

driver's side of the car, gathering her things.  (20, 53)  Wayne walked slightly past her,

turned right back around and grabbed her.  He put his hand around her neck, over her

right shoulder, he had a gun.  He told her to be quiet.  Another male individual walked

around the corner into the apartments.  Wayne yelled, "grab the gun", talking about the

Tec 9 lying on the floorboard.  Bonner then told DeLeon to grab the gun.  But he did not

grab the gun.  DeLeon told Bonner to grab the gun and get out.  Bonner took the gun and

got out.  He walked over to the man.  Wayne told Bonner to tell the man to lie down.  The

man did not lie down.  Bonner told the man to turn around, but he did not.  Bonner put his

hand on the man's left shoulder, turning him around, facing away from Wayne and the

girl.  Bonner backed away from the man and walked towards the car, the man walked

away.  The female was placed in the car.  Bonner then got into the car.  James retrieved

the girl's purse and keys off of the ground.  Wayne instructed Bonner to dial a number on

the cell phone.  Bonner thought Cathey was talking to Riley on the phone.  Cathey said,

"where the fuck were you-all" and "we got the girl".  (20, 62)  Bonner stated that no one

attempted to go by the plan that was previously discussed.  They went to the Third Ward

on Palmer Street.  They went into Cathey's mother's house.  Cathey was upset because

the other vehicle was not there when the girl was abducted.  Cathey tried to tape her arms

and hands before they arrived. (20, 70-71) Cathey said the girl had seen his face and mentioned that she had seen everybody. He said she would probably go to the police. After the van arrived Riley questioned the female. She was still in the back seat of the car. (20, 74-75) The questions involved money and drugs. She said she did not know about any money or drugs all she knew was some individuals in Southpark that had ounces. The female was then taken out of the back seat and placed in the passenger seat. Riley questioned her again and then Baker questioned her. She still denied knowledge about money and drugs. Riley hit her with his backhand. Baker hit her also. First he slapped her, and then hit her with his open fist. Baker then kicked her. When she was on the ground, Cathey kicked her. She was beaten for 10-15 minutes. The female kept repeating that she did not know anything. When she was in the car, she said she was pregnant, after she was hit for the first time. Cathey taped her feet and tried to tape her mouth and eyes. They discussed letting her go, Riley told them to take her back and cut her loose. (20, 81) The vehicles then left Palmer Street. A new vehicle, a white station wagon, was occupied by Brooks and Baker. Cathey and the girl were in the back seat. The other car was left at the other location. The van left later, driven by Riley, Bonner and DeLeon were also in the van. The van was following the car. The vehicles pulled up besides each other and Riley told Brooks to just drop the girl off and leave. Riley rolled up the window and started to drive off. The last thing Bonner saw was Baker on the South side on the passenger side towards the rear door and Cathey was on the outside of

42

the car on the passenger side of the rear door.  Cathey was reaching over, like scooping up under the girl. (20, 86)  Bonner heard gunshots, upon departure.  Cathey had the handgun.  The van went back to Baker's house.  Later the car arrived and the occupants went into the house.  Bonner stated that Cathey said he shot the female.  About a month later, Bonner had another conversation about the events with Cathey.  Bonner asked Cathey if he really shot the girl, and he said yes.  Sometime later, Cathey showed Bonner a picture of the girl, which he had taken from her purse. (20, 86-93)

In January 1996, Bonner was in Brookshire, Texas and was asked to come in by Chief Garcia and he was introduced to Detective Avila and his partner.  Bonner gave a written statement to the law enforcement authorities.  He told them he went around the house, to Sonny's house to get the duct tape.  But, he said this is not what happened, the duct tape had been in the car all along.  Patrick Brooks had told him about the man and told him that he would be driving an older model grayish color car, a Regal or a Cutlass.  Patrick Brooks said the girl did most of the moving of the drugs and if she was not there, there might not be anything there.  Stated it was Cathey's idea to get the girl there instead of following her to her apartment.  Connie D. Williams represented him.  He made an agreement to testify in this case in exchange for the State reducing his charge to aggravated kidnapping.   Before being indicted for aggravated kidnapping, he testified in front of the grand jury about what he knew in this case.  He has entered a plea on his charge of aggravated kidnapping.  On cross-examination, Bonner states that his nickname

43

is Eyes. Has a case pending in Austin County for crack cocaine that had been put on hold until the disposition of this case has been settled. (20, 94-110)

### MARK ALAN YOUNG

Witness testified that on October 20, 1995 he saw Eric Wayne Cathey at a Chevron gas station with two guys and woman. The witness states that Cathey was carrying a black 9 millimeter gun. His testimony states the gun came into his possession that night and he turned it into the police. (20, 187-192)

### OFFICER ROGELIO RUIZ

Testimony states he went to 1820 Brittmore on October 25, 1995 responding to a call and met Mr. Young who gave him a 9 millimeter Daewoo pistol. (20, 198-200)

### ROBERT BALDWIN

Witness is a Criminalist 3 for the Houston Police Department and is assigned to the firearms laboratory. He determined the three casings found were fired from the same gun and that the casings are consistent with the type of projectile you would find in a 9 millimeter cartridge. He excluded the Intratec 9 millimeter that was brought by Sergeant Guerrero. He testified his opinion was State's 38, the fired jacketed lead bullet, was fired in State's 63, a 9 millimeter Daewoo (20, 201-209)

### PAULINE BLACKSHEAR

Witness testified that she knew Eric Wayne Cathey from growing up in Brookshire, Texas. She spoke with Chief Garcia in February of 1996. (20, 226-228) Cathey told her he was wanted for a murder case involving a Spanish girl. She was under drugs at the time she wrote

down the information for Chief Garcia and does not remember what she wrote. She states it is her handwriting. The letter in her handwriting says "He said Sonny kicked this body but he shot on the ground and she didn't think that he was going to kill her but he said he done the job, I killed the Spanish lady, ". (20, 231-238)

### DAVID PERRO

Has known Cathey since elementary school. In 1996, Perro went to Houston after being in the Penitentiary and living in Louisiana, he went to visit his baby's mother. He went to see Eric Cathey where he lived on Palmer Street. But he was not there, so he went to Simmons where he saw Cathey, Sonny Baker, and Cathey's sister, Lisa. They went to Brookshire to visit Cathey's girlfriend. Someone had come in and told Cathey that Baker and had been picked up by Joe Garcia for some tickets, and Lionel had been picked up by homicide. Cathey said, "him, P.B., Lionel, and James was together when the bitch got shot." Upon leaving the apartment, he was arrested along with Cathey (20, 247-256)

## DEFENSE WITNESSES

### James DeLeon

Pleaded the Fifth Amendment.

## ARGUMENT AND AUTHORITIES

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of

the offense. Art. 38.14, Tex. Code Crim. Pro.

In reviewing the jury's finding, the Court should review all of the record evidence, whether properly or improperly admitted, in the light most favorable to the prosecution and then make its determination. The Due Process Clause of the Fourteenth Amendment to the United States Constitution "forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt."[32] In assessing the legal sufficiency of the evidence, under the Due Process Clause, to support the jury's implicit finding, the reviewing Court considers all of the record evidence in the light most favorable to that finding and determines whether any rational jury could have found the essential elements, beyond a reasonable doubt.[33] If the evidence is insufficient under the standard set out in Jackson v. Virginia, it is legally insufficient.

So what evidence did the jury hear, in addition to Lionel Bonner's testimony – the Accomplice Witness, to help show them beyond a reasonable doubt that petitioner was responsible for killing victim Christina Castillo? Prosecutor Dolan answered three pieces of evidence:

1. a statement from Mr. Perro about his conversation with petitioner;

2. a statement from Ms. Blackshear telling about her comment she heard from Cathey, and

3. the testimony about the gun used in the killing of Castillo. (21, 26-27)

---

[32] Tibbs v. Florida, 457 U.S. 31, 44 (1982).

[33] Jackson v. Virginia, 443 U.S. 307, 319 (1979).

46

Ms. Blackshear had a substantial crack habit when her statement was taken. She stated that sometime around 1996, petitioner mentioned he was wanted for a murder case involving a Spanish girl. (20, 231) No elaboration could be developed.

David Perro testified that him, P.B., Lionel and James was "together when the bitch got shot." (20, 254) And on October 20, 1995, Houston police patrol officer Rogelio Ruiz investigated and took possession of a Daewoo 9 mm from suspect Mark Young. (20, 173) Houston Police Department firearms examiner Robert Baldwin testified this gun matched that used to fire the bullet found at the location with the victim's body. (20, 182-183) Young stated he received the gun from petitioner. (20, 190-192)

What was not shown at trial? No eyewitness testimony place petitioner near the scene of the crime. No state's evidence linked petitioner to Bonner himself. No physical evidence, though not inconsistent, corroborates Bonner's testimony. Blackshear's statement about being wanted offers no evidence at all that petitioner committed a crime. This fact, coupled with her drug use, makes the testimony not relevant at all in an analysis of the evidence. Perro's statement has no value unless it is considered with Bonner's testimony but should be viewed as standing alone. The weapon link is of no value to the analysis of facts because the possession of the weapon was some six weeks subsequent to the offense. There was no testimony about the chain of custody of the weapon during this six-week period. The time is just too remote to link petitioner with the offense. Under

47

the <u>Jackson v. Virginia</u> standard of viewing the evidence in the light most favorable to the verdict, none of the state's evidence offered was sufficient to connect petitioner to the offense at hand.

5. **THE ADMISSIBLE EVIDENCE ADDUCED AT THE TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S FINDING THAT THERE WAS NO SUFFICIENT MITIGATING CIRCUMSTANCE OR CIRCUMSTANCES TO WARRANT THAT A SENTENCE OF LIFE IMPRISONMENT RATHER THAN A DEATH SENTENCE BE IMPOSED**

6. **THE MITIGATION SPECIAL ISSUE OMITS A BURDEN OF PROOF, MAKING UNAVAILABLE ANY APPELLATE REVIEW OF THE SUFFICIENCY OF EVIDENCE, WHICH VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT AND THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT**

## STATEMENT OF FACTS

Petitioner's jury received the statutory instruction found in Art. 37.071, Sec. 2(e), V.A.C.C.P. They were instructed to answer the special issues, which the State was bound to prove beyond a reasonable doubt and the "mitigation special issue", which carries no burden of proof or persuasion. The Texas mitigation scheme, with its ill-defined scope of permissible evidence, with no burden of proof and with no possibility of review, produces verdicts like Petitioner's, which have been improperly affirmed, when in fact the evidence which should have been presented by effective counsel, as discussed in other grounds herein, shows an immature juvenile who, given his overall record, the inevitable maturation that comes with age, and the controls which exist in our prison system, clearly deserved a life sentence which would recognize these points of evidence, rather than a sentence of death. The lack of a burden of proof on mitigation is a crucial factor in Petitioners sentence.

Petitioner presents as one issue the three points that are commonly presented and argued together in one direct appeal, in light of the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) The *Apprendi* opinion affects the general proposition that the Texas death penalty scheme, because of its lack of review of mitigation, in the context of its weighing framework, violates the Eighth and the Fourteenth Amendments.

The Texas scheme is inconsistent with the Eighth Amendment's twin objectives of measured and consistent application of the death penalty in general (and fairness to the accused in particular) and *Jurek v. Texas*, 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976), the very case in which the Supreme Court previously upheld the constitutionality of the Texas death penalty scheme, in part because, "By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational and consistent imposition of the death sentence under law.  Because this system serves to assure that death sentences will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution."

The Texas scheme is inconsistent with the Supreme Court's decision in *Apprendi v. New Jersey*, and the Fourteenth Amendment's due process guarantee, by preventing review of the jury's answer to the mitigation special issue, which includes their consideration of non-statutory aggravating factors, and which places no burden of proof.

As long as the Texas so-called mitigation scheme remains, as it is, with an ill-

defined scope of permissible evidence, with no burden of proof and with no possibility of review, death verdicts like Petitioner's will be improperly affirmed. If there were review of the mitigation issue, the evidence of Petitioner's juvenile nature, remorse he showed after the act, and controls in prison would permit a rational determination on review that the jury's verdict was against the great weight and preponderance of the evidence. The structure (or lack of structure) of the current scheme makes such review virtually impossible; Petitioner's case provides a vivid illustration of the fact that a properly designed scheme would permit review and reversal of his death sentence.

In reviewing the sufficiency or insufficiency of evidence a reviewing court ought to be able to assess the strength or probative force of evidence as against opposing or "rebutting" evidence. The Court of Criminal Appeals cannot do this assessment in the context of mitigating evidence versus victim evidence, unless it acknowledges that it is using the comparative value and worth of the victim as the measure of whether the defendant's mitigating evidence is or is not sufficient to reduce his moral blameworthiness and warrant a life sentence.

The defendant's burden of proof in Texas is not just to produce sufficient evidence to overcome the statutory answer to the future dangerousness question, but also to overcome the unanswerable aggravating evidence of victim character and impact evidence.

51

## ARGUMENT AND AUTHORITIES

In Texas, the reviewing court does not balance or weigh mitigating evidence against aggravating evidence within the special issues it does review for sufficiency, nor within the mitigation special issue itself, nor will it weigh all the defense evidence proffered as mitigating against the statutory aggravating factors proven in the other special issues.

It has become a fiction indeed to say that the mitigation special issue is intended to be or is functioning as a conduit for mitigating evidence to counter the already-answered aggravating special issue or issues. Instead, the so-called *mitigation issue has become the State's favored tool for introducing non-statutory aggravating factors it need not have proved in relation to the other issues, free from any statutory definitional constraints, free from any troublesome jury instructions like those found in "weighing states," telling the jurors what may be considered aggravating or mitigating, free from any burden of proof and free from any possibility of review for sufficiency.*

Other states, have provided meaningful appellate review as required in *Clemons v. Mississippi*,[34] by considering whether the mitigating evidence was outweighed by aggravating evidence: *State v. Breton*, 663 A.2d 1026, 1039 (Conn. 1995); *State v. Richardson*, 462 S.E.2d 492 (N.C. 1995); *Sheridan v. State*, 852 S.W.2d 772 (Ark. 1993); *State v. Hernandez*, 562 N.E.2d 219 (Ill. App. 2 Dist. 1990); *Lowery v. State*, 547 N.E.2d 1046 (Ind. 1989) and *Fisher v. State*, 736 P.2d 1003 (Okl.Cr. 1987). Thus, it is clear that

in Texas the reviewing court will not balance or weigh mitigating evidence against aggravating evidence within the special issues it does review for sufficiency, nor within the mitigation special issue itself, nor will it weigh all the defense evidence proffered as mitigating against the statutory aggravating factors proven in the other special issues.

The result of the code's failure to assign a burden of proof and a standard of proof regarding mitigation even after the Court of Criminal Appeals assigned a burden of production, with no possibility of review for the defense, is that the death penalty will be applied arbitrarily, inconsistently  and  without clear preventive measures properly to select the persons who receive the penalty of death.   The State escapes the burden it should have: that of proving the non-statutory aggravating circumstances comprised by "all of the evidence, including the circumstances of the offense" as the mitigation special issue requires, aggravating factors it had not necessarily proved up to that point.

The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase.  *See, e.g., Walton v. Arizona*, 497 U.S. 639, 650, 111 L.Ed.2d 511 (1990) (State's "method of allocating the burdens of proof" during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors").  In order to understand why *Walton* applies to the statutory mitigation special issue, rather than solely to the aggravating factors under the other special issues, this Court must recognize that this special issue is a conduit for aggravating factors (victim impact evidence, for example) as

---

[34]  494 U.S. 738, 749, 1105 S.Ct. 1441, 108 L.Ed.2d 725 (1990)

well as mitigating factors. By asking jurors to determine whether there are "sufficient ...
mitigating circumstances," Art. 37.071, Sec. 2(e), V.A.C.C.P., the statutory special issue
in effect tells jurors to consider any possible aggravating factors present in all the
evidence, including the circumstances of the case, that may outweigh the mitigating
factors. Although the statute does not explicitly use the term "aggravating circumstance,"
clearly that is how a reasonable juror would interpret the statute and that is how the State
argues the issue. *Cf., Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290
(1993) (describing jurors' determination of answer to "future dangerousness" special
issue to require balancing of aggravating and mitigating circumstances).

In *Walton v. Arizona, supra*, four members of the Supreme Court found
constitutionally permissible the Arizona scheme that placed upon capital defendants the
burden of establishing, by a preponderance of the evidence, the existence of mitigating
circumstances sufficiently substantial to call for leniency in spite of the fact that the State
had established (by what standard, the opinion did not say) the existence of one or more
often statutorily defined aggravating factors.

"So long as a State's method of allocating the burdens of proof does not lessen the
State's burden to prove the existence of aggravating circumstances, a defendant's
constitutional rights are not violated by placing on him the burden of proving mitigating
circumstances sufficiently substantial to call for leniency." *Walton v. Arizona, supra*, 497
U.S. 639, 650, 111 L.Ed.2d 511, 526 (1990)

The Texas statutory scheme does lessen the State's burden to prove the existence of aggravating factors that fall outside the scope of the special issues that preceded the mitigation special issue.   (Again, victim impact evidence is the most significant aggravating factor.)  If the defendant had to establish mitigating evidence sufficient to overcome or outweigh only the statutorily-defined aggravating circumstances, then the process would be similar to Arizona's - and the defendant could obtain review of the question just as the Arizona defendant did.  The syllabus of the *Walton* opinion states that the Arizona Supreme Court "in an independent review" concluded not only that the evidence was sufficient to prove the existence of both aggravating factors found by the trial court but also "agreed that there were no mitigating factors sufficient to call for leniency..." *Walton, supra,* Syllabus at 111 L.Ed.2d 511, 519 (1990); 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989).

Petitioner may obtain review of the sufficiency of the evidence to prove only the aggravating factors upon which the State is assigned the burden of proof.  He may not, however, obtain the Court's review of his proffered mitigation evidence to see if the Court agrees that it was not sufficient to call for a life sentence.  In Texas, the State submits in argument many aggravating factors that are not set out in the statute. Such as factors upon which it has no independent burden of proof at guilt or at punishment, including the unadjudicated extraneous offenses it used so effectively in Petitioner's case as anti-mitigation for the jury to weigh against the defense's mitigating evidence.

The mitigation special issue in Texas, by omitting a burden of proof entirely, opens up the range of aggravating factors to include whatever the prosecution wishes to argue from the evidence, yet places no burden of proof on the State with respect to those factors; it prevents a reviewing court from evaluating the sufficiency of evidence to prove those extra-statutory aggravating factors and it prevents a rational, meaningful review of the sufficiency of mitigating evidence, even if the sufficiency issue is more precisely a determination whether the jury's answer was against the great weight and preponderance of evidence.

Petitioner's argument finds additional support in the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed2d 435 (2000). The rule as announced in *Apprendi* was, "[o]ther than the fact of a prior conviction, any fact that increases the penalty beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The Justices of the Supreme Court themselves continue to dispute whether *Apprendi* can apply to capital sentencing. The dispute centers on *Walton v. Arizona, supra,* discussed above. The Justices agree that *Walton* poses a great precedential stumbling block to the coherence and legitimacy of *Apprendi*'s holding.[35] In his *Apprendi* majority opinion, Justice Stevens

---

[35] See *Apprendi*, 530 U.S. at 2387-2389 (O'Connor, dissenting) (discussing *Walton*); *id.* at 2366 (distinguishing *Walton*); *id.*, at 2380 (Thomas, J., concurring) (leaving *Walton* question open); see also *Jones v. United States*, 119 S.Ct. 1215, 1227-8 (1999) (distinguishing *Walton*); *id.* at 1238 (Kennedy, J., dissenting) (raising *Walton*); *Almendarez-Torres v. United States*, 523 U.S. 224, 257 n.2 (1998) (Scalia, J., dissenting) (distinguishing *Walton*).

takes pains to distinguish *Walton* because, as Justice O'Connor demonstrates in her dissent, that case seems to stand for *the precise opposite of the principle announced by the majority*, to wit, that "it is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which the defendant is exposed."[36]

Justice Stevens claims that *Walton* and other the capital cases do not control, because under the scheme at issue in *Walton* the determination of whether a case is capital is made solely on the basis of the jury's finding of the elements of the underlying crime in the guilt/innocence phase. Once that jury determination is made, death is within the "prescribed range of penalties for the offense" and a further determination by a judge of an additional fact that brings that potential death penalty to fruition is constitutionally permissible.[37]  Since every capital sentencing scheme in every jurisdiction in the nation can be similarly characterized, this language has the effect of excluding capital sentencing *tout court* from *Apprendi*'s procedural protections.   Indeed, since mandatory death sentencing schemes -- that is, schemes in which the determination of one or more specific facts automatically calls for the death penalty -- are unconstitutional under the Eighth Amendment,[38] from Justice Stevens' point of view, *Apprendi*'s irrelevance to capital jurisprudence is a constitutional given.

---

[36] *Apprendi*, 530 U.S. at 2363 (quoting *Jones*, 526 U.S. at 252-3).

[37] *Apprendi*, 530 U.S. at 2366.

*Sumner v. Shuman*, 483 U.S. 66 (1987); *Roberts v. Louisiana*, 431 U.S. 633 (1977).

However, four dissenting Justices in *Apprendi* believed the case effectively overruled *Walton*. *Apprendi*, 530 U.S. at 536-38 (O'Connor, J., dissenting). *Walton* touches upon two issues both revisited in *Apprendi*: (1) assignment of factfinding authority to a judge rather than jury (a non-issue in this context in Texas); and (2) the burden of proof issue (found in Part III of the *Walton* opinion). Four Justices dissented from Part III of *Walton* and Justice Scalia concurred only in the result of Part III, so the second issue did not actually command a majority in *Walton*.

Although an argument can be made that *Apprendi* overruled both aspects of *Walton*, the Arizona Supreme Court continues to consider *Walton* binding. *State v. Hoskins*, 14 P.3d 997, 1016 n.5 (Ariz. 2000) (on the judge/jury issue). So does the Ninth Circuit. *Hoffman v. Arave*, 236 F.3d 523 (9th Cir. 2001) (same). These and other similar cases speak to what would have been the natural perception of the availablity or possibility of reasonably formulating the *Apprendi* rule in 1996-97. TEX. CODE CRIM. PROC. art. 11.071, Sec. 5(d). *Walton* did not control on the burden of proof issue, because the decision did not command a majority.

In *Apprendi*, this Court reviewed a New Jersey state prosecution in which a judge had increased the maximum punishment for possession of a firearm pursuant to a New Jersey statute that allowed increased punishment if a defendant "acted with a purpose to intimidate an individual or group of individuals because of race." The Court framed the question as follows: "Whether the Due Process Clause of the Fourteenth Amendment

58

requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." *Apprendi*, 530 U.S. at 469.

Guidance for appellate review can be found in the positions taken before the trial court. For example, the ambiguity of drug abuse does not really matter if a defendant takes the position at trial that drug abuse is mitigating. The defendant then must live with that position on appeal. Guidance can come from common sense. For example, no one should doubt that duress is mitigating rather than aggravating. Facts that diminish mental capacity are obviously mitigating and there is no doubt as to where they should fit into appellate sufficiency review. Even if it were true that appellate review of the mitigation issue is difficult, or even impossible, that is not a good reason for failing to instruct the jury properly on the burden of proof. The jury and appellate court serve different functions, and the burden-of-proof prong of *Apprendi* enhances the jury's function. Application of *Apprendi*, otherwise, would make appellate review easier, because it would give the reviewing Court a measurement by assigning the State a burden of proof beyond a reasonable doubt.

Petitioner submits that if a listing of aggravating and mitigating factors, together with an assignment of a burden of proof and a requirement of special findings as to those factors, permits appellate review and the Texas scheme with its lack of specific factors and its omission of burdens of proof forecloses appellate review, then the Texas

59

procedure is unconstitutional on its face.

Article 44.251(a) of the Code of Criminal Procedure requires that the Court of Criminal Appeals shall reform a sentence of death to a sentence of life imprisonment if the Court finds there is insufficient evidence to support "a negative answer to an issue submitted to a jury under Section 2(e), Article 37.071" of the Code. Petitioner can hardly argue that the Legislature ever intended to enlarge upon the opportunities for a capital appellant to gain review of any issue that would result in a life sentence where a death sentence had been pronounced. He does argue that the Legislature realistically anticipated that some reviewing court might one day decide that the Constitution required some kind of sufficiency review of the mitigation special issue.

The scheme as it is now interpreted and implemented allows the State to offer and use extra-statutory aggravating factors without the traditional controls of a burden of proof or production and without any means of evaluation by review. The result is that rather than an opportunity for the defendant to gain a reprieve from death through an issue that does not involve consideration of aggravating factors the mitigation special issue is open for the introduction and argument of extra-statutory aggravating factors.

Petitioner submits that the Court should recognize that the Texas death penalty scheme violates both the Eighth Amendment and the Fourteenth Amendment, because by omitting a burden of proof it prevents any meaningful review of the mitigation answer if it is negative.

## 6. PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE TRIAL JUDGE IMPROPERLY ADMONISHED A DEFENSE WITNESS ABOUT THE PRIVILEGE AGAINST SELF INCRIMINATION

### STATEMENT OF FACTS

The defense called James Deleon as a witness. Deleon was implicated in the offense at bar by Bonner and was under indictment for aggravated kidnapping. His case was still pending in the trial court. The Trial Court Judge indicated to defense counsel that Deleon was represented by Attorney Steve Morris who was not present at the time. An associate of Morris, Attorney Jim Leitner, was asked by the Court to come talk to Deleon. Deleon stated he desired to talk to Morris and Leitner informed the Court of this decision.

The Court next swore Deleon in and inquired as to whether he was currently charged with the offense of aggravated kidnapping, to which Deleon answered in the affirmative.   The Court asked if after talking to Morris, he intended to testify and Deleon answered in the affirmative. Deleon then took a moment and talked to Leitner again. The court then advised Deleon that his testimony in petitioner's trial could be used against him in his trial. The Court stated that, "I will be honest, when I came our here I was under the impression that you were not going to testify, that you were going to claim the fifth Amendment privilege." Deleon replied, "Well, you hone, I was, but you know, there's something that I have to get off my chest." The court then told Deleon about

61

counseling with his attorney and the fact that if his attorney was there, he could not assist

him during testimony.  Deleon was told that if he agreed to testify, no privilege existed

anymore and anything he said would require an answer.  Deleon then told the court he

would testify and Leitner spoke with him again.   After Recess, Deleon was called to the

stand and remained silent.  (21, 8-11)

## ARGUMENT AND AUTHORITIES

The due process clause gave petitioner the right to present evidence in his own

behalf.  A trial court can not improperly infringe on an accused's right to call witnesses in

his own behalf.  See Webb v. Texas, 409 U.S. 95 (1972).  The Webb record reflected the

fact that the trial judge made no such admonitions or warnings to other state witnesses.

The Supreme Court emphasized the great disparity between the posture of the judge and

that of a witness and held the unnecessary strong terms used by the judge could have

exerted duress on the mind of the witness as to preclude him from making a free and

voluntary choice whether or not to testify.  See 409 U.S. at 98.  An abuse of trial court

discretion occurs when the court actively encourages a witness not to testify or badgers a

witness into remaining silent.  United States v. Arthur, 949 F.2d 211, 216 (6th Cir. 1991).

It was found the trial court had induced the witness to exercise his privilege and that a due

process violation occurred.

Deleon was subject to judicial intimidation is petitioner's case.  He most certainly

desired to testify when he related to the judge he needed to get something off his chest.

62

He even appeared eager to testify at this point.  Not until the Judge verbalized his dismay that Deleon was going to testify and continued the warnings did Deleon change his mind. None of the state witnesses received this type of treatment before they testified.   Deleon had already consulted his counsel before professing a desire to testify and the further judicial admonitions were unduly coercive.  The trial judge went beyond the duty to inform Deleon of the privilege against self-incrimination.  Even after Deleon consulted with counsel, the judge continued to instruct Deleon about the negative consequences of putting forth his testimony.

Deleon's testimony in his own trial less than a month later presented a completely different set of facts as Bonner's testimony did in petitioner's trial.  Without Deleon's testimony, Bonner's testimony was unchallenged and the only version heard by the jury. Defense counsel was denied the opportunity to argue the case in a more beneficial light than Bonner's version that convicted petitioner.

## IV. <u>CONCLUSION AND PRAYER</u>

WHEREFORE, Petitioner prays this Honorable Court:

A.      Stay his imminent execution pending final disposition of this petition;

B.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and relieved of his unconstitutional sentence of death;

C.      Conduct a hearing at which evidence and argument may be offered concerning the allegations of this petition;

D.      Permit him, because of his indigence, to proceed without payment of the costs and fees;

E.      Appoint him, because of his indigence, undersigned counsel to represent him throughout these proceedings, and grant him sufficient funds to secure such testimony as may be necessary to prove the facts as alleged in his petition;

F.      Grant him the authority to obtain subpoenas in forma pauperis for witnesses and discovery of documents and other information necessary to prove the facts as alleged in this petition;

G.      Grant him an evidentiary hearing at which he may be allowed to present evidence on these claims, and allow him a reasonable period of time subsequent to any hearing this Court conducts, in which to brief the issues of fact and law raised by this petition or manifest in such hearing;

H.    Enter findings, ordering that his conviction and sentence be vacated and that his

case be remanded for a new trial; and

I.    Grant such other relief as law and justice require.


Respectfully submitted,

ERIC DEWAYNE CATHEY
Petitioner

By: _K. S. Dunn_____

**K.S. "GATOR" DUNN**
**LEAD COUNSEL**
**594 SAWDUST RD., SUITE 332**
**THE WOODLANDS, TX 77380**
**Telephone: (281) 362-7156**
**Fax: (281) 292-5434**
**State Bar No. 00789266**

**ATTORNEY FOR PETITIONER**

# VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 2, 2004.


ERIC DEWAYNE CATHEY
Petitioner

By: _K L Dunn_

# **<u>EXHIBIT 1</u>**

THE STATE OF TEXAS         D.A. LOG NUMBER: **247003**
VS.          CJIS TRACKING NO.: **9002279140-A001**
**ERIC DEWAYNE CATHEY**    SPN: __01224361-990__    BY: JH    DA NO: 334
3517 PALMER         DOB: BM/7-29-71     AGENCY: HPD
HOUSTON, TX.        DATE PREPARED: 1/19/96    O/R NO: GC107569295
                                        ARREST DATE: 1-18-96
NCIC CODE: 0907 10     RELATED CASES: SONNY R. BAKER
                                    JAMES DELEON
                                    LIONEL D. BONNER
                                    ANTHONY W. RILEY
                                    PATRICK W. BROOKS

FELONY CHARGE:
   CAPITAL MURDER
CAUSE NO: __0713189__                                BAIL: $ NO BOND
HARRIS COUNTY                          PRIOR CAUSE NO:
DISTRICT COURT NO: _____ 176

## IN THE NAME AND BY AUTHORITY OF THE STATE OF TEXAS:

Before me, the undersigned Assistant District Attorney of Harris County, Texas, this day appeared the undersigned affiant, who under oath says that he has good reason to believe and does believe that in Harris County, Texas, **ERIC DEWAYNE CATHEY** , hereafter styled the Defendant, on or about **SEPTEMBER 12, 1995**, did then and there unlawfully while in the course of committing and attempting to commit the kidnapping of CHRISTINA O. CASTILLO intentionally cause the death of CHRISTINA O. CASTILLO by shooting CHRISTINA O. CASTILLO with a deadly weapon, namely, a firearm.

## AGAINST THE PEACE AND DIGNITY OF THE STATE.

Sworn to and subscribed before me on _January 19, 1996_

_____                      _____
AFFIANT                              ASSISTANT DISTRICT ATTORNEY
                                   OF HARRIS COUNTY, TEXAS.

## COMPLAINT

000005

# EXHIBIT 2

NO. _713189_          ~~2003 P 1774~~

THE STATE OF TEXAS                    IN THE _176th_ DISTRICT
VS.
_Eric Dewayne Cathey_                 COURT OF HARRIS COUNTY, TEXAS

_____                      Change of Venue From: _NA_

### JUDGMENT - DEATH PENALTY

Judge Presiding: _Brian Rains_        Date of Judgment: _3-14-1997_

Attorney        _Lyn McClellan_       Attorney        _Kurt Wentz_
for State:      _Kate Dolan_          for Defendant:  _Terry Gaiser_

Offense
Convicted of:   _Capital Murder_

---

Degree: CAPITAL   Punishment Assessed: DEATH   Date Offense Committed: _September 12, 1995_
Charging Instrument: Indictment                Plea: Not Guilty

---

Affirmative Findings: (Circle appropriate selection - N/A not available or not applicable)
DEADLY WEAPON: (Yes) No N/A   FAMILY VIOLENCE: Yes No (N/A)   HATE CRIME: Yes No (N/A)

---

    The Defendant having been indicted in the above entitled and numbered cause for the
felony offense indicated above and this cause being this day called for trial, the State
appeared by her District Attorney as named above and the Defendant named above appeared in
person with Counsel as named above, and both parties announced ready for trial.

    A Jury of _Arnold J. Normand Jr._ and eleven others was selected,
impanelled, and sworn. The indictment was read to the Jury, and the Defendant entered a plea
of not guilty thereto, after having heard the evidence submitted; and having been charged by
the Court as to their duty to determine the guilt or innocence of the Defendant and having
heard argument of counsels, the Jury retired in charge of the proper officer and returned
into open Court on _March 12_ , 19_97_ , the following verdict, which was
received by the Court and is here entered of record upon the minutes:

        "We, the Jury, find the defendant, Eric Dewayne Cathey, guilty of

    capital murder, as charged in the indictment."
                                            ARNOLD J. NORMAND, JR.
                                            FOREMAN OF THE JURY
    Thereupon, the Jury, in accordance with law, heard further evidence in consideration
of punishment, and having been again charged by the Court, the jury retired in charge of the
proper officer in consideration of punishment and returned into open Court on the _14th_
day of _March_ , 19_97_ , the following verdict, which was received by the
Court and is here entered of record upon the minutes:
(Special Issues/Verdict/Certification):

                        SPECIAL ISSUE #1

        Do you find from the evidence beyond a reasonable doubt that there is a
    probability that the defendant, Eric Dewayne Cathey, would commit criminal acts
    of violence that would constitute a continuing threat to society?

                            ANSWER

        We, the Jury, unanimously find and determine beyond a reasonable doubt that
    the answer to this Special Issue is "YES".
                            ARNOLD J. NORMAND JR.
                            FOREMAN OF THE JURY

CRM-95  R06-30-94                   4

SPECIAL ISSUE #2

Do you find from the evidence beyond a reasonable doubt that Eric Dewayne Cathey, the defendant himself, actually caused the death of Christina O. Castillo, on the occasion in question, or if he did not actually cause the death of Christina O. Castillo, that he intended to kill Christina O. Castillo, or that he anticipated that a human life would be taken?

ANSWER

We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "YES".

ARNOLD J. NORMAND JR.
FOREMAN OF THE JURY

SPECIAL ISSUE #3

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Eric Dewayne Cathey, that there is a sufficient mitigating circumstances of circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

ANSWER

We, the jury, unanimously find the answer to this Special Issue is "NO".

ARNOLD J. NORMAND JR.
FOREMAN OF THE JURY

VERDICT

We, the jury, return in open court the above answers to the "SPECIAL ISSUES" submitted to us, and the same is our verdict in this case.

ARNOLD J. NORMAND JR.
FOREMAN OF THE JURY

It is therefore considered, ordered, and adjudged by the Court that the Defendant is guilty of the offense indicated above, a felony, as found by the verdict of the jury, and that the said Defendant committed the said offense on the date indicated above, and that he be punished as has been determined by the Jury, by death, and that Defendant be remanded to jail to await further orders of this court.

And thereupon, the said Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him, and he answered nothing in bar thereof.

Whereupon the Court proceeded, in presence of said Defendant to pronounce sentence against him as follows, to wit, "It is the order of the Court that the Defendant named above, who has been adjudged to be guilty of the offense indicated above and whose punishment has been assessed by the verdict of the jury and the judgment of the Court at Death, shall be delivered by the Sheriff of Harris County, Texas immediately to the Director of the Institutional Division, Texas Department of Criminal Justice or any other person legally authorized to receive such convicts, and said Defendant shall be confined in said Institutional Division in accordance with the provisions of the law governing the Texas Department of Criminal Justice, Institutional Division until a date of execution of the said Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from the Court of Criminal Appeals of the State of Texas.

The said Defendant is remanded to jail until said Sheriff can obey the directions of this sentence. From which sentence an appeal is taken as a matter of law to the Court of Criminal Appeals of the State of Texas.

Signed and entered on this the 14th day of MARCH , 19 97 .

B. Rains

JUDGE 176th DISTRICT COURT
Harris County, Texas

RECORDER'S MEMORANDUM.
This instrument is of poor quality and not satisfactory for photographic recordation; and/or alterations were present at the time of filming

MAR 20 1997   Notice of Appeal
CRM-95 06-30-94   Filed in 3rd Extending
per Judge Rains.

00040'7

# **EXHIBIT 3**

NO. 713,189

| THE STATE OF TEXAS | IN THE DISTRICT COURT |
| --- | --- |
| VS. | OF HARRIS COUNTY, TEXAS |
| DALTON COLLINS | 176TH JUDICIAL DISTRICT |

### DEFENDANT'S MOTION TO REQUIRE THE STATE TO
### REVEAL ANY AGREEMENTS OR OFFERS WITH A WITNESS
### THAT COULD INFLUENCE HIS TESTIMONY

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOWERIC CATHEY, Defendant, by and through his attorney of record, KURT B. WENTZ, and files this Defendant's Motion to Require the State to Reveal Any Agreements or Offers With A Witness That Could Influence His Testimony and in support thereof would show this Court as follows:

I.

The Defendant is charged with capital murder.

RECORDER'S MEMORANDUM:
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming

II.

The Defendant requests that the Court order the State to advise the Defendant of any agreements or offers that exists between the State and any witness at this time or at any time hereafter immediately as soon as such agreement or offer is tender to any witness and the total substance of that agreement or that offer with the witness in question.

III.

This request is to insure that the Defendant's right to due process and due course of law as well as his right to confront the witnesses against him and his right to effective assistance of counsel as provided by the United States Constitution and the Texas Constitution are preserved.

IV.

000086

1

"Agreement" as used herein includes, but is not limited to, any understanding between the State and the witness as to the witnesses testimony in this case other than that the witness will uphold their oath.   This is to include any benefit that is inure to the witness for his or her testimony and includes, but is not limited to, providing for travel, lodging, counselling, or the reduction or reconsideration of any criminal case or charges that might be pending against the witness.

WHEREFORE, PREMISES CONSIDERED, the Defendant requests that the Court grant this motion in all things.

Respectfully submitted,

KURT B. WENTZ
Attorney for Defendant
5629 FM 1960 West
Suite 115
Houston, Texas 77069
(713) 587-0088
TBA: 21179300

1998 DEC 30  PM 0: 24
BY
DEPUTY

## CERTIFICATE OF SERVICE

I, Kurt B. Wentz, hereby certify that a true and correct copy of the foregoing Motion was personally served upon the Assistant District Attorney currently handling this matter for Harris County, Texas, on the _Dec. 30_ day of , 1996.

Kurt B. Wentz

NO. 713,189

| THE STATE OF TEXAS | IN THE DISTRICT COURT |
| --- | --- |
| VS. | OF HARRIS COUNTY, TEXAS |
| DALTON COLLINS | 176TH JUDICIAL DISTRICT |

## ORDER

It is ORDERED that this motion is GRANTED/DENIED.
SIGNED this 31st day of December, 1996.

JUDGE PRESIDING

000089                    4

# **EXHIBIT 4**

1           APPELLATE CASE NO. 72,772

2        IN THE CRIMINAL COURT OF APPEALS

3           OF THE STATE OF TEXAS

4

5    _____

6  ERIC DEWAYNE CATHEY,

7                  APPELLANT,

8  VS.

9  THE STATE OF TEXAS,

10                 APPELLEE.

11    _____

12       FROM THE 176TH DISTRICT COURT

13         HARRIS COUNTY, TEXAS

14      Judge Brian Rains, Presiding

15    _____

16    SUPPLEMENT TO STATEMENT OF FACTS

17         PRE-TRIAL MOTIONS

18      VOLUME    OF    VOLUMES

19

20

             Cause No. 713189
21        December 31, 1996

22          Judith Fox
       Official Court Reporter
23      176th District Court
      Harris County, Texas

24

25

**FILED**
CHARLES BACARISSE
District Clerk

JUN 1 1 1998

Harris County, Texas

COPY

Time: _____

By _____ Deputy

RECORDER'S MEMORANDUM. This instrument is of poor quality and not satisfactory for photographic recordation, and/or alterations were present at the time of filming.

1

1          THE COURT:  All right.  I will grant the

2     motion.

3          Defendant's motion to require the State to

4     reveal any agreements or offers with a witness that

5     could influence his testimony, has there been any

6     agreements made with any witnesses on behalf of the

7     State?

8          MS. DOLAN:  Yes, sir.  The State has made an

9     agreement with one of the codefendants, Mr. Lionel

10    Bonner.  Counsel for the defendant has been made aware

11    of that.  We don't have a specific agreement in regard

12    to Mr. Bonner's sentence, or the disposition of his

13    case.  That has not been decided.  He has, however,

14    cooperated with the State and has met with us during

15    the pendency of the case.

16         THE COURT:  All right.  Your motion is

17    granted.  Should there be any further develpments in

18    that matter, if you will make them known to the

19    attorney representing Mr. Cathey.

20         Will that suffice, Mr. Wentz?

21         MR. WENTZ:  At this time, your Honor.

22         THE COURT:  Defendant's motion to disclose

23    the existence of any testing, questions, surveillance

24    or observations of defendant by State agents or

25    representatives.  What exactly are you talking about?

# **EXHIBIT 5**

Criminal Evidence. If it is deemed relevant, its probative value is substantially outweighed by its by the danger of unfair prejudice in its admission before the jury.

[ ✓ ] GRANTED

[    ] DENIED

7.) That the lawyers for the defendant can, "Ask your client what happened." That, "He was there." Such comments are an indirect comment on the defendant's failure to testify and violate the Texas and United States Constitutions.

[ ✓ ] GRANTED

[    ] DENIED

8.) That this court at some future date will sentence the accomplice witness Lionel Bonner, and the court will be evaluating the probative value of such testimony and its credibility in making a sentencing determination. Such comments allow the State to indicate that the court can somehow control the outcome of the defendant's case if it does not believe Bonner's testimony, and allows the State to indirectly indicate the court believes the testimony.

[    ] GRANTED

[ ✓ ] DENIED

9.) Any photos or videotapes of the body of the deceased showing the deceased's body in a maggot covered condition. The maggot infested condition of the body is not relevant

## Page 17

1   MR. MCCLELLAN:  And turned it over to the
2 police.
3   THE COURT:  That much of it would be
4 admissible.
5   MR. MCCLELLAN:  But not at the course of
6 conduct that was going on at the time that he saw --
7   THE COURT:  Not that there was a robbery
8 going on.  I'm granting the motion in regards to the
9 act of a robbery.  I guess in effect I'm denying it in
10 regards to the possession of the weapon, which still
11 technically is a violation of the law, but --
12   All right.  No. 7.
13   MR. MCCLELLAN:  Judge, that refers to a
14 witness on the witness stand making a comment that the
15 lawyers for the defendant if they want to know the
16 answer to a question can ask their client the answer or
17 because he was there.
18   THE COURT:  I'm lost.  I don't see it.
19   MR. GAISER:  Well, I've been in a situation
20 where a police officer has been on the witness stand
21 and you ask him a question concerning something that
22 occurred during the offense and he will say, "I don't
23 know, ask your client.  He was there."
24   THE COURT:  Maybe on television.
25   MR. GAISER:  That's happened to me.

## Page 18

1   THE COURT:  Well, I will grant the motion.
2   MS. DOLAN:  So, you are ordering me to --
3   THE COURT:  Instruct your witnesses not to
4 say in response to a, a witness in response to questions
5 asked by the Defense to make a statement such as "ask
6 your client."
7   MS. DOLAN:  Yes.
8   THE COURT:  No. 8.
9   MR. MCCLELLAN:  We would ask that be denied.
10   MR. GAISER:  Judge, we have no objection to
11 the State informing the jury that the testimony -- the
12 Court is at some future date is going to be sentencing
13 Mr. Bonner.
14   THE COURT:  What was the proffer for me, the
15 questions you intend to ask Mr. Bonner in that regard?
16   MR. MCCLELLAN:  I would just ask Mr. Bonner
17 what has happened with his case, that he's pled guilty
18 to aggravated kidnapping, and what's the status of
19 that, it is set for a pre-sentence investigation, what
20 does pre-sentence investigation mean, and who's going
21 to assess his punishment as a result of that.  And has
22 the State made any offer as to how little or most or
23 whatever the punishment he's going to receive, and who
24 is the sole determiner about what he's going to
25 receive, and that's going to be the Court after hearing

## Page 19

1 all the evidence Mr. Bonner may have to present on his
2 as well as the Court's having seen the defendant, judge
3 his character, involvement.
4   THE COURT:  Your response, Mr. Gaiser?
5   MR. GAISER:  As long -- I don't have an
6 objection to that testimony, Judge, as long as they
7 don't indicate that the Court's sentencing is somehow
8 going to be based on the Court's determination of his
9 credibility.
10   THE COURT:  All right.  Your motion is
11 denied.
12   No. 9 is denied.  Take up the pictures at the
13 time that they're offered.
14   MS. DOLAN:  We brought them and I have -- if
15 you want to look at them now, I have them, the ones we
16 anticipate offering.  We only have a few pictures of
17 her body.
18   And we do intend to offer the scene video,
19 which is also available for viewing.  At the time of
20 the playing of the scene video, when we get to the
21 closeup of the body, we do not anticipate publishing
22 that at the time to the jury.
23   THE COURT:  How do you intend --
24   MR. MCCLELLAN:  Stop it and turn it off.
25   THE COURT:  Before the tape itself is going

## Page 20

1 to be admitted into evidence, how are you going to
2 delete it?
3   MS. DOLAN:  We're not deleting.  We're not
4 going to publish in the courtroom.  We're not going to
5 show it to them in the courtroom.
6   MR. GAISER:  They're going to give them the
7 option of seeing it back in the jury room.
8   MS. DOLAN:  If they choose to.
9   THE COURT:  If we need to take that --
10   What other motions need to be heard?
11   MR. WENTZ:  There was an original motion in
12 limine that has been on file since the 21st, and
13 there's also a motion relating to the determination as
14 to the admissibility and the nature of coconspirator
15 statements, and would request for a limiting
16 instruction thereon.
17   THE COURT:  All right.  Let's take up the
18 motion in limine.  You-all have that in front of you,
19 Mr. McClellan?
20   MR. MCCLELLAN:  Yes, your Honor.
21   We would ask that No. 1 be denied.  Not only
22 that we intend to ask the question is he a gang member,
23 but if evidence is elicited from a witness that
24 multiple people in this party had the same type tattoo
25 or were all in a group together on other occasions or

# EXHIBIT 6

STATE OF TEXAS       §
                             §
COUNTY OF HARRIS    §

## AFFIDAVIT

Before me, the undersigned authority, on this date personally appeared CONNIE B. WILLIAMS, who, having been dully sworn by me, stated upon his/her oath that the foregoing facts are true:

"My name is CONNIE B. WILLIAMS and I am qualified to make this affidavit."

"I am making this affidavit of my own free will. I have not been induced or threatened or promised anything in return for making this affidavit, nor have I received anything in return for making this affidavit. I solemnly swear and affirm that all of the facts set forth herein are true and correct."

"I was retained to represent LIONEL D. BONNER in cause number 713190 in the 176th District Court of Harris County, Texas. Mr. BONNER was charged with aggravated kidnapping. There were three other co-defendants charged in the case. Early on, Lynn McLellan, the assistant district attorney handling the case, approached me about a cooperation agreement between the D.A.'s office and my client. Mr. McLellan told me that the D.A.'s office needed my client's testimony and could definitely use him against the other three co-defendant's who, everyone agreed, were more culpable in this crime than Mr. BONNER. I persuaded my client to cooperate with D.A. McLellan. To this end, Mr. BONNER was debriefed many times by D.A. McLellan, without my presence but with my knowledge and agreement. In exchange for Mr. BONNER'S cooperation, D.A. McLellan agreed not to make a recommendation to the court and agreed not to oppose any sentence we suggested. Since, under *Brady* and *Giglio*, any agreement between my client and the D.A.'s office would have to be made known to the respective defendant's in the other cases, my agreement with Mr. McLellan was a tacit one. I have 25 years experience in the criminal courts and I have known Mr. McLellan for many years. Therefore, I saw no reason to put our agreement in writing. I informed Mr. McLellan that we would be asking for deferred adjudication. I also discussed a ten year cap. Mr. McLellan expressed his doubts about the ability to get deferred on this case but informed me that he believed Mr. BONNER would receive a sentence at the lower end of the spectrum, possible in the eight to ten year range. Although Mr. McLellan made no written agreement with my client, I believe, based upon my prior dealings with Mr. McLellan, that we had a meeting of the minds and an understanding that my client would, at the very least, receive less time than the individuals he testified against.

Over the course of several month I periodically consulted with Mr. McLellan regarding the status of Mr. BONNER'S cooperation. At all times Mr. McLellan assured

1

me that everything was fine and Mr. BONNER was cooperating satisfactorily.  When it came time for sentencing, I was shocked when the judge sentenced Mr. BONNER to thirty [30] years.  The other co-defendant's, which my client testified against, received sentences of life, 27, and 25 years respectively.

As for my client's understanding of the plea, I don't believe, in retrospect, that he understood that by entering a plea without an agreed recommendation he was subjecting himself to the full range of punishment.  I may have misled Mr. BONNER because I repeatedly told Mr. BONNER that things were going to be fine and that he should continue to cooperate with the state.  I also told him of what D.A. McLellan said about a possible deferred adjudication and the low sentencing range.  Quite possibly, Mr. BONNER may have taken what I said to mean that there was an agreement with the D.A.'s office to limit the judge's sentencing discretion, when in fact there wasn't. "


AFFIANT


SUBSCRIBED AND SWORN to, before me, the undersigned authority, this
30 day of _June_ , 1997.

MARITZA FANINI GUZMAN
MY COMMISSION EXPIRES
APRIL 4, 2001

Notary Public, State of Texas

My commission
expires:____4-001____.

2

STATE OF TEXAS          §
                        §
COUNTY OF HARRIS        §

## AFFIDAVIT

Before me, the undersigned authority, on this date personally appeared LONNIE NUNN, who, having been duly sworn by me, stated upon his/her oath that the foregoing facts are true:

"My name is LONNIE NUNN and I am qualified to make this affidavit."

"I am making this affidavit of my own free will. I have not been induced or threatened or promised anything in return for making this affidavit, nor have I received anything in return for making this affidavit. I solemnly swear and affirm that all of the facts set forth herein are true and correct."

"I am the father of LIONEL D. BONNER who was charged in cause number 713190 in the 176th District Court of Harris County, Texas. My son was charged with aggravated kidnapping. There were three other co-defendants charged in the case. After my son was charged, I hired CONNIE WILLIAMS as my son's attorney. After I hired CONNIE WILLIAMS, Mr. Williams called me on the phone and told me that the District Attorney wanted to talk with us about making a deal in exchange for my son's testimony against the other three co-defendant's. Mr. Williams said he had discussed a ten year probation with the district attorney. I asked Connie if they were going to give us something in black and white and Connie said, "Yes, I'm going to get us a one hundred percent guarantee. The worst he could get is ten years probation because they are going to give us a ten year cap on his sentence." Later, before my son pleaded guilty, I told Connie that we needed to see something in writing. Connie said, "Okay, I'll get something worked out with them so that we'll know where we stand." At one point before the plea, I called Connie and he told me that he, "needed the rest of his money because he got the charges reduced from capital murder down to aggravated kidnapping and he got him a ten year probation on the aggravated kidnapping." Connie also said the "deal" was wrapped up. I assumed that Connie had gotten a guarantee so I then advised my son to sign for the PSI. After entering his plea, my son testified in the trials of the other three co-defendants. I still assumed that Connie had something in writing from the district attorney handling the case. After my son testified against co-defendant ERIC DEWAYNE CATHY, I again asked Connie if he had something in writing to guarantee my son's probation. Connie said he did not have anything in writing because they couldn't give it to me without turning it over to the other lawyers. I said, well we still need something in writing. Connie said he would talk to the district attorney and the judge so they could give us a guarantee. Then Connie said, "you have nothing to worry about because they aren't going to screw you around like that." Connie did not get back to me concerning the guarantee.

1

After my son testified against the last two co-defendants, it came time for my son's sentencing. I was not able to be there for the sentencing because I was working out of town driving a truck. When I heard my son received thirty years I thought it was going to kill me. Someone had to come and pick up my truck because I could not continue. I met with Connie the very next Saturday and he told me I should file for a Motion for New Trial. When I asked what went wrong and what happened to the guarantee and the probation, Connie told me that he did not know what happened. He also said, "I told them I thought we had a ten year cap but the judge asked the district attorney if they had given me something in writing and the district attorney said, 'no'."

If I had known there was no guarantee I would not have let my son enter the plea. Why would my son testify against the other co-defendant's if he was going to get more time than they did ?                                                                                              "

_Lonnie Nunn_
AFFIANT

SUBSCRIBED AND SWORN to, before me, the undersigned authority, this _1_ day of _July_, 1997.

[Notary seal: Linda S. Chapa, Notary Public, STATE OF TEXAS, My Commission Expires March 23, 2000]

_Linda Chapa_
Notary Public, State of Texas

My commission
expires: _3/23/2000_

STATE OF TEXAS       §
                             §
COUNTY OF HARRIS     §

## AFFIDAVIT

Before me, the undersigned authority, on this date personally appeared LIONEL BONNER, who, having been duly sworn by me, stated upon his/her oath that the foregoing facts are true:

"My name is LIONEL BONNER and I am qualified to make this affidavit."

"I am making this affidavit of my own free will. I have not been induced or threatened or promised anything in return for making this affidavit, nor have I received anything in return for making this affidavit. I solemnly swear and affirm that all of the facts set forth herein are true and correct."

"I am the same LIONEL D. BONNER who was charged in cause number 713190 in the 176th District Court of Harris County, Texas. I was charged with aggravated kidnapping. There were three other co-defendants charged in the case. My father hired CONNIE WILLIAMS as my attorney. There was a discussion between myself and CONNIE WILLIAMS about a plea bargain. Connie said he spoke to the district attorney and he wanted to make a deal in exchange for my testimony against the other three co-defendants. I agreed that this would be the best way to go. Approximately one month before the plea I was in court and the case was reset because my attorney wasn't there. KATE DOLAN, another DA, came over to the bench and told me to follow her. I was out on bond at the time. We went back to the jury room and they asked If I would be willing to cooperate. I said I would. I asked them what kind of deal where they offering for my testimony. LYNN MCLELLAN said I could probably receive probation but that I would definitely have a ten year cap on any sentence, whether probation or pen time. He told me the most I would receive would be ten years. I agreed to the deal and told them about the offense. They said they would get with my attorney so as to be more specific about the deal.

Before the plea, CONNIE WILLIAMS sent over another attorney to represent me. Mr Williams was not present. At first I refused to sign the plea bargain agreement because it was a guilty plea with no deal written on it. When I refused to sign, DA McLellan came out into the hallway and got me. He said I had to go with him. My mother went with us to the jury room. DA McLellan said if I didn't sign the plea papers, the DA's office would re-charge me with capital murder and that I could easily get a life sentence. When the DA asked me how much time I thought I would get, I told him I expected to get probation if I testified for the state. DA McLellan said he wasn't sure I could get probation but that I should sign the plea papers because he had already spoken

1

to CONNIE WILLIAMS about the deal. I signed the plea papers with the understanding that there was a deal between DA McLellan and CONNIE WILLIAMS and myself.

When I approached the bench and the judge asked me if I had been promised anything in return for my plea, I thought he meant it in the sense had anyone given me anything of monetary value for my plea. I didn't know he was talking about the deal I had with the DA's office. If I had known there was no deal, I would not have pleaded guilty. I would have insisted upon a jury trial. My involvement in this offense was less than any other of the co-defendants.

After the plea I testified for the state against the other three co-defendant's, one of whom was my own brother-in-law. During the months between my plea and my sentencing, CONNIE WILLIAMS continually told me the state was going to recommend to the court that I get ten years deferred adjudication probation. When I went to court for sentencing, however, DA McLellan said he wasn't going to make a recommendation. I then asked CONNIE WILLIAMS if we could do the sentencing in another five days. CONNIE WILLIAMS asked DA McLellan for the five day reset, but DA McLellan refused. I asked for the additional time because I wanted to discuss with my attorney what the DA said about not making a recommendation. I didn't understand why he said that when all along CONNIE WILLIAMS had been telling me things were alright and that we had a deal with the DA. When we went into the court for the PSI hearing, the judge asked the DA if the DA had a recommendation. When DA McLellan said no, CONNIE WILLIAMS asked about the ten year cap  The judge said, "What do you want me to do, the State doesn't have a recommendation." The judge then said he was giving me thirty years. This was more time than two of the three co-defendants I testified against. Why would I agree to testify for the state unless I thought I had a deal. It doesn't make any sense. The whole point was to get a fixed recommendation in exchange for my testimony."

_Lionel Bonner_
LIONEL BONNER
AFFIANT


SUBSCRIBED AND SWORN to, before me, the undersigned authority, this ___7___ day of ___July___, 1997.


_J.R. Segura_
Notary Public, State of Texas

My commission
expires: _1-7-2000_.

2



J R SEGURA
Notary Public, State of Texas
My Commission Expires
JANUARY 7, 2000

# **EXHIBIT 7**

No-0020

Offense- MURDER        ML# 95-6629
                    Street location information
Number-     1300 Name-WEST              Type-        Suffix-
Apt no-        Name-OPELOUSAS           Type-     Suffix-
Date of offense-09/18/95            Date of supplement-11/28/95
Compl(s) Last-CASTILLO      First-CHRISTINA  Middle-OFELIA
                    Recovered stolen vehicles information
 Recovery location-                        District-    Beat-   00
 Stored-                           by-
Officer1-P J GUERRERO         Emp#-066767 Shift-1 Div/Station-HOMICIDE
Officer2-X E AVILA            Emp#-068547 Shift-1

                    SUPPLEMENT NARRATIVE

TUESDAY, NOVEMBER 21, 1995 :                INC. #107569295 L
***************************                 ****************


     THIS DATE, INVS GUERRERO AND AVILA DROVE TO BEAUMONT TO
SPEAK WITH MICHAEL WAYNE PAUL JR, WHO IS IN THE JEFFERSON COUNTY
CORRECTIONAL FACILITY FOR A POSSESSION OF COCAINE CHARGE.

     INVS ARRIVED AT THE LOCATION IN BEAUMONT, LOCATED ON U.S.
HWY 69, BETWEEN BEAUMONT AND PORT ARTHUR.  INVS IDENTIFIED
THEMSELVES AS POLICE OFFICERS AND REQUESTED TO SPEAK WITH MICHAEL
PAUL.  THE DESK OFFICER LOOKED UP PAUL'S LOCATION IN THE COMPUTER
AND CALLED TO THE LOCATION TO HAVE PAUL SENT TO THE BOOKING DESK.

     A SHORT TIME LATER, MICHAEL PAUL CAME TO THE BOOKING OFFICE
AND DEPUTIES THERE PROVIDED A ROOM FOR THE INTERVIEW.

     INVS IDENTIFIED THEMSELVES AND ADVISED MICHAEL THAT THEY
WERE THERE TO ASK HIM SOME QUESTIONS ABOUT HIS CAR.  HE ASKED WHY
INVS FROM HOMICIDE WERE INTERESTED IN THE CAR.  INVS ADVISED THAT
THEY WOULD TELL HIM A LITTLE LATER IN THE INTERVIEW.

     MICHAEL TOLD INVS THAT HE HAD BOUGHT THE CAR FROM A DEALER
IN HOUSTON.  MICHAEL STATES THAT THE DOES NOT KNOW THE NAME OF
THE DEALER, BUT THAT IT WAS OFF OF NORTH SHEPHERD.  HE FURTHER
TOLD INV THAT HE HAD LENT HIS CAR TO MONTEGO JORDAN AND THAT THE
CAR WAS LATER STOLEN.  HE FURTHER TOLD INVS THAT THE CAR WAS
STOLEN ON A WEEKEND, POSSIBLY A SATURDAY, FROM A CLUB.  HE STATED
THAT HIS COUSIN, DERRICK, HAD HELPED HIM BUY THE CAR BECAUSE
DERRICK HAD A JOB.  HE PUT A $1000 DOWN ON THE CAR AND IT WAS
STOLEN BEFORE HE COULD MAKE A PAYMENT.

     HE STATED THAT MONTEGO CALLED HIM AND TOLD HIM THAT THE CAR
WAS STOLEN FROM A CLUB, BUT THAT HE DID NOT KNOW WHICH ONE.  INVS
ASKED HIM IF HE HAD EVER BEEN TO A CLUB CALLED "MR. A'S".  HE

TOLD INVS THAT HE HAD NEVER BEEN ON THE NORTH SIDE OF HOUSTON.

INVS ASKED HIM HOW WELL HE KNEW MONTEGO. HE STATED THAT HE HAD ONLY MET HIM TWICE. HE LATER TOLD INVS THAT HE WAS ALWAYS LENDING THE CAR TO MONTEGO. HE WAS SHOWN SEVERAL PHOTOGRAPHS OF POSSIBLE SUSPECTS IN THIS CASE AND IDENTIFIED MONTEGO JORDAN AND CORIE WILSON'S BROTHER, WHO HAD GIVEN CORIE'S NAME WHEN HE WAS ARRESTED. HE WAS ALSO SHOWN THE PHOTO SPREAD THAT INVS HAD COMPILED WITH HIS PHOTO AND THAT OF BLACK MALE, WARREN FRANKS, AKA "RAT". HE STATED THAT THE ONLY PHOTO HE RECOGNIZED WAS THAT OF HIMSELF.

INVS THEN TOLD HIM THAT HIS BURNED CAR HAD BEEN FOUND NEAR A MURDER SCENE WITH A NOTE ON A BAG CONTAINING PAPERS. MICHAEL IMMEDIATELY STATED THAT HE DID NOT KNOW ANYTHING ABOUT A MURDER AND WAS NOT INVOLVED IN A MURDER. INVS FURTHER TOLD HIM THAT HIS CAR HAD BEEN IDENTIFIED AS BEING AT THE SCENE OF AN AGGRAVATED ROBBERY. HE TOLD INVS THAT HE DID NOT KNOW ANYTHING ABOUT ANY ROBBERIES. HE TOLD INVS THAT MONTEGO WAS ALWAYS BORROWING HIS CAR AND THAT MONTEGO WAS ALWAYS HANGING AROUND WITH A GUY BY THE NAME OF "T". HE STATES THAT HE DOES NOT KNOW "T'S" FULL NAME.

SEVERAL TIMES DURING THE INTERVIEW, MICHAEL SAID THAT MONTEGO WAS THE KILLER.

MICHAEL TOLD INVS THAT HE HAD BEEN IN JAIL SINCE SEPTEMBER 1ST. HE STATED THAT HE WAS IN JAIL THREE TIMES IN AUGUST IN HARRIS COUNTY AND THAT HE WAS BROUGHT TO PORT ARTHUR ON SEPT. 1. INV GUERRERO ADVISED THAT HE WAS NOT IN JAIL IN PORT ARTHUR IN SEPTEMBER. MICHAEL INSISTED THAT HE WAS IN JAIL.

INV THEN WENT TO THE FRONT DESK AND REQUESTED THAT THEY PULL UP HIS ENTRY DATE INTO THEIR SYSTEM. THE PRINTOUT SHOWED THAT HE HAD BEEN TRANSPORTED TO PORT ARTHUR AND PLACED IN THE CORRECTIONAL FACILITY. WHEN CONFRONTED WITH THIS INFORMATION, MICHAEL TOLD INV GUERRERO THAT HE WANTED TO TALK TO INV AVILA AND DID NOT WANT TO TALK TO HIM BECAUSE HE YELLED AT HIM. INV TOLD HIM THAT HE WAS NOT YELLING AND HAD NOT EVEN RAISED HIS VOICE. INV AVILA CONDUCTED THE REST OF THE INTERVIEW.

INV AVILA ADVISED MICHAEL THAT IT WAS IN HIS BEST INTEREST TO PROVIDE INFORMATION THAT WOULD ASSIST IN THIS INVESTIGATION. MICHAEL TOLD INVS THAT HE WOULD THINK ABOUT IT AND REQUESTED THEIR CARDS TO CALL LATER THAT EVENING. THE BUSINESS CARDS WERE PROVIDED WITH OFFICE PHONE NUMBERS AND INVS WROTE THEIR PAGER NUMBERS ON THE CARDS IN THE EVENT THAT THEY WERE NOT IN THE OFFICE.

AS INVS WERE LEAVING, THEY SHOOK MICHAEL'S HAND AND HE STATED "I'LL CALL YOU THIS EVENING AT 8:30 AND YOU WILL BE ABLE TO CLOSE YOUR INVESTIGATION. YOU CAN CONSIDER IT CLOSED."

***********

P R O G R E S S          R E P O R T

NOVEMBER 21, 1995:

INVESTIGATOR AVILA WAS OFF DUTY AT HIS RESIDENCE WHEN
INVESTIGATOR AVILA RECEIVED A PAGER VIA PERSONAL PAGER (409-726-
2501) AT APPROXIMATELY 2030 HRS.  INV AVILA RETURNED THE PAGE BY
CALLING THE ABOVE LISTED PHONE NUMBER AND TALKING TO SGT.
MICHELLE PATTERSON WITH JEFFERSON COUNTY S.O. SGT. PATTERSON
ADVISED INVS THAT SHE WAS MICHAEL WAYNE PAUL'S SUPERVISOR AND SHE
WAS AWARE THAT INVS HAD INTERVIEWED MICHAEL PAUL EARLIER TODAY
ABOUT A HOMICIDE. SGT. PATTERSON INFORMED INVS THAT SHE HAD PAUL
IN HER OFFICE AT THIS TIME. PAUL ADVISED HER THAT HE DID
RECOGNIZED SOME OF THE PERSONS ON THE PHOTOS WHICH INVS HAD
SHOWED HIM. HE EXPLAINED TO SGT. PATTERSON THAT HE DENIED KNOWING
THEM BECAUSE HE FEARS FOR HIS FAMILY. PAUL BELIEVES THAT HIS
FAMILY IS IN DANGER IF HE COOPERATES WITH THE POLICE. SHE FURTHER
STATED THAT MICHAEL PAUL HAD RECOGNIZED PAUL GREEN, MONTEGO
JORDAN, AND WARREN FRANK PHOTOS BUT FAILED TO ADVISED INVS
BECAUSE HE FEARS FOR HIS FAMILY. SGT. PATTERSON ASKED PAUL IF HE
WAS INVOLVED IN THE KILLING OF THE COMPL OR IF HE HAD ANY
KNOWLEDGE ABOUT THE KILLING OF THE COMPL. PAUL DENIED ANY
INVOLVEMENT OR KNOWLEDGE. PAUL WOULD ONLY SAY THAT MONTEGO JORDAN
WAS THE KILLER. PAUL NEVER DID EXPLAINED HOW HE KNEW THAT MONTEGO
JORDAN WAS INVOLVED.

INV AVILA WAS ALLOWED TO TALK TO MICHAEL PAUL ON THE TELEPHONE.
INV ADVISED  HIM THAT WE NEEDED TO KNOW THE FACTS ABOUT WHY
MONTEGO JORDAN WAS THE KILLER. PAUL WOULD NOT EXPLAIN HOW HE KNEW
HE ADVISED INV AVILA THAT IF INV CAME BACK TO SEE HIM, HE WOULD
COOPERATED WITH INVS.

INVESTIGATOR ADVISED SGT. PATTERSON THAT INV WOULD RETURNED TO
TALK TO PAUL  ON 11-25-95. SGT. PATTERSON STATED THAT SHE WOULD
NOT BE ABLE TO BE THERE BUT SHE COULD BE REACHED ON HER PAGER
654-1581. SHE FURTHER STATED THAT MICHAEL PAUL TOLD HER THAT HE
FELT COMFORTABLE TALKING WITH INV AVILA.

INVESTIGATION WILL BE CONTINUED ON 11-25-95.

     SYSTEM ADVISORY: REPORT ENTERED USING PERSONAL COMPUTER  VER-2.08
     **********************************************************************
     *   ENTRY DEVICE: AST 386SX 105010 X07                            *
     *   ENTRY FROM DATE-112895 TIME-1618  TO  DATE-112895 TIME-1620   *
     *   TRANSFER DEVICE: AST 386SX 105010 X07           VER. 2.08-1   *
     *   TRANSFER DATE-112895 TIME-1620   LOAD DATE-112895 TIME-1623   *
     *   LOCATION OF OFFENSE: POLICE DISTRICT-DISTRICT 09      DIST-09  *

*********************************************************************

Supplement entered by =  66767
Report reviewed by-EG                    Employee number-025810

-------------------------------------------------------------------

No-0021

Offense- MURDER       ML# 95-6629
                       Street location information
Number-     1300 Name-WEST              Type-        Suffix-
Apt no-         Name-OPELOUSAS          Type-      Suffix-
Date of offense-09/18/95           Date of supplement-12/05/95
Compl(s) Last-CASTILLO      First-CHRISTINA  Middle-OFELIA
          Last-
              Recovered stolen vehicles information
 Stored-                    by-                 Ph#- (000) 000-0000
Officer1-L.R.VERBITSKEY      Emp#-084823 Shift-1 Div/Station-CSU2

                       SUPPLEMENT NARRATIVE

                   CRIME SCENE UNIT REPORT

 OFFICER VERBITSKEY ASSIGNED TO CSU 2 ON THIS DATE,12/5/95 ASSIGNED TO MORGUE
RUN WAS ASSIGNED TO PICK UP FOLLOWING LISTED ARTICLES.

CLOTHES /
         1 PR WHITE JEANS, 1 MIKEY MOUSE HALTER TOP, 1 PR WHITE HEAL SHOES,
1 BRA W 3 ROUND OBJECTS ON IT, 1 BLOUSE.

ALL TAG HPD DRY ROOM.


Supplement entered by =  84823
Report reviewed by-EG                Employee number-025810

No-0022

Offense- MURDER        ML# 95-6629
                    Street location information
Number-    1300 Name-WEST              Type-       Suffix-
Apt no-     Name-OPELOUSAS          Type-      Suffix-
Date of offense-09/18/95          Date of supplement-12/14/95
Compl(s) Last-CASTILLO     First-CHRISTINA  Middle-OFELIA
                 Recovered stolen vehicles information
 Recovery location-                    District-   Beat-   00
 Stored-                      by-
Officer1-X.E. AVILA          Emp#-068547 Shift-1 Div/Station-
Officer2-P.J. GUERRERO       Emp#-066767 Shift-1
Caller'S name-               Phone# (713) 000-0000 Ext-0000


                    SUPPLEMENT NARRATIVE

SATURDAY, NOVEMBER 25, 1995 :             INC. #107569295 L
***************************             ******************

    THIS DATE, INVS GUERRERO AND AVILA MADE A RETURN TRIP TO THE
JEFFERSON COUNTY CORRECTIONAL FACILITY TO SPEAK WITH MICHAEL
WAYNE PAUL JR.  AFTER THE PREVIOUS INTERVIEW ON TUESDAY, 11-21-
95, MICHAEL CALLED INV AVILA TO ADVISE THAT HE HAD MORE
INFORMATION AND WANTED TO SPEAK WITH INVS.

    INVS ARRIVED IN BEAUMONT AT THE CORRECTIONAL FACILITY AND
REQUESTED TO SPEAK WITH MICHAEL PAUL.  THE DEPUTIES CALLED
MICHAEL TO THE BOOKING DESK AND ALSO SHOWED INVS TO A SHOWUP ROOM
WHERE A TABLE AND FOUR CHAIRS HAD BEEN SET UP.

    WHEN MICHAEL ARRIVED IN THE ROOM, HE TOOK A CHAIR AT THE FAR
END OF THE TABLE FROM INVS.  MICHAEL WAS ASKED IF HE HAD ANY
PROBLEMS WITH THE INTERVIEW BEING RECORDED.  HE STATED THAT HE
DID NOT HAVE ANY PROBLEMS AND THE INTERVIEW WAS BEGUN WITH THE
READING OF HIS LEGAL WARNING.  AFTER EACH WARNING WAS READ, HE
WAS ASKED IF UNDERSTOOD.  HE STATED THAT HE DID.  HE WAS ALSO
ASKED AT THE END OF THE READING IF HE UNDERSTOOD.  HE STATED THAT
HE UNDERSTOOD HIS RIGHTS.

    INVS BEGAN THE INTERVIEW BY ASKING PERSONAL QUESTIONS, NAME,
DATE OF BIRTH, ADDRESS, ETC.  INV AVILA ALSO TOLD MICHAEL THAT NO
FORMAL CHARGES HAD BEEN FILED ON HIM.  AT THIS POINT, MICHAEL
ASKED IF HE WOULD FEEL BETTER IF HE HAD A LAWYER PRESENT WITH
HIM.  HE FURTHER TOLD INVS THAT HE DID NOT HAVE ANYTHING TO WORRY
ABOUT.  INV GUERRERO ADVISED HIM THAT IT WAS HIS DECISION IF HE
WANTED A LAWYER.  MICHAEL THEN DECIDED THAT HE DID NOT NEED A
LAWYER AND CONTINUED WITH THE INTERVIEW.

    MICHAEL TOLD INVS THAT HE HAD BEEN IN JAIL IN HARRIS COUNTY
THREE TIMES IN AUGUST, UNDER THE NAME OF CORIE WILSON, AND WAS
LATER TRANSFERRED TO JEFFERSON COUNTY ON A WARRANT ISSUED OUT OF

THAT COUNTY.  INVS ADVISED HIM THAT THEY WERE CONDUCTING AN
INVESTIGATION INTO THE MURDER OF A HISPANIC FEMALE, IN THE 1300
BLOCK OF WEST.  MICHAEL ASKED WHERE WEST STREET WAS.  WHEN TOLD
THE LOCATION, MICHAEL STATED THAT HE HAD NEVER BEEN TO NORTH
SIDE.  MICHAEL STATED THAT HE HAD LENT HIS CAR TO MONTEGO JORDAN
AND THAT MONTEGO GOES TO THE COKE STREET APARTMENTS TO SEE HIS
GIRLFRIEND, MEME.  HE STATES THAT HE DOES NOT KNOW MEME'S REAL
NAME.  HE DID STATE THAT HE, MONTEGO AND MEME WERE ALL ARRESTED
IN MONTEGO'S CAR, WHICH HE DESCRIBED AS A 1989 OR 1990 OLDS 88,
SILVER IN COLOR.

     WHEN ASKED WHAT HE KNEW ABOUT A HOMICIDE THAT MIGHT HAVE
INVOLVED THE USE OF HIS CAR.  HE STATED THAT HE DID NOT KNOW
ANYTHING ABOUT A HOMICIDE.  HE AGAIN STATED THAT HE HAD NEVER
BEEN TO THE NORTH SIDE.  HE DID STATE THAT MONTEGO HAD TAKEN HIS
CAR TO VISIT MEME AND HAD GOTTEN INTO AN ALTERCATION WITH SOMEONE
OVER A THEFT.

     INVS ASKED ABOUT HIS CAR AND HE SAID THAT HE HAD A MAROON
OLDS 98.  HE SAID THAT HE HAD BOUGHT IT WITH THE HELP OF HIS
COUSIN, DERRICK PAUL, AT A DEALER ON THE "NORTH SIDE", OFF OF
NORTH SHEPHERD.  MICHAEL STATED THAT HE HAD PUT A $1,000 ON THE
CAR.  MICHAEL STATED THAT HE DOES NOT REMEMBER THE NAME OF THE
DEALER OR WHEN HE BOUGHT IT.  HE SAID THAT HE DOES NOT OWN THE
CAR NOW, SINCE IT WAS STOLEN AND BURNED WHEN HE HAD LENT THE CAR
TO MONTEGO.  HE STATED THAT THE STOLEN AUTO INCIDENT OCCURRED IN
JUNE OR JULY.

     HE STATED THAT MONTEGO JORDAN, PAUL GREEN AND A GUY BY THE
NAME OF CHAD, HAD THE CAR WHEN IT WAS STOLEN.  HE SAID THAT HE
DOES NOT KNOW CHAD, BUT THAT HE LOOKS LIKE A MEXICAN.  HE AGAIN
SAID THAT THE INCIDENT HAPPENED IN JUNE OR JULY.  HE STATED THAT
HE WAS WITH A GIRL NAMED LACONDA DAVIS AND WAS GOING TO SPEND THE
NIGHT WITH HER.  HE SAID THAT, BY THAT TIME, MONTEGO DIDN'T HAVE
HIS CAR, THE OLDS 88.  HE STATED THAT MONTEGO HAD A 1977 OR 1978
WHITE OLDS 98 THAT WAS BROKE DOWN.  HE STATED THAT HE WAS AT
MONTEGO'S GRANDMOTHER'S HOUSE ON SAUER WHEN HE LENT THEM THE CAR.
HE STATED HE LENT THEM THE CAR ON A WEEKDAY.

     LACONDA HAD PICKED UP MICHAEL AND THEY HAD GONE TO HER
HOUSE.  MONTEGO AND THE OTHERS LATER CAME OVER TO HER HOUSE AND
TOLD HIM THAT HIS CAR HAD BEEN STOLEN.  THEY TOLD HIM THAT THEY
HAD GOTTEN INTO A MIX WITH SOME PEOPLE AND THE CAR WAS STOLEN.
MONTEGO TOLD HIM THAT THEY HAD GOTTEN INTO A SHOOTOUT WITH SOME
PEOPLE ON BELLFORT.  MONTEGO AND THE OTHERS CHASED THEM DOWN AND
THE DRIVER HAD PULLED OVER TO THE SIDE OF THE ROAD AND STARTED
SHOOTING.  MONTEGO DIDN'T HAVE A GUN AND THEY LATER WENT BACK TO
LOOK FOR THEM AND GOT INTO WITH THEM AGAIN ON THE SAME DAY.
MONTEGO AND PAUL GOT OUT OF THE CAR TO CHASE THE MAN AND SOMEONE
TOOK THE CAR.  HE STATED THAT THE PEOPLE MONTEGO GOT INTO A
SHOOTOUT WITH WERE MEXICANS OR DOMINICAN TYPE PEOPLE.

     MICHAEL STATED THAT HE THOUGHT THE SHOOTING WAS OVER DRUGS.
MICHAEL SAID THAT MONTEGO AND THE OTHERS WERE OUT HIJACKING DRUG
DEALERS FOR THEIR DRUGS OR MONEY.  MICHAEL THEN RETOLD THE STORY
OF HOW HIS CAR WAS STOLEN.  HE STATED THAT THEY HAD STOPPED THE

GUYS AND HAD CALLED THE DRIVER OVER. AS THE DRIVER WAS WALKING
TOWARD THEM, THE PASSENGER GOT OUT AND THEY SAID THEY SAW A GUN.
THE THREE, MONTEGO, PAUL GREEN AND CHAD, JUMPED OUT OF THE CAR
AND RAN. THEY WRESTLED WITH THE ONE OF THE GUYS AND THEN THE
OTHER STARTED SHOOTING AT THEM.

HE FINALLY TOLD INVS THAT THE CAR WAS NOT STOLEN AT A CLUB
LIKE HE HAD SAID EARLIER. HE CALLED HIS COUSIN, DERRICK, AND THE
CAR WAS SUPPOSED TO BE REPORTED STOLEN. HE WENT OVER TO
DERRICK'S HOUSE A COUPLE OF DAYS LATER AND DERRICK TOLD HIM THAT
THE POLICE HAD CALLED AND TOLD HIM THAT THE CAR HAD BEEN BURNED.
HE NEVER HEARD ANYTHING MORE ABOUT THE CAR.

HE SAID THAT THEY USED HIS CAR A LOT, BUT COULD NOT REMEMBER
THE LAST TIME THAT THEY HAD USED IT BEFORE THE INCIDENT. HE
STATED THAT HE HAD ALSO LENT THE CAR OUT TO A GUY BY THE NAME OF
"T" OR "TELLY", UNKNOWN REAL NAME. HE DID SAY THAT HIS CAR HAD
BEEN WRECKED BY "T" ONE TIME AND THAT "T" HAD LEFT A CAR WASH ON
SCOTT AND WAS HIT BY A WOMAN. HE HAD LATER BEEN TOLD BY SOMEONE
THAT HE HAD GOTTEN INTO IT WITH SOMEONE AND THE POLICE WERE
CHASING HIM AND SHOOTING AT HIM.

HE SAID THAT MONTEGO AND PAUL ONLY HANG OUT TOGETHER WHEN
IT'S ABOUT SOMETHING. HE WOULD NOT SAY THIS TIME THAT MONTEGO
AND PAUL WERE HIJACKING DOPE DEALERS. HE WAS TOLD BY HIS FRIENDS
THAT HE WAS HANGING OUT WITH THE WRONG PEOPLE.

HE WAS ASKED WHAT HE MEANT THE LAST TIME THAT INVS SPOKE
WITH HIM, WHEN HE SAID THAT MONTEGO WAS THE KILLER. HE SAID THAT
IT WAS HARD FOR HIM TO SPECIFY THAT AND THEN SAID THAT ANYONE
COULD BE A KILLER. HE DEFINED A KILLER AS SOMEONE THAT WOULD
SNAP AND KILL SOMEONE. HE THEN SAID THAT MONTEGO WAS BOTH A
SHOOTER AND A KILLER.

HE SAID FOR MONTEGO TO GO OUT AND KILL SOMEONE, SOMETHING
WOULD HAVE TO BE DONE TO HIM. HE ALSO SAID THAT MONTEGO WOULD
KILL SOMEONE IF HE HEARD THAT SOMEONE HAD SOMETHING THAT HE
WANTED. MICHAEL DENIED THAT HE WAS HOLDING ANYTHING BACK FROM
INVS. MICHAEL SAID THAT HE LEARNED ALL OF THIS FROM TALKING TO
MONTEGO AND THAT MONTEGO WAS LED ASTRAY AS A YOUNG BOY. HE
DENIED HEARING ABOUT HIM KIDNAPPING A GIRL AND KILLING HER.

MICHAEL SAID THAT MONTEGO WAS ALWAYS CARRYING A 9MM, USUALLY
A BERETTA. HE SAID THAT MONTEGO HAD A BLACK BERETTA AND PAUL
WOULD CARRY A GLOCK 9MM. "T" CARRIES A SIG SAUER 9MM AND CHAD
CARRIES A .357. HE SAID THAT CHAD WAS HARD TO FIGURE OUT.

HE THEN DESCRIBED MONTEGO AS BEING ABOUT 5'6" OR 5'7", 160
TO 170 WITH A MUSTACHE AND A LOT OF GOLD TEETH, WITH DIAMONDS.
HE WEARS A CHAIN WITH A COIN.

HE DESCRIBED "T" AS BEING ABOUT 5'2" OR 5'3", ABOUT 160 TO
165. HE IS DARK COMPLECTED WITH A LOT OF GOLD TEETH.

HE DESCRIBED PAUL AS BEING LIGHT COMPLECTED, ABOUT 6', ABOUT
200 POUNDS, ONE GOLD TOOTH.

HE SAID THAT CHAD IS 5'8", ABOUT 185 TO 190, WITH SOFT BLACK
HAIR IN A PONY TAIL.  HE SAID THAT CHAD COULD PASS FOR A MEXICAN
AND THAT HE ALSO SPEAKS SPANISH.

HE THEN TOLD INVS THAT THEY OUGHT TO TALK TO MONTEGO ABOUT
THIS AND THAT INVS MIGHT LEARN A LOT.  INVS ASKED IF HE WOULD
TALK ABOUT THIS MURDER.  HE THEN SAID THAT MONTEGO WAS KIND OF
WISHY WASHY.

HE LATER TOLD INVS THAT HE DID NOT TELL EVERYTHING TO INVS
BECAUSE HE WAS AFRAID FOR HIS FAMILY.  HE LATER TOLD THE SGT AND
SHE CALLED INV AVILA.  HE THEN SAID THAT HE HADN'T TOLD INVS
ENOUGH THAT THEY WOULD WANT TO KILL HIS FAMILY.  HE DENIED HAVING
BEEN INVOLVED IN ANY OF THE HIJACKINGS.  HE STATED THAT HE ALWAYS
HAD MONEY.

HE THEN BACKTRACKED ON WHAT HE HAD SAID ON TUESDAY AND THAT
HE COULD HELP INVS WITH A LOT OF THINGS, BUT THAT HE PROBABLY DID
NOT GIVE ENOUGH INFORMATION TO CLEAR THE CASE.  HE DENIED BEING
INVOLVED IN ANY HIJACKINGS OR OF THE KIDNAPPING AND MURDER.  HE
ALSO STATED THAT HE HAD NOT HEARD ANYTHING.  HE DENIED HAVING
TOLD INVS THAT THE INVESTIGATION COULD BE FINISHED THAT NIGHT.
HE THEN SAID THAT HE DID NOT MEAN WHAT INVS THOUGHT THAT THEY
HEARD.  HE THEN SAID THAT INV AVILA MUST BE LYING ABOUT WHAT HE
HEARD.  HE SAID THAT HE TOLD INVS THAT HE COULD TELL INVS A LOT
OF THINGS.

HE THEN DENIED HAVING HEARD ABOUT A WOMAN, HE DIDN'T KNOW
HOW TO GET TO NORTH SIDE AND THAT HE HAD NEVER BEEN TO "MR. A'S"
NIGHT CLUB.  HE DENIED HAVING HEARD ABOUT THEM HIJACKING A
RESTAURANT.

THE INTERVIEW WAS TERMINATED AT 2:25 P.M.

MICHAEL WAS RETURNED TO HIS WORK STATION AND INVS RETURNED
TO HOUSTON.

INVESTIGATION TO CONTINUE ................

SYSTEM ADVISORY: REPORT ENTERED USING PERSONAL COMPUTER  VER-2.08
*************************************************************
*  ENTRY DEVICE: AST 386SX 105010 X07                       *
*  ENTRY FROM DATE-121495 TIME-1029  TO  DATE-121495 TIME-1032 *
*  TRANSFER DEVICE: AST 386SX 105010 X07          VER. 2.08-1 *
*  TRANSFER DATE-121495 TIME-1039  LOAD DATE-121495 TIME-1042 *
*  LOCATION OF OFFENSE: POLICE DISTRICT-DISTRICT 07    DIST-07 *
*************************************************************

# **EXHIBIT 8**

INV AVILA FOUND THE BROWN ENVELOPE LAYING ON TOP OF INV GUERRERO'S DESK. INV
FOUND SEVERAL DIFFERENT PAPER DOCUMENTS INSIDE THE ENVELOPE. IT WASN'T UNTIL
HANDLING SEVERAL OF THE PAPER DOCUMENTS BEFORE INV AVILA FOUND A HANDWRITTEN
MESSAGE IN SPANISH ADDRESSED TO INV GUERRERO. THE MESSAGE WAS WRITTEN ON A
CLEAR 8 BY 11 TYPING PAPER. THE MESSAGE READ AS FOLLOWING IN SPANISH BUT WAS
TRANSLATED IN ENGLISH BY INV AVILA:
*****************************************************************************
MR PHILLIP J GUERRERO
THIS PAPER WILL HELP YOU FIND THE PERSONS RESPONSIBLE FOR CRISTINA CASTILLO
DEATH. THESE ARE THE LEADERS OF THE GANG.

NOTE: THE NAME CRISTINA CASTILLO WAS UNDERLINED.

ALSO STAPLE TO THE BOTTOM CENTER OF THE LETTER WAS A XEROX COPY OF PAUL
NICHOLAS GREENE, DOB 011672, TDL #08471807, 10555 TORTLEWOOD #241. ON THE
BOTTOM LEFT CORNER A CAMBRIDGE IDENTIFICATION CARD WAS STAPLED WITH THE NAME
MECO JORDAN ,3311 SAUER, HOUSTON, TX 77004, PHONE 520 -7981.

NOTE: INV REMEMBERED THE NAME PAUL N. GREENE FROM INFORMATION RECEIVED FROM
SGT. E. MEHL ON 9-28-95. GREENE'S DRIVER'S LICENSE WAS FOUND IN A BAG WHICH
WAS LABELED ON THE OUTSIDE PROOF OF MURDER. FOR DETAILS, REFER TO SUPPLEMENT
NUMBER 11.

AFTER READING THE WRITTEN MESSAGE, INV AVILA STARTED USING WHITE LATEX
SURGICAL GLOVES WHILE HANDING THE PAPER DOCUMENTS TO PREVENT GETTING INV'S
FINGERPRINTS ON THE REST OF THE PAPER DOCUMENTS.

THE FOLLOWING IS AN INVENTORY OF DOCUMENTS FOUND IN THE ENVELOPE:

1. HANDWRITTEN MESSAGE WRITTEN IN SPANISH WITH A XEROX COPY OF PAUL NICHOLAS
GREENE'S TEXAS DRIVER'S LICENSE STAPLED TO THE BOTTOM OF THE WRITTEN MESSAGE
AND A CAMBRIDGE IDENTIFICATION CARD STAPLED TO THE BOTTOM RIGHT SIDE WITH THE
NAME MECO JORDAN, 3311 SAUER, HOUSTON, TX. ,PHONE 520-7981.
"MR PHILLIP J GUERRERO ESTOS PAPELES LE PUEDEN AYUDAR A ENCONTRAR LOS
RESPONSABLE DE LA MUERTE DE CRISTINA CASTILLO ESTO SON LOS JEFE DE LA GANGA"

2. CAMBRIDGE ADDRESS BOOK WITH THE FOLLOWING NAMES AND ADDRESS:
663-6649 WORK
406-3958 PAGER
RUTHU

3.MONTEGO
508-7252
428-9440

4.TAMIKA
HOME 909-1747

5.TYONE
HOUSTON,TEXAS 77004
HOME 438-5912

6.TISHARA        #001103
HOME 433-0825      517-7819
433-4971 (SCRATCHED OUT)

Case 4:04-cv-01306 Document 9 Filed in TXSD on 04/08/04 Page 101 of 118

7.LIL    T
746-0894

8.QUINCY
ADDRESS NASSAU,HOUSTON,TEXAS
HOME 643-7854

9.RONALD    PAGER 653-0300
HOUSTON,TEXAS   HOME 738-7238

10.KEISHA    HOME 522-2985

11.KEVIN    HOME 715-5472

12.LIL JR. HOME 951-9729

13.GRANDMA   HOME 520-7981
3311 SAUER, HOUSTON TX. 77004

14.CINTU    HOME 816-7380
            FAX 835-3960

15.DAD    HOME 661-5899
HOUSTON,TEXAS

16.DEDE    HOME 995-8528

17.DITTY    635-4942

18.TELLY    602-4644

19.NAME NOT LEGIBLE
    3311 SHEP         HOME 846-3218

20.BILAL FARANKHAR
    CLEMENS   WORK   CAMP
    ROUTE 1, BOX  1077
    BROZORIA TX 77422

21.BUBBA    HOME 606-1738
SCOOP HOUSE OFFICE 635-0962
            FAX 635-2061

22. 960-1760

23.523-0915

24. MEALS  $6.50        625
    WORMY  $6.50          3
    KEVIN $3.25        ----
    LIL MAMA  $1.75
    KENDOO $6.25

            600
              3
            - - - -

```
              1800
               325
              ----
          NOT LEGIBLE
```

25.KESHA
    644-6406
    522-2652


26.BUSINESS CARD
CLYDE MELTON MOTORS          RANDY OR BUBBA          BUS. 697-2252
5723 AIRLINE                                        FAX #697-5839

27.PLASTIC BUSINESS CARD HOLDER WITH THE FOLLOWING FOUR CARDS
1. J&B LANDSCAPING    MANAGER JOSEPH BUTLER JR.       OWNER JOSEPH BUTLER SR.
3501 CRESTMONT, HOUSTON,TX 77026     905-4195
2. RADIO SHACK    STORE 01-8259, 223 GULFGATE MALL,HOU, TX. 713-649-5090
HAND WRITTEN (628-9440)
SALES REPRESENTATIVE JACKIE
3.CLYDE MELTON MOTORS,5723 AIRLINE  RANDY OR BUBBA 697-2252
4.CLASSIC CLEANER PICKUP & DELIVERY SERVICE
BEVERLY/MANAGER      713-741-4400
3717 ALABAMA

28.ACCIDENT EXCHANGE INFORMATION
DATE: SEPT. 14,1995 TIME: 1215 P.M. LOCATION:   TIREWESTER/HOUSTON
DRIVER : BERNADO EDWARDS
YOUR VEHICLE 94 TALON EAGLE ZTU2852 VA.
OWNER OF VEHICLE BERNADO EDWARDS  6200 RENWICK #364
LIABILITY AGENT   GEICO     (804-223-4965)
ACCIDENT INVESTIGATOR NOT LEGIBLE #111    AGENCY TSU/DPS

WRITTEN ON BACK SIDE 618-6818,281, 285-078, 285-0782

29.TAMIKA    733-3490   WRITTEN OF PIECE OF PAPER
30.CLYDE MELTON MOTORS   PURCHASE RECEIPT
 MONTEGO D JORDAN
BALANCE 4940.14
PAYMENT 240.00
NEW BALANCE 4700.14

31.HARRIS COUNTY SHERIFF'S DEPARTMENT INMATE TRUST FUND
CASH   RECEIPT 790.00
INMATE MECO JORDAN  DOB 050276
DATE 9-11-95
RECEIPT #011026 A

31. TEXAS SOUTHERN UNIVERSITY DEPARTMENT OF PUBLIC SAFETY TRAFFIC VIOLATION
TICKET #00607
DATE:091595 1215P.M.
DRIVER:TIM HARRISON   DOB 050276
3311 SAUER, HOME 520-7981
LOCATION 3900 TIERWESTER
VIOLATIONS 1.NOL
          2.FAILURE TO MAINTAIN FINANCIAL RESPONSIBILITY
VEHICLE LICENSE #P11132, GREY , 86 OLDS, 2 DR.

32. FOUR FIDELITY EXPRESS MONEY ORDERS
ALL FOUR DATED ON 9-5-95 AND  PAY TO THE ORDER OF PLAZA DEL ORO
SENDER RONDRA G. ROBERTS  2607 A  HOLLY HALL
#50055193 8    AMOUNT $25.00
#50055190 2    AMOUNT $200.00
#50055191 1    AMOUNT $200.00
#50055192 9    AMOUNT $200.00

33. FOUR DIFFERENT DISTRICT COURT DOCUMENTS WHICH PRETEND TO TIM HARRISON
BEING THE DEFENDANT. HARRISON IS CHARGED ON SEPTEMBER 11, 1995 WITH A FELONY
CARRYING A PISTOL IN THE 184TH DISTRICT COURT CAUSE #703025 AND A $10,000
BOND. THE DEFENDANT'S BAIL WAS POSTED ON SEPTEMBER 12, 1995 BY INTERNATIONAL
FIDELITY INSURANCE COMPANY (AGENT DAVID G. SCHMIDT 713-225-6655.

FOR DETAILS ON COURT DOCUMENTS REFER TO COPES ATTACHED TO FILE COPY.

33. BAIL BOND DOCUMENT FOR CORIE JAMAAL WILSON CHARGED WITH MISDEMEANOR POSS.
OF MARIJ. 0-2 OZ. IN COUNTY COURT #6 , $500 BOND , CAUSE #9538784. BONDING
COMPANY IS DAVID G. SCHMIDT 713-225-6655. BOND POSTED ON 9-12-95.

34. HALLMARK CARD TO MR MONTEGO FROM MS MEME
"I KNOW THIS IS A SURPRISE, I JUST WANT YOU TO KNOW I CAN'T GET YOU OFF MY
MIND! I HOPE THIS IS THE START OF A LONG TIME TOGETHER.

35. RECEIPT
SEPTEMBER 5, 1995
FROM MONTIEGO JORDAN
$180.00
FOR: REPAIR (NOT LEGIBLE)
BY (NOT LEGIBLE)

36. DAILY PLANNER
SANDRA  728-8982

37. CAMERA MAN 747-4941

38. PIECE OF PAPER WITH NAMES CORIE JAMAAL, MACO JORDAN, AND MONTEGO JORDAN

39. DADDY 901-8048
JASSANDRA 522-3651    615-6755

40. HOUSE FOR RENT
    561-5100
    ROSEWOOD

SCOTT 618-7600


ALL THE ABOVE ITEMS WERE TURNED OVER TO SGT. MEHL, WHO WILL SUBMIT THEM TO
HFD ARSON INVESTIGATOR BUDDY WOODS FOR FINGERPRINT ANALYSIS.  THE PRINTS
LIFTED FROM THESE ITEMS WILL BE COMPARED WITH PRINTS FOUND ON ITEMS FOUND BY
A BURNED OUT VEHICLE INSIDE A BAG LABELED PROOF OF MURDER.

INVESTIGATION TO CONTINUE........

# **EXHIBIT 9**

Case 4:04-cv-01306   Document 3   Filed in TXSD on 04/22/04   Page 105 of 118

Page 33

1  longer.
2       We found out he's not even elected.  Chief
3  Garcia has never stood for election, but that's his
4  motivation to have DeLeon tell -- put these people's
5  names in there, because I've got a tough election
6  campaign that doesn't even exist.
7       Or Monteigo Jordan, don't you know he was
8  surprised.  "I thought I was coming back on my appeal,"
9  whenever he came back from T.D.C., whenever he came
10 back on the bench warrant from T.D.C.  I thought I was
11 coming back to find out about the appeal.  No, James
12 DeLeon has just accused you of commiting capital
13 murder.
14      James DeLeon, he's never met before in his
15 life, a person who was 20 years of age, Monteigo
16 Jordan, he's 24, and he says he met him in 1991.  That
17 put Monteigo Jordan at age 15 when they first met.
18      You know, James just can't quite keep all
19 these things straight.  There's no election out there.
20 The guy is only 15 years old.  He doesn't know
21 anybody.  He's never been to Brookshire in his life,
22 and he was arrested, Monteigo Jordan, was arrested on
23 September 11, 1995, and this offense occurred on
24 September 12, 1995.  I suggest to you the evidence is
25 that Monteigo Jordan was in jail.  He couldn't have

Page 34

1  done it.  But he's doing a 50-year sentence on a drug
2  case.  He won't mind the extra baggage that we will put
3  on him.
4       Incredulous.
5       And then not only is he going to say that
6  Chief Garcia did this for the purpose of election, for
7  the purpose of reelection, but we're all going to say
8  he did it because he threatened to ruin his career.
9  How can you ruin James DeLeon's career?  His career as
10 a wife beater?  His career as a verbal arguer?  His
11 career as a deferred adjudicationer?  He had no career
12 to be ruined.
13      Okay.  Let's up it again.  He's going to put
14 a dope case on my sister, who is a track star at the
15 school.  Then he's going to beat up my Downs Syndrome
16 brother.  Then he's going to put a dope case on my
17 mother and parents.  He's going to do all these
18 things.
19      I suggest to you that the evidence is just
20 totally clear.  There's so many inconsistencies between
21 what he said Monteigo Jordan told him was -- the
22 details weren't there -- and the details he gave
23 Avila.  He knew about the gun, the 9 millimeter, and
24 the fact that it was then found in Wayne Cathey's
25 possession.  What a coincidence.  There's not any doubt

Page 35

1  in anyone's mind.  This man, James DeLeon, is guilty of
2  the offense of aggravated kidnapping in each and every
3  way alleged in the indictment and alleged in this jury
4  charge, and I would ask you to clearly come back that
5  he is guilty of aggravated kidnapping.
6       The testimony of Lionel Bonner was totally
7  corroborated not only by him, but also by the fact that
8  Wayne Cathey was found in possession of the murder
9  weapon.
10      This is clear and convincing.  It's like --
11 one last thing, if I might, your Honor -- is that Mr.
12 DeLeon said, he said, "It's like losing a game, you
13 want to blame it on someone."  Mr. DeLeon has tried to
14 blame it on Monteigo Jordan.  He's tried to blame it on
15 Chief Garcia.  He's tried to blame it on anybody and
16 everybody other than himself, but that's where the
17 blame lies and that's where I ask that you place it.
18 Thank you.
19      THE COURT:  All right.  Ladies and gentlemen,
20 if you will retire in the jury room and begin your
21 deliberations.
22      (Jury out.)
23      (Whereupon, after jury deliberation the
24 following proceedings were had in open court:)
25      (Jury in.)

Page 36

1       THE COURT:  Members of the jury, have you
2  arrived at a verdict?
3       A JUROR:  Yes, we have, your Honor.
4       THE COURT:  If you will pass it to the
5  bailiff, please.
6       (Complies.)
7       THE COURT:  In Cause No. 747309, we, the
8  jury, find the defendant, James DeLeon, guilty of
9  aggravated kidnapping as charged in the indictment,
10 signed Mary Alexander, foreman of the jury.
11      Ladies and gentlemen, is this each and
12 everyone's individual verdict in this case as well?
13      (Whereupon, the jurors answer "yes" in
14 unison.)
15      THE COURT:  Anything further at this time?
16      MR. MORRIS:  No, your Honor.
17      THE COURT:  All right.  You may be seated.
18      All right.  Ladies and gentlemen, we will be
19 in recess now for lunch, and after lunch begin the
20 second phase of this trial.  Again you are not to
21 discuss this case with anyone.  Don't let anyone
22 discuss it with you.  If you will retire in the jury
23 room, please.
24      (Jury out.)
25

# EXHIBIT 10

648059

# BAIL BOND

CASE NO. 703025

COURT SETTING:

DATE 9-12-95 HM

TIME 830Am

Know All Men By These Presents:

CHARGE FELON POSS

WPN

SPN 01194953

That we, _____ HARRISON, TIM _____, as principal, and the

undersigned INTERNATIONAL FIDELITY INSURANCE COMPANY (AGENT, DAVID G. SCHMIDT) as sureties, are held and firmly bound unto the STATE OF TEXAS, in the penal sum of

TEN THOUSAND ($ 10,000.00 ) Dollars and, in addition thereto, we are bound for the payment of all fees and expenses that may be incurred by any peace officer in re-arresting the said principal in the event any of the hereinafter stated conditions of this bond are violated for the payment of which sum or sums well and truly to be made, we do bind ourselves, and each of us, our heirs, executors and administrators, jointly and severally.

THE CONDITION OF THIS BOND IS THAT THE DEFENDANT HAS BEEN CHARGED WITH A FELONY

(Felony-Misdemeanor)

offense and to secure his release from custody is entering into this obligation binding him to appear before_____

DISTRICT COURT 184 _____ Court of Harris County, Texas.

NOW THEREFORE, IF THE SAID PRINCIPAL SHALL WELL AND TRULY MAKE HIS PERSONAL APPEARANCE BEFORE SAID COURT INSTANTER AS well as before any other court to which the same may be transferred and for any and all subsequent proceedings that may be had relative to said charge in the course of criminal actions based on said charge, and there remain from day to day and term to term of said courts, until discharged by due course of law, then and there to answer said accusation against him, this obligation shall become void, otherwise to remain in full force and effect.

SIGNED AND DATED SEPTEMBER 11 , 19 95

Taken and approved this 11th day of SEPTEMBER , 19 95.
Tommy B. Thomas, Sheriff Harris County, Texas

By _____ Deputy

INTERNATIONAL FIDELITY INSURANCE COMPANY

_____ Surety
AGENT, DAVID G. SCHMIDT
400 SAN JACINTO
(Mailing Address)

HUSTON, TX 77002 713-225-6655
(City and State)     (Phone)

Lic. # 74360 Empt. _____

7 4 3 6 0

T. FIDELITY INS. CO.
ENT DAVID SCHMIDT
A/ ABAC BONDING CO.

RECORDER'S MEMORANDUM
This instrument is of poor quality and not satisfactory for photographic recordation; and/or alterations were present at the time of filming.

1. Tim Harrison Principal
2 3311 Sauer
(Mailing Address)
3 Houston Tx
(City and State)
2:1

RACE____ SEX____ DOB____ HT.____ WT.____

HAIR____ EYES____ DL#____ STATE____

Jail Location COUNTY

Co-Surety
_____
(Mailing Address)
_____
(City and State)        (Phone)

OATH OF SURETIES
THE STATE OF TEXAS
COUNTY OF HARRIS  We, each of us, INTERNATIONAL FIDELITY INSURANCE COMPANY

_____ do swear that we are worth in our own right at

least the sum of TWICE AMOUNT OFBOND _____ DOLLARS, after deducting from our property all that which is exempt by the Constitution and Laws of the State from forced sale, and after the payment of all our debts, of every description, whether individual or security debts, and after satisfying all encumbrances upon our property which are known to us; and that we reside in the County of HARRIS and have property in the State liable to execution worth:
INTERNATIONAL FIDELITY INSURANCE CO.

THE SAID _____ SUM OF TWICE AMOUNT OF BOND _____ DOLLARS

THE SAID _____ SUM OF _____ DOLLARS

_____ SURETY _____ CO-SURETY
(Signature)                          (Signature)
AGENT, DAVID G. SCHMIDT        SUBSCRIBED AND SWORN to before me this 11th

JOHNNY BUENROSTRO
Notary Public, State of Texas
My Commission Expires
OCTOBER 17, 1998

day of SEPTEMBER A.D. 19 95

_____
NOTARY PUBLIC HARRIS COUNTY

(Expiration Date of Notary)

P0504  1634916

# **EXHIBIT 11**

Incident no. 107569295 L  CURRENT INFORMATION REPORT          PAGE 2.088

No-0026

Offense- MURDER      ML# 95-6629
                     Street location information
Number-     1300 Name-WEST                 Type-        Suffix-
Apt no-     Name-OPELOUSAS                  Type-        Suffix-
Date of offense-09/18/95         Date of supplement-01/24/96
Compl(s) Last-CASTILLO      First-CHRISTINA  Middle-OFELIA
                Recovered stolen vehicles information
 Recovery location-                        District-   Beat-   00
 Stored-                        by-
Officer1-P J GUERRERO          Emp#-066767 Shift-1 Div/Station-HOMICIDE
Officer2-X E AVILA             Emp#-068547 Shift-1

                SUPPLEMENT NARRATIVE

TUESDAY, JANUARY 9, 1996 :                      INC. #107569295 L
************************                        ******************

    THIS DATE, INVS GUERRERO AND AVILA RECEIVED AN INFORMATION SHEET FROM
INV. J.C. BONABY.  BONABY ADVISED THAT HE HAD SPOKEN WITH TEXAS RANGER JESSE
MACK, WHO ASKED HIM TO RESEARCH INFORMATION THAT HE HAD RECEIVED REGARDING A
MURDER.  BONABY TOLD INVS THAT AN INFORMANT HAD COME FORWARD AND SPOKEN TO
CHIEF JOE GARCIA, BROOKSHIRE P.D., AND RANGER MACK.  HE TOLD THEM ABOUT THE
MURDER OF A YOUNG HISPANIC FEMALE THAT HAD BEEN ABDUCTED FROM AN APARTMENT
COMPLEX.  SHE WAS LATER BEATEN AND THEN DUMPED IN A VACANT LOT, SHOT THREE OR
FOUR TIMES.

    BONABY STATES THAT HE RESEARCHED THE INFORMATION AND FOUND THAT IT
MATCHED THIS INVESTIGATION.  BONABY ALSO PROVIDED THE TELEPHONE NUMBER FOR
RANGER MACK.

    INV GUERRERO THEN CONTACTED RANGER MACK AT HIS OFFICE, WHO GAVE INV THE
INFORMATION AGAIN.  INV ADVISED THAT THEY HAD BEEN INVESTIGATING A GROUP OF
AMERICAN BLACKS THAT HAD BEEN GOING AROUND TARGETING COLOMBIAN AND PUERTO
RICAN DRUG DEALERS.  RANGER MACK ADVISED THAT HE AND CHIEF GARCIA HAD BEEN
TARGETING A GROUP OF AMERICAN BLACKS THAT HAD BEEN COMMITTING AGGRAVATED
ROBBERIES AND WERE POSSIBLY INVOLVED IN THE MURDER OF LIBERTY COUNTY DEPUTY
AT A VIDEO STORE.  HOWEVER, AT THAT POINT THE NAMES OF THE PEOPLE INVOLVED IN
THE TWO GROUPS DID NOT MATCH.

    RANGER MACK ADVISED THAT CHIEF GARCIA HAD MORE INFORMATION, INCLUDING
THE NAMES OF ALL OF THE MEMBERS OF THE GROUP THAT HE WAS INVESTIGATING.  INV
THEN CONTACTED THE BROOKSHIRE POLICE DEPT. AND REQUESTED TO SPEAK WITH CHIEF
GARCIA.  CHIEF GARCIA WAS OUT OF THE OFFICE AT THE TIME AND INV LEFT HIS
NAME, OFFICE NUMBER AND PAGER NUMBER.

    CHIEF GARCIA LATER CALLED AND TOLD INV THAT HE HAD BEEN TARGETING A
GROUP OF BLACKS FROM BROOKSHIRE THAT WERE COMMITTING ROBBERIES IN HIS CITY
AND SEVERAL SURROUNDING SMALL TOWNS.  HE ALSO HAD INFORMATION THAT THIS GROUP
WAS RESPONSIBLE FOR THE MURDER OF A LIBERTY COUNTY DEPUTY AT A VIDEO STORE

ROBBERY IN HOUSTON.  HE TOLD INV THAT HE HAD AN INFORMANT THAT HAD COME
FORWARD AND HAD GIVEN INFORMATION REGARDING THIS MURDER AND HAD SHOWN HIM THE
LOCATION WHERE SHE WAS ABDUCTED.  SHE WAS LATER TAKEN TO A HOUSE IN THE THIRD
WARD AND BEATEN FOR INFORMATION REGARDING HER BOYFRIEND AND HIS DRUGS AND
MONEY.  SHE WAS DUCT TAPED AND TAKEN TO A VACANT LOT AND SHOT THREE TO FIVE
TIMES.

        INV ADVISED THE CHIEF OF SOME OF THE NAMES THAT HAD BEEN DEVELOPED IN
THIS INVESTIGATION.  HE ADVISED THAT HE DID NOT KNOW SOME OF THE NAMES, BUT
THAT MONTEGO JORDAN WAS A COUSIN OF ONE OF THE MEMBERS OF THE GROUP THAT HE
HAD BEEN INVESTIGATING.

        CHIEF GARCIA AND INV SET UP A TENTATIVE TIME TO MEET HALFWAY BETWEEN
BROOKSHIRE AND HOUSTON IN ORDER TO EXCHANGE INFORMATION.

        THAT EVENING, WHILE OFF DUTY, INV RECEIVED A PAGE ON HIS BEEPER.  INV
RETURNED THE CALL AND SPOKE WITH CHIEF GARCIA.  GARCIA ADVISED THAT THEY WERE
INVESTIGATING AN AGGRAVATED ROBBERY THAT HAD OCCURRED JUST PRIOR TO HIS CALL
AND THAT HIS OFFICERS HAD BEEN CHASING THE SUSPECTS, WHO WERE DRIVING A VAN.
ONE OF THE SUSPECTS HAD BEEN CAUGHT AND THE OTHER, ERIC CATHEY, HAD ESCAPED
ON FOOT.  HE FURTHER STATED THAT CATHEY HAD ALLEGEDLY THROWN A GUN OUT THE
WINDOW WHILE BEING CHASED AND THAT HE HAD OFFICERS SEARCHING THE ROUTE OF THE
CHASE TO SEE IF THEY COULD LOCATE THE WEAPON.

        INV ASKED CHIEF GARCIA IF THEY NEEDED ANY HELP SEARCHING THE AREA.
GARCIA TOLD INV THAT HE WAS ONLY GOING TO HAVE HIS MEN OUT THERE FOR ABOUT
ANOTHER HOUR AND THEN PULL THEM IN UNTIL MORNING.


                        ***********

WEDNESDAY, JANUARY 10, 1996 :
****************************

        INV GUERRERO CONTACTED CHIEF GARCIA IN HIS OFFICE AT THE BROOKSHIRE P.D.
CHIEF GARCIA TOLD INV THAT THE ROUTE OF THE CHASE WAS LONG AND IT WOULD BE
EXTREMELY DIFFICULT TO LOCATE A WEAPON IF ONE HAD BEEN THROWN OUT ALONG THE
ROUTE.  HE TOLD INV THAT HE WOULD BE COMING IN TO  HOUSTON ON SATURDAY AND
ASKED IF HE COULD MEET WITH INVS REGARDING THIS CASE AND THE OTHER ROBBERY
CASES THAT HE WAS WORKING.

        A TENTATIVE TIME WAS SET FOR SATURDAY AT 11:30 WITH A LOCATION TO BE
DETERMINED LATER.

                        ***********

SATURDAY, JANUARY 13, 1996 :
****************************

        INVS GUERRERO AND AVILA MET WITH CHIEF GARCIA AT A RESTAURANT ON DAIRY
ASHFORD, NEAR I-10, AT 12:00 NOON.

        CHIEF GARCIA TOLD INVS THAT HE HAD AN INFORMANT WHO WAS A PART OF THE
GROUP THAT HAD COMMITTED THIS MURDER.  HE FURTHER TOLD INVS THAT THE ONE WHO

# **EXHIBIT 12**

EXHIBIT
14

CAUSE No. 713192

The State of Texas          *          In The District Court
          V.          *          176th Judicial District
James De Leon          *          Harris County, Texas

## Affidavit

My first encounter with Montiego was in Brookshire at the Union 76 Truck Stop/Restaurant in or about the summer of 91. He sat in a booth beside mine and our conversation started up over the poor Service we were recieving. As our conversation grew I found out he had attended the Grand Prix Club with some friends from Houston and Brookshire.

          We started to ask each other who we knew In town only to find out that he and i were familar with Mr. Sonny Baker. I explained that Mr. Baker and myself were only Aquainted through Jr. High and High School that we attended in Brookshire that he and I have had our "up's" and "Down's" with each other while in school, Plus of only what I heard through town rumors of his reputation. Montiego then replied about Mr. Baker, but did not elaborate much about him. I then told Montiego a little bit about myself and intrest and He too about himself. He began to tell me he come to Brookshire to sell Dope and hang out at the Club. Just before leaving he shook my hand and stated that if i ever needed to score dope from him to keep intouch he gave me his Beeper number and mentioned about seeing me around town. Since that encounter with Montiego I've passed him several times during the next few months that passed.

——————————————— I. ———————————————

As time passed I started attending the Art Institute of Houston where i later find out that Mr. Baker to was Also attending. When i learned of this, Mr. Baker and myself re-aquainted ourselves, but because of our past I kept a distance from him because we constantly ran into each other in School.

During my attendance at the Art Institute of Houston (A.I.H.) I picked up a part time job Bouncing at a club, "Club 94" to make ends meet while going to school. I worked there Approximately 1½ to 2 months running into Mr. Montiego on Several occasion's. He and I reaquainted with each other filling in on each other's lives and progress. I told him of school, work, My part time job at the club and a new relationship I had, Plus telling him about attending school with Mr. Baker after all these year's again!

While working Part time Montiego and I build a relationship of trust and I eventually start to score Small amounts of cocaine to sell and also turn him on to Some people at School. He would occasionally come to the A.I.H. to deliver me cocaine or Pot. As our trust and Bussiness grew with the drugs he eventaully told me how he was Getting his drugs and money. He told me by "Jacking" dope houses or dealer's. He explained there was plenty to go around and that if I were intrested to let him know.

My part-time job was coming to an end and i decided that I would no longer continue fooling with Montiego. It was time to move on. I told him that my Part time job was over and that I would no longer be calling him for anything.

II.

I told him finals were coming around and I needed my personal time to myself. He asked me to stay in touch and if I changed my mind about his offer to contact him.

As finals finally came around I saw Mr. Baker one last time at school before he told me he would be dropping out of school for a while because of money problems. He wished me well and told me that we may cross paths in Brookshire.

Shortly after Graduation in September of 94 I moved to Lake Jackson for a Job. I eventually moved back with my parents after 4-5 months because of finacial difficulties. In September of 95 I ran into Montiego unexpectedly at the Brookshire Park where I decided to go before picking up job applications. He quickly reconized me and approached me asking for a ride back into Houston where he offered me money (50.⁰⁰), gas and a meal. I told him i was going into the Katy-Houston Area and would take him up on his offer, but before leaving I asked How he got into Brookshire with no ride home. He told me his partners left for food, but never returned. We then left for Houston

During our drive we filled each other in on ourselves since our last encounter. I told him about my Job situation and some emotional problems due to my marriage break up. I explained how i picked up an assault case while with her and explained About my probation and stipulation's, but before i could finish he laughed and lit a Joint and told me about himself and a female he had murdered because of a similar relationship, but mainly because she wouldn't cooperate. Confused, I listened to his story in doubt. He continued about his "Jacking" and robbing and how all that tied

III.

into his relationship telling me he would never let a women get him in the position my relationship got me in. He goes on to tell me how he met the young lady at a Houston club and how they eventually got romantically involved with one another because of her and her boyfriend's drug bussiness. He spoke of the large amount of money and dope they have and are selling. During their involvement she eventually sets Montiego up with "Jack's" and robberies in the area with other drug dealers and dope house's, mainly to slow down competition, but also stated that he intended to also rob them of their money and drugs. Before that could happen she wanted to end their little 4-6 month affair because she told him she was preganet with either his or her boyfriend's baby. This angered him due to the fact that he would probably not be able to rob her and her boyfriend. At this point we stop for gas and a burger at the Jack in the Box off of Hwy. 6 @ I-10. where we stayed roughly 30 min, to dine in. He continued to tell me the story that he and his friends followed the young lady for a day or two to carry out his robbery of this lady. He explains that after following her that they abducted her at her Apartment Complex where they eventually took her to a friend's home. According to Montiego they began beating her for several hour's because she refused too tell of the drugs and money which anger's them into eventually killing her.

        By this time we are leaving the restaurant and he goes on to tell me of the violence and sexual act's they conducted with her after not successfully obtaining the information

IV.

needed. They feared that she would contact police or Boyfriend of the incident. Montiego goes on to explain that the area that i am to drop him off at is where she had been taken and killed after making her conduct oral sex with everyone involved, giving her one last chance to talk. Just before reaching his destination he directs me to the area where she had been ~~taken~~ to and killed. We drive by the area where she had been dumped and off we go. By this time Montiego pretty much has me convinced of his story, but i did have some doubts because of being unsure about certain things he had talked about. As we reach a corner store Montiego tells me to drop him off there and tells me he was sorry to hear about my troubles and my ex wife, but commented on the **fact** that if i too would of killed her, i wouldn't be on probation or the money problems i have. We shook hands and he went on his way. He told me to keep in touch and if i ever needed anything to let him know he gave me his beeper number and i left back to the Katy area to finish my Job search, then back to Brookshire

I declare under the penalty of perjury, that the Above and foregoing affidavit is true and correct.

*James DeLeon*

James DeLeon

Sworn and subscribed before me this 20 day of ~~November~~ 199_. The above person personally appeared

J. BESHEARS
Notary Public, State of Texas
My Commission Expires
SEPTEMBER 29, 1997

# **EXHIBIT 13**

NO. 713,189-A

| | | |
|---|---|---|
| EX PARTE | : | IN THE DISTRICT COURT OF |
| | : | |
| | : | HARRIS COUNTY, T E X A S |
| | : | |
| ERIC DEWAYNE CATHEY | : | 176TH  JUDICIAL DISTRICT |

<u>AFFIDAVIT</u>

THE STATE OF TEXAS      :

COUNTY  OF  HARRIS      :

      BEFORE ME, the undersigned authority, personally appeared CYNTHIA PATTERSON, who upon her oath stated as follows:

      " My name is Cynthia Patterson.  I am the investigator for Eric Dewayne Cathey in the above styled and numbered application for writ of habeas corpus.  At the request of Janet Morrow, Mr. Cathey's court appointed attorney on this writ, I contacted the jurors in his capital murder trial to interview them.  I spoke by telephone with juror Heather Bradford, identifying myself at the beginning as Mr. Cathey's investigator.

      I asked Ms. Bradford if it would have had any effect on her decision to vote in favor of the death penalty on the mitigation special issue if she had known that if the jury failed to reach a verdict on a special issuec the trial judge would be required by statute to enter an automatic sentence of life imprisonment.  Ms. Bradford told me that she had not known that, and that she had assumed there would be a mistrial in the event of a "hung jury" on punishment.  Ms. Bradford said, "I was the holdout", and she said if she had realized the consequence of maintaining her verdict would be a life sentence, rather than a mistrial and retrial of the whole case, she probably would not have changed her vote to join the death-voting jurors on the mitigation special issue.  Ms. Bradford said the other jurors did not "browbeat" her, that any pressure came from her assumption that there would be a mistrial if the jury failed to sign the verdict form.

*Cynthia Patterson*

CYNTHIA PATTERSON

SUBSCRIBED AND SWORN TO before me on this 15th day of March, 1999.

*[signature]*

PEGGY J. DAILEY
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
OCT. 7, 2000