# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| ERIC DEWAYNE CATHEY, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  H-04-1306 |
| | § | |
| DOUGLAS DRETKE, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Eric Dewayne Cathey filed a Petition for Writ of Habeas Corpus on April 2, 2004. [Doc. # 3].  This action comes before the Court on Respondent Douglas Dretke's motion for summary judgment.  [Doc. # 7].  Having considered the pleadings, the record, and the applicable law, most particularly the operation of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), the Court grants Respondent's summary judgment motion and denies habeas relief.  The Court will not issue a Certificate of Appealability.  The Court sets forth the reasons for this ruling below.

## BACKGROUND

On September 13, 1995, Christina Castillo's live-in boyfriend contacted the police and reported her as missing.  Ms. Castillo had not returned to their apartment the night before and did not answer calls to her cell phone and pager.  On September 18, 1995, a family collecting aluminum cans in an unfrequented area of Houston found Ms. Castillo's body.

Duct tape bound her hands and feet, and also covered her eyes.  The police found three 9-millimeter cartridge cases and a fired lead bullet near the body.  A subsequent examination revealed that Ms. Castillo died from three gunshot wounds in her head.

The police received tips that led them to arrest Cathey for Ms. Castillo's murder. Importantly, James DeLeon provided a confession in which he described how six men – himself, Cathey, Lionel Bonner, Anthony Riley, Patrick Brooks, and Sonny Baker – all participated in kidnapping Ms. Castillo during a failed robbery attempt.  DeLeon fingered Cathey as the one who shot Ms. Castillo three times in the head.[1]  The State of Texas indicted Cathey for murdering Christina Castillo during a kidnapping.

At trial, Lionel Bonner testified concerning the events surrounding Ms. Castillo's death.  Bonner testified that on September 12, 1995, the six men planned to rob Ms. Castillo and her boyfriend, believing that they had drugs and money.  The group waited near Ms. Castillo's apartment until she arrived.  As Ms. Castillo exited her vehicle, Cathey grabbed her by the throat and held her at gunpoint.  Cathey forced her into a car.  The group and Ms. Castillo then proceeded in two separate vehicles to the house of Cathey's mother.  The kidnappers secured Ms. Castillo's hands and feet with duct tape.  The men then asked Ms. Castillo where her drugs and money were.  When she denied having any, the group began beating her, repeatedly hitting and kicking her although she told them she was pregnant.  The

---

[1]    The defense called DeLeon as a witness.  DeLeon vacillated between testifying and exerting his Fifth Amendment right against self-incrimination.  DeLeon ultimately decided not to testify.

beating lasted fifteen minutes while Ms. Castillo continually denied having any drugs or money.

The group eventually discussed letting Ms. Castillo go free.  The group drove to a low-income, high-crime area in separate vehicles, ostensibly to leave Ms. Castillo there.  As Bonner left the area in one car, he saw Cathey outside the other vehicle reaching toward Ms. Castillo.  Bonner then heard gunshots.  Cathey later told Bonner that he shot Ms. Castillo. He also showed Bonner a picture of Ms. Castillo that he stole from her purse.  When Bonner asked Cathey why he shot her, he responded that he did not know.

Other testimony showed that several weeks later Cathey possessed the weapon that killed Ms. Castillo.  Cathey also told others that the police wanted him for the murder of a "Spanish girl" and that he "killed the Spanish lady."  Cathey also admitted to his presence when "the bitch got shot."

A jury found Cathey guilty of capital murder.[2]  In a separate punishment phase, the prosecution presented evidence and testimony concerning Cathey's criminal history, including his past convictions for driving with a suspended licence, reckless conduct, and marijuana possession.  The prosecution presented testimony showing that Cathey repeatedly failed to comply with his probation conditions.  Additionally, the prosecution highlighted Cathey's history of committing violent, but unadjudicated, offenses including possessing weapons, shooting at people, engaging in drug transactions, stealing money from drug dealers, and attempting to commit robbery and burglary.  The prosecution adduced testimony

---

[2]     Kurt Wentz and Terry Gaiser represented Cathey at trial.  This Court, for the most part, will refer to Cathey's attorneys collectively as "trial counsel."

showing Cathey's poor reputation for being a peaceful, law-abiding person.  After the presentation of testimony and the argument of counsel, the jury answered Texas' special issue questions in a manner requiring the imposition of a death sentence.[3]

The Court of Criminal Appeals affirmed Cathey's conviction and sentence on direct review.  *Cathey v. State*, 992 S.W.2d 460 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000).  Cathey unsuccessfully sought habeas corpus review in Texas state court.

Cathey filed a motion for the appointment of counsel in this Court on April 21, 2003. [Doc. # 1] which was granted [Doc. # 2].  On April 2, 2004, Cathey filed the instant federal

---

[3]     Texas' special issue questions, submitted pursuant to TEX. CODE CRIM. PRO. art. 37.071, required the jury to answer the following three questions:

Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Eric Dewayne Cathey, would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue No. 2

Do you find from the evidence beyond a reasonable doubt that Eric Dewayne Cathey, the defendant himself, actually caused the death of Christina O. Castillo, on the occasion in question, or if he did not actually cause the death of Christina O. Castillo, that he intended to kill Christina O. Castillo or another, or that he anticipated that a human life would be taken?

Special Issue No. 3

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Eric Dewayne Cathey, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than the death sentence be imposed?

Court of Criminal Appeals File, Vol. I-A at 406-07.

habeas petition through appointed counsel. [Doc. # 3]. Cathey's federal petition raises the following grounds for relief:

- The prosecution violated Cathey's due process rights by failing to disclose an "understanding" with Bonner regarding his trial testimony.

- A constitutional violation resulted from when: (1) the prosecution suppressed a police report containing allegedly exculpatory information; or (2) trial counsel failed to fashion a defense using that information (if the prosecution turned over the police report).

- The trial court's instructions misled the jury regarding the effect of any failure to reach an unanimous verdict.

- Insufficient evidence supported Cathey's conviction, largely because an accomplice's trial testimony lacked adequate corroboration.

- Insufficient evidence supported the jury's negative answer to the mitigation special issue.

- Texas fails to assign a burden of proof to, and provide meaningful appellate review of, a capital defendant's mitigating evidence.

- The trial court violated Cathey's constitutional rights by informing a witness of his right not to provide self-incriminatory testimony.

Respondent moves for summary judgment, contending that the operation of the AEDPA, state procedural law, and federal precedent requires this Court to deny habeas relief.[4]

## STANDARD OF REVIEW

---

[4]     Recent revisions of the federal habeas rules afford a petitioner the opportunity to "submit a reply to the respondent's answer or other pleading . . . ." RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS, Rule 5(d). This Court ordered Cathey to file a reply to any dispositive motion filed by Respondent. [Doc. # 4]. Cathey elected not to respond to the pending summary judgment motion. This Court, however, can rule on the allegations contained in his petition without a summary judgment response. *See Dillard v. Blackburn*, 780 F.2d 509, 515-16 (5th Cir. 1986).

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also* 28 U.S.C. § 2254(a). Therefore, "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983). Important interests of finality, comity, and federalism circumscribe the scope of federal habeas review because "[l]iberal allowance of the writ . . . degrades the prominence of the trial itself." *See Engle v. Isaac*, 456 U.S. 107, 127-28 (1982) ("The States possess primary authority for defining and enforcing the criminal law. In criminal trials they also hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights."). "[F]ew indeed is the number of state prisoners who eventually win their freedom by means of federal habeas corpus. Those few who are ultimately successful are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963). Thus, "the writ of habeas corpus has historically been regarded as an extraordinary remedy, a bulwark against convictions that violate fundamental fairness." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (quotation omitted); *see also Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring in judgment) (stating that habeas corpus "is designed to guard against extreme malfunctions in the state criminal justice systems").

The AEDPA governs this Court's review of Cathey's habeas petition.  Congress enacted the AEDPA "at least in part, to ensure comity, finality, and deference to state court habeas determinations by limiting the scope of collateral review and raising the standard for federal habeas relief."  *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003); *see also Williams v. Taylor*, 529 U.S. 420, 436 (2000) (noting the "AEDPA's purpose to further the principles of comity, finality, and federalism").  Under the AEDPA, a federal court can only grant relief if a state court's adjudication of a constitutional claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  A state court's decision is "contrary to" clearly established law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *see also Price v. Vincent*, 538 U.S. 634, 640 (2003); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  A state court unreasonably applies federal law when it "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the particular facts of the particular state prisoner's case" or when "the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 407.

The AEDPA also controls this Court's review of factual questions.  The AEDPA "overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party."  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *cert. dismissed*, ___ U.S. ___, 24 S. Ct. 1652 (2003).  A federal habeas court must presume any underlying state factual findings to be correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003); *Smith*, 311 F.3d at 668.[5]  Under 28 U.S.C. § 2254(d)(2), "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented."  *Miller-El*, 537 U.S. at 340.

Nevertheless, a petitioner's compliance with 28 U.S.C. § 2254(d) does not entitle him to habeas relief.  No Supreme Court case "ha[s] suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard[.]"  *Horn v. Banks*,

---

[5]     Relying on pre-AEDPA law, Cathey asserts that this Court should not afford the state factual findings any deference because the state habeas court did not hold a "full and fair" hearing on his claims.  Prior to the passage of the AEDPA, a federal court could only defer to factual findings made after a "full and fair" hearing, whether on paper or through live testimony.  *See* 28 U.S.C. § 2254(d) (1994) (repealed 1996).  The AEDPA, however, contains no such requirement, squarely placing the burden on the petitioner to disprove any factual finding by clear and convincing evidence.  *See Valdez v. Cockrell*, 274 F.3d 941, 948 (5th Cir. 2001) (holding that "a full and fair hearing is not a prerequisite to the operation of the AEDPA's deferential scheme"), *cert. denied*, 537 U.S. 883 (2002); *but see Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002) (analyzing the presumption of correctness under pre-AEDPA standards).  Cathey essentially asks this Court to apply pre-AEDPA law to his claims.  "To reintroduce a full and fair hearing requirement that would displace the application of § 2254(e)(1)'s presumption would have the untenable result of rendering the amendments enacted by Congress a nullity."  *Valdez*, 274 F.3d at 949-50.  This Court must presume any state factual findings to be correct, unless Cathey demonstrates otherwise by the appropriate standard.

536 U.S. 266, 272 (2002); *see also Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (finding that 28 U.S.C. § 2254(d) "does not require federal habeas courts to grant relief reflexively").  A habeas corpus petitioner meeting his burden under 28 U.S.C. § 2254(d) must still comply with 28 U.S.C. § 2254(a); he must show that "he is in custody in violation of the Constitution or laws or treaties of the United States."  Thus, other jurisprudential doctrines, such as the harmless-error doctrine and the non-retroactivity principle, guide federal habeas review.  Any trial error cannot form the basis for federal habeas relief unless it "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht*, 507 U.S. at 629); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir.) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."), *cert. denied*, 539 U.S. 960 (2003).  A habeas court likewise cannot grant relief if it would require the creation of new constitutional law.  *See Horn*, 536 U.S. at 272 (relying on *Teague v. Lane*, 489 U.S. 288 (1989)).[6]

---

[6]       Federal habeas relief generally may not be premised on "a new rule" of law if the Supreme Court announced that rule after the petitioner's conviction became "final," if the petitioner wishes to establish a wholly new rule, or if the petitioner seeks to apply a settled precedent in a novel way that would result in the creation of a new rule.  *See Teague*, 489 U.S. at 310; *Penry v. Lynaugh*, 492 U.S. 302, 313 (1989) (finding *Teague* applicable in the capital context).  "[A] case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal government. . . . To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final."  *Teague*, 489 U.S. at 301; *see also Graham v. Collins*, 506 U.S. 461, 467 (1993).  As a general rule, "if the State . . . argue[s] that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim . . . ."  *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994); *see also Horn*, 536 U.S. at 272 ("[A] federal court considering a habeas petition must conduct a threshold (continued...)

## ANALYSIS

I.    **Cathey's Claim that the Prosecution Suppressed Information About Its "Understanding" with an Accomplice that Resulted in his Testimony (Claim One)**

Cathey first alleges that the prosecution failed to disclose an "understanding" between the prosecution and Lionel Bonner that resulted in Bonner's trial testimony incriminating Cathey in the charged crimes.  The prosecution's case against Cathey depended on Bonner's testimony.  Bonner's account of the murder provided substance to the otherwise-skeletal information before the jury.  Cathey properly refers to Bonner's testimony as "the lynch pin in [his] case."  (Doc. # 3 at 8).  Before trial, the defense filed a "Motion to Require the State to Reveal any Agreements or Offers with a Witness that Could Influence his Testimony."  Court of Crim. App. File, Vol. I at 86.  The parties discussed the introduction of Bonner's testimony on the record, and agreed that the parties could question him concerning any agreement to testify for the prosecution.

The prosecution maintained that Bonner agreed to testify without a promise of what sentence he would serve for his complicity in Ms. Castillo's death.  Trial Transcript ("Tr.") Vol. 17 at 18-19.[7]  On February 25, 1997, Bonner pleaded guilty to aggravated kidnapping.  The plea papers accompanying that action indicated that he did not enter into a plea bargain agreement with the State and that the trial court would decide his punishment without any prosecutorial recommendation.  At his guilty plea hearing, Bonner affirmed that he had made

---

6         (...continued)
         *Teague* analysis when the issue is properly raised by the state.").

7         Hereafter, the trial transcript will be cited in the following format: "Tr. at [Vol.]:[page]."

no deal in return for his plea and that he received no promise concerning his punishment. Both the prosecution and Bonner's counsel also maintained that they had not reached any agreement concerning Bonner's sentence.  State Habeas Record at 122-23.

On March 11, 1997, Bonner delivered highly incriminatory testimony against Cathey. Bonner recounted the reason he chose to testify against his co-defendant:

> The State:    After you gave a statement to Detective Avila, were you charged with a criminal offense in this case?
>
> Bonner:       Yes, I was.
>
> The State:    Were you charged with the offense of capital murder?
>
> Bonner:       Yes.
>
> The State:    Do you have a lawyer?
>
> Bonner:       Yes, I do.
>
> The State:    Who is your lawyer?
>
> Bonner:       Connie D. Williams.
>
> The State:    Did you make an agreement through your lawyer to testify in this case in exchange for the State reducing your charge to aggravated kidnapping?
>
> Bonner:       Yes.
>
> The State:    And prior to being indicted for aggravated kidnapping, did you testify in front of a grand jury?
>
> Bonner:       Yes.
>
> The State:    About what you knew in this case?
>
> Bonner:       Yes.

The State:     Have you entered a plea on your charge of aggravated kidnapping?

Bonner:        Yes, I have.

The State:     And how did you plead?

Bonner:        Guilty.

The State:     And through your lawyer did you file a motion for probation in this case?

Bonner:        Yes, I did.

The State:     And what is the range of punishment as you understand it for the offense of aggravated kidnapping?

Bonner:        5 years to 99 years to life.

The State:     Do you know what punishment you're going to receive?

Bonner:        No, I don't.

The State:     Has the State or any of its agents ever made any representation to you that there's some deal for how much time you are going to receive?

Bonner:        No.

The State:     As far as–what is your understanding of who will make that decision of how–what sentence you will receive in this case?

Bonner:        Judge Rains.

The State:     Has your lawyer or the State or anyone told you that there's some special deal you're going to get, some set punishment you're going to receive depending upon the outcome of this case, or depending on anything?

Bonner:        No, sir.

| | |
|---|---|
| The State: | At the time that you entered your plea to the judge, did the judge tell you that he was going to do a certain type of punishment? |
| Bonner: | No, sir. |
| The State: | You pled for what's called a pre-sentence investigation; is that right? |
| Bonner: | Yes. |
| The State: | And what is your understanding of a pre-sentence investigation? |
| Bonner: | The probation department investigates your past, from juvenile to present, present it before the judge, and he goes through it and decides the punishment. |

Tr. at 20:98-101. On cross-examination, Bonner admitted that he received some benefit from his testimony, insofar as the prosecution had reduced his charge from capital murder to aggravated kidnapping. Tr. at 20:107-110. The reduction in charge allowed Bonner to seek probation for his role in the kidnapping/murder and also allowed him to request a bond reduction. Tr. at 20:109-110. While Bonner's testimony showed that his willingness to testify influenced the State's choice of criminal *charges* to levy against him, nothing indicated that he secured any promise affecting his *sentencing*.

After Cathey's trial, a state court sentenced Bonner to thirty-years imprisonment in the Texas Department of Criminal Justice, Institutional Division. Bonner subsequently filed a motion for new trial arguing that the prosecution failed to honor an agreement to recommend a lenient sentence in his case. The state courts found that no such agreement existed between Bonner and the prosecution.

In his state habeas proceedings, Cathey argued that the prosecution failed to divulge the contours of its agreement that resulted in Bonner's trial testimony against him. Cathey did not dispute that the prosecution disclosed the fact that Bonner's guilty plea ensured that they would not charge him with a capital offense. However, Cathey alleged that the prosecution also entered into an "understanding" regarding Bonner's ultimate sentence. Cathey supported that claim with an affidavit in which Bonner described his perception of the facts leading up to his testimony in Cathey's trial:

> I am the same LIONEL D. BONNER who was charged in cause number 713190 in the 176th District Court of Harris County, Texas. I was charged with aggravated kidnapping. There were three other co-defendants charged in this case. My father hired Connie Williams as my attorney. There was a discussion between myself and CONNIE WILLIAMS about a plea bargain. Connie said he spoke to the district attorney and he wanted to make a deal in exchange for my testimony against the other three co-defendants. I agreed that this would be the best way to go. Approximately one month before the plea I was in court and the case was reset because my attorney wasn't there. KATE DOLAN, another DA, came over to the bench and told me to follow her. I was out on bond at the time. We went back to the jury room and they asked [i]f I would be willing to cooperate. I said I would. I asked them what kind of deal were they offering for my testimony. LYLE Mc[C]lellan said I could probably receive probation or pen time. He told me the most I would receive would be ten years. I agreed to the deal and told them about the offense. They said they would get with my attorney so as to be more specific about the deal.
>
> Before the plea, CONNIE WILLIAMS sent over another attorney to represent me. Mr. Williams was not present. At first I refused to sign the plea bargain agreement because it was a guilty plea with no deal on it. When I refused to sign, DA Mc[C]lellan came out into the hallway and got me. He said I had to go with him. My mother went with us to the jury room. DA Mc[C]lellan said if I didn't sign the plea papers, the DA's office would re-charge me with capital murder and that I could easily get a life sentence. When the DA asked me how much time I thought I would get, I told him I expected to get probation if I testified for the state. DA Mc[C]lellan said he wasn't sure I could get probation but that I should sign the plea papers because he had

already spoken to CONNIE WILLIAMS about the deal.  *I signed the plea papers with the understanding that there was a deal between DA Mc[C]lellan and CONNIE WILLIAMS and myself.*

*When I approached the bench and the judge asked me if I had been promised anything in return for my plea, I thought he meant in the sense had anyone given me anything of monetary value for my plea.  I didn't know he was talking about the deal I had with the DA's office.  If I had known there was no deal, I would not have pleaded guilty.*  I would have insisted upon a jury trial. My involvement in this offense was less than any other of the co-defendants.

After the plea I testified for the state against the other three co-defendant[s], one of whom was my own brother-in-law.  *During the months between my plea and my sentencing, CONNIE WILLIAMS continually told me the state was going to recommend to the court that I get ten years deferred adjudication probation.*  When I went to court for sentencing, however, DA Mc[C]lellan said he wasn't going to make a recommendation.  I then asked CONNIE WILLIAMS if we could do the sentencing in another five days.  CONNIE WILLIAMS asked DA Mc[C]lellan for the five day reset, but DA Mc[C]lellan refused.  I asked for the additional time because I wanted to discuss with my attorney what the DA said about not making a recommendation.  I didn't understand why he said that when all along CONNIE WILLIAMS had been telling me things were alright and that we had a deal with the DA.  When we went into court for the PSI hearing, the judge asked the DA if the DA had a recommendation.  When DA Mc[C]lellan said no, CONNIE WILLIAMS asked about the ten year cap.  The judge said, 'What do you want me to do, the State doesn't have a recommendation."  The judge then said he was giving me thirty years.  This was more time than two of the three co-defendants I testified against.  *Why would I agree to testify for the state unless I thought I had a deal.  It doesn't make any sense.*  The whole point was to get a fixed recommendation in exchange for my testimony.

(Doc. # 3, Exhibit 6, affidavit of Lionel Bonner, signed July 7, 1997) (emphasis added).

Cathey supports Bonner's account of his "understanding" with the prosecution by

submitting an affidavit from Bonner's attorney, Connie Williams:

*D.A. Mc[C]lellan agreed not to make a recommendation to the court and agreed not to oppose any sentence we suggested.*  Since, under *Brady* and *Giglio*, any agreement between my client and the D.A.'s office would have to be made known to the respective defendant[s] in the other cases, *my*

> *agreement with Mr. Mc[C]lellan was a tacit one.* I have 25 years experience in the criminal courts and I have known Mr. Mc[C]lellan for many years. Therefore, I saw no reason to put our agreement in writing. *I informed Mr. Mc[C]lellan that we would be asking for deferred adjudication. I also discussed a ten year cap. Mr. Mc[C]lellan expressed his doubts about the ability to get deferred on this case, but informed me that he believed Mr. BONNER would receive a sentence at the low end of the spectrum, possible in the eight to ten year range. Although Mr. Mc[C]lellan made no written agreement with my client, I believe, based upon my prior dealings with Mr. Mc[C]lellan, that we had a meeting of the minds and an understanding that my client would, at the very least, receive less time than the individuals he testified against.*

(Doc. # 3, Exhibit 6, affidavit of Connie B. Williams, signed June 30, 1997) (emphasis added).[8]  Mr. Williams further stated that

> I don't believe, in retrospect, that [Bonner] understood that by entering a plea *without an agreed recommendation* he was subjecting himself to the full range of punishment. *I may have misled Mr. Bonner because I repeatedly told Mr. BONNER that things were going to be fine and that he should continue to cooperate with the state.* I also told him of what D.A. Mc[C]lellan said about a possible deferred adjudication and the low sentencing range. *Quite possibly, Mr. BONNER may have taken what I said to mean that there was an agreement with the D.A.'s office to limit the judge's sentencing discretion, when in fact there wasn't.*

---

[8]     Bonner's father also submitted a hearsay-laden affidavit wherein he described how Mr. Williams assured him that "I'm going to get us a one hundred percent guarantee. The worst he could get is ten years probation because they are going to give us a ten year cap on his sentence." (Doc. # 3, Exhibit 6, affidavit of Lonnie Nunn, signed July 1, 1997). Bonner's father assumed that Mr. Williams secured a ten-year sentence, but could not get it in writing "because they couldn't give it to me without turning it over to the other lawyers." (Doc. # 3, Exhibit 6, affidavit of Lonnie Nunn, signed July 1, 1997). When Bonner's father expressed concern at the lack of a written agreement, Mr. Williams allegedly told him, "you have nothing to worry about because they aren't going to screw you around like that." (Doc. # 3, Exhibit 6, affidavit of Lonnie Nunn, signed July 1, 1997). When it became apparent that Bonner would not receive the lenient sentence he expected, Mr. Bonner "asked what went wrong and what happened to the guarantee and the probation, Connie told me that he did not know what happened." He also said, "I told them I thought we had a ten year cap but the judge asked the district attorney if they had given me something in writing and the district attorney said, 'no.'" (Doc. # 3, Exhibit 6, affidavit of Lonnie Nunn, signed July 1, 1997).

(Doc. # 3, Exhibit 6, affidavit of Connie B. Williams, signed June 30, 1997) (emphasis added).

The record contains other evidence, however, suggesting that no tacit agreement existed between Bonner and the prosecution.  The trial prosecutor, Kate Dolan, provided an affidavit describing the prosecution's "deal" with Bonner:

> Lionel Bonner's attorney, Connie Williams, approached me about having Bonner testify against Eric Dewayne Cathey and the other codefendants involved in this case.  The agreement we reached was that Bonner would testify truthfully about the offense in the trials of all of the parties involved in these cases.  In return, Bonner would plead to the first degree felony of aggravated robbery [subject] to a [subsequent] presentence investigation. This meant that Judge Rains would determine the sentence when Bonner completed his testimony in the last of the trials of the codefendants.  There was never any agreement concerning a number of years nor was there any discussion or agreement concerning probation or deferred adjudication.  The agreement was that the State would not make any recommendation concerning punishment at Bonner's sentencing hearing.   After this agreement was reached, Connie Williams told his client to cooperate with Mr. McClellan and I.

(State Habeas Record at 274, Affidavit of Kate Dolan, dated March 7, 2002).  Ms. Dolan stated that "[a]t no time during [her] contact with Lionel Bonner did [she] believe that he did not understand what the deal was or that he was confused about any of the details of our agreement."  (State Habeas Record at 274, Affidavit of Kate Dolan, dated March 7, 2002). Ms. Dolan clarified that "[i]t was not until Lionel Bonner was sentenced and received 30 years . . . and filed a motion for a new trial that [she] realized that Bonner was claiming that [they] had made some kind of agreement for probation or a low number of years.  That was not true."  (State Habeas Record at 275, Affidavit of Kate Dolan, dated March 7, 2002).

The other prosecutor, Brian Lyn McClellan, testified in a hearing related to a motion for new trial filed in Bonner's case.  State Habeas Record at 168-184.  Cathey's state habeas court issued the following factual findings concerning Mr. McClellan's testimony:

> The Court finds, based on the appellate record of cause no. 713190, that prosecutor Lyn McClellan testified during co-defendant Lionel Bonner's motion for new trial that at no time did he nor any other prosecutor represent to Bonner or his attorney that there was any agreement as to Bonner's punishment; that prior to [Cathey's] trial in the primary case, prosecutor McClellan spoke with Bonner and asked Bonner what he thought he would get for his role in complainant Christina Castillo's kidnapping and murder; that McClellan went "ballistic" when Bonner said he thought ten year probation was what he expected to get, and McClellan told Bonner in no uncertain terms that there had never been any such deal, that his punishment would be assessed by the court after the pre-sentence investigation was completed, and that Bonner faced a possible punishment range of five to ninety-nine years or life in the Texas Department of Criminal Justice, Institutional Division; and, that there was no deal struck with the State, but that Bonner had testified in the trials of [Cathey] and his two co-defendants that he had made no deal with the State in regards to punishment.

State Habeas Court Findings of Fact and Conclusions of Law ("FFCL"), at 4, ¶ 12.

Based on the information from the prosecutors, the state habeas court found that "there was no deal with co-defendant Lionel Bonner other than to permit him to plead to the lesser offense of aggravated robbery, and Bonner would plead to a pre-sentence investigation and the trial court would sentence Bonner without a recommendation from the State after Bonner testified in all the trials of the co-defendants."  FFCL, at 5, ¶ 15.  The state habeas court found that Bonner's account of an "understanding" lacked credibility, resting entirely on "contradictory, bare allegation[s]."  The state habeas court also noted that "the trial court stated during co-defendant Bonner's motion for a new trial, in the court's opinion, Bonner had not told the truth during his motion for a new trial hearing and that the trial court found

no reason to believe that there was any kind of deal between Bonner and anybody else." FFCL, at 5, ¶ 15.  Thus, Cathey "fail[ed] to show that there was an agreement between the State and Bonner that should have been disclosed to the jury."  FFCL, at 9, ¶ 1. Alternatively, the state habeas court concluded that Cathey failed to show any prejudice from the failure to disclose an agreement with Bonner because "trial counsel thoroughly cross-examined Bonner concerning the benefits he received from the State in return for his testimony, and the jury was free to accept or reject any portion of Bonner's testimony and free to view Bonner's testimony with skepticism based on his possible motives."  FFCL, at 9, ¶ 2.[9]

---

[9]     On appeal from his guilty plea, Bonner likewise asserted that the prosecution reneged on an understanding concerning his testimony.  The intermediate appellate court found that "[t]he record shows that the State never agreed to a reduced sentence or probation and that it was always the State's intent for the trial court to assess punishment after a presentence investigation report and for the State to remain silent as to punishment."  *Bonner v. State*, 1999 WL 1240917, *1 (Tex. App.--Houston [1st Dist.] 1999, pet. ref'd) (unpublished), *cert. denied*, 531 U.S. 929 (2000).  The intermediate appellate court further explained:

> The record shows that, in exchange for his plea of guilty and his testimony, he was charged with aggravated kidnapping, instead of capital murder. In addition, the State indicated that it would remain silent as to a punishment recommendation in light of the full range of punishment, 5 to 99 years or life, plus a fine not to exceed $10,000.

> [Bonner's] comments during the plea hearing show that he realized that the full range of punishment was available to the trial judge. Any statements made to [Bonner] by his defense counsel about a "deal" with the State for punishment were simply counsel's erroneous expectation, speculation, and hope for the outcome of trial strategy. In view of the clear admonitions given by the trial court before the plea, [Bonner] cannot credibly contend that his plea was involuntary and that he was denied effective assistance of counsel.

*Id.* at *4.

On federal habeas review, Cathey renews his claim relating to Bonner's testimony. "[T]he special role played by the American prosecutor in the search for truth in criminal trials" encourages the full disclosure to the defense of all exculpatory or impeachment evidence. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "Courts, litigants, and juries properly anticipate that 'obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed.'" *Banks v. Dretke*, __ U.S. __, __, 124 S. Ct. 1256, 1275 (2004) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Three essential components comprise a valid *Brady* claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 281-82.

The state habeas court issued explicit and thorough factfindings relating to Cathey's *Brady* claim. Of particular note, the state habeas court found that no "deal" or "understanding" existed between Bonner and the prosecution relating to his potential sentence. On federal review, Cathey must rebut those findings by clear and convincing evidence. Aside from referring to the information presented on state review, Cathey provides

no evidence to rebut the state findings.  This Court must presume correct the state finding that no undisclosed sentencing agreement existed between the prosecution and Bonner.

Cathey simply fails to make the most basic showing required by *Brady*: that the prosecution suppressed material from the defense.  The evidence before the Court suggests that, at best, Bonner and/or his counsel held a subjective belief that he had entered into an agreement with the prosecution.  Bonner, however, does not present any evidence that an actual sentencing agreement existed either on paper or through discussion.  Instead, Cathey argues that Bonner and his counsel believed that, through winks and nods, they entered into a plea agreement.  That belief does not make it so.  Cathey fails to show that the relevant parties entered into any plea agreement beyond that which Bonner testified to at trial.[10]

The state habeas court alternatively found that, if a punishment agreement indeed existed, the suppression of that fact would not meet *Brady*'s materiality standard.  Under *Brady*, a prisoner must show "there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed."  *Strickler*, 527 U.S. at 296. As noted by the state habeas court, the jury in this case already understood that Bonner entered into an agreement which allowed him to avert a death sentence.  They also knew that the prosecution would not champion a harsh recommendation against Bonner at his

---

[10]    Cathey specifically asks this Court to hold an evidentiary hearing on his *Brady* claim. However, Cathey fails to show entitlement to a hearing under 28 U.S.C. § 2254(e)(2). Beyond his general request for a hearing in state court, State Habeas Record at 23, Cathey makes no effort to prove that he sought to develop this specific issue in state court with the diligence required under the AEDPA.  *See Williams v. Taylor*, 529 U.S. 420, 432 (2000). Cathey's allegations do not presuppose that a hearing would uncover any information not already contained in the affidavits and records before the Court.  Cathey has not shown that an evidentiary hearing is available or necessary in this case.

sentencing.  The jury comprehended that some factors would give Bonner encouragement to tailor his testimony in a manner favorable to the prosecution.  The extent to which he would benefit from the alleged punishment agreement would not materially differ if the jury found that the prosecution had promised Bonner a ten-year cap on his sentence; they already knew that Bonner would not be a candidate for lethal injection.  The state habeas court did not unreasonably find that Bonner's testimony concerning his own case left the jury "free to accept or reject any portion of Bonner's testimony and free to view Bonner's testimony with skepticism based on his possible motives."  FFCL, at 9, ¶ 2.  Thus, Cathey has not shown a "reasonable probability of a different result," had the jury known about any "understanding."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also United States v. Bagley*, 473 U.S. 667, 682 (1985) ("The evidence is material only of there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different.").[11]

The record supports the state court's finding that no agreement existed between Bonner and the prosecution beyond that which he testified to at trial.  Alternatively, Bonner fails to show that, had such an agreement existed, it "could reasonably be taken to put [Cathey's] whole case in such a different light as to undermine confidence in the verdict."  *Kyles*, 514 U.S. at 435.  Cathey fails to show that the state habeas court's rejection of his

---

[11]    Cathey also argues that the prosecution should have made the jury aware that Bonner lied when he stated that he did not have a "deal" with the prosecution, thus impeaching his credibility.  Cathey, however, fails to call Bonner's credibility into question by disclosing the existence of any explicit or implicit deal between the prosecution and Bonner regarding his sentence.

*Brady* claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  The Court will deny Cathey's first claim.

## II.   Claims Relating to Potentially Exculpatory Information Contained in a Police Report (Claim Two)

Cathey raises two claims based on pre-trial information that allegedly indicated that another man, Monteigo Jordan,[12] killed Ms. Castillo.  Cathey presents two alternative, and mutually incompatible, arguments based on that information.  First, Cathey contends that the prosecution violated *Brady* by not revealing the potentially exculpatory information.  Second, Cathey argues that, if the prosecution did not suppress that evidence, his trial counsel provided ineffective assistance by not incorporating the information into his defense strategy.  The Court will address the nature of the allegedly exculpatory evidence before addressing the state court's rejection of the two claims based on that information.

The police had no leads in Ms. Castillo's murder until they found a note in a burnt-out car near where they found Ms. Castillo's body.  The note identified several people as those involved in the kidnapping/murder of Ms. Castillo.  Soon thereafter, the police received an envelope of material that included an anonymous note written in Spanish.  The police translated the note as follows: "This paper will help you find the persons responsible for Cristina Castillo's death.  These are the leaders of the gang."  State Habeas Record at 58. The envelope contained a list of those allegedly participating in the kidnapping/murder, along with other documents referring to Jordan and his residence.  The list, however, did *not*

---

[12]     The record also refers to Jordan as "Meco Jordan."

include the names of Cathey and the other five men identified by DeLeon and Bonner as participating in the kidnapping/murder.

According to police reports submitted in state habeas court, on November 21, 1995, Officers Xavier Avila and Bill Guerrero drove to Beaumont to speak with Michael Paul, the owner of the burnt-out car, who was then incarcerated in the Jefferson County Correctional Facility on drug charges. Paul informed the officers that he had owned the car, but lent the car to Jordan. Jordan later told him that someone stole the car. Paul initially told the officers that he had only met Jordan twice, but later admitted that Jordan "was always borrowing his car." State Habeas Record at 50. Paul claimed not to have any information about the kidnapping/murder of Ms. Castillo. However, the police recorded that "several times during the interview, [Paul] said that [Jordan] was the killer." *Id*.

On November 25, 1995, the police officers returned to interview Paul. Paul clarified his statement about Jordan being the killer:

> He was asked what he meant the last time that [officers] spoke with him, when he said that [Jordan] was the killer. He said that it was hard for him to specify that and then said that anyone could be a killer. He defined a killer as someone that would snap and kill someone. He then said that [Jordan] was both a shooter and a killer.

> He said for [Jordan] to go out and kill someone, something would have to be done to him. He also said that [Jordan] would kill someone if he heard that someone had something that he wanted. [Paul] denied that he was holding anything back from [the officers]. [Paul] said he learned all of this from talking to [Jordan] and that [Jordan] was led astray as a young boy. He denied hearing about him kidnapping a girl and killing her.

State Habeas Record at 55.  Paul disclaimed any knowledge about Ms. Castillo's kidnapping and murder.  State Habeas Record at 56.[13]

At trial, Cathey's attorneys tried to call his co-defendant James DeLeon as a witness, ostensibly intending to implicate Jordan in the killing.  After DeLeon exerted his constitutional right not to provide self-incriminating testimony, Cathey submitted into evidence an affidavit prepared by DeLeon (though that affidavit did not come before the jury).  DeLeon's affidavit describes his acquaintance with Jordan and how Jordan claimed to have kidnapped, beaten, raped, and killed a girl with whom he had been having an affair.[14] DeLeon stated that Jordan identified the area where the police found Ms. Castillo's body as the place where he killed his girlfriend.  Tr. at 24:90, Defendant's Exhibit 14; State Habeas Record at 72-73.

Cathey faults the prosecution for not turning over information relating to the possibility that Jordan killed Ms. Castillo.  Cathey alleges that the State suppressed information that Michael Paul named Jordan as the killer, that Jordan was related to one of Cathey's co-defendants, that Jordan was free on bond at the time of the murder, and that Jordan's street address was near the place of Ms. Castillo's murder.  Cathey alternatively argues that, if counsel had this information before trial, his attorneys should have formed a defensive strategy that would inculpate Jordan as the killer.

---

[13]    Officer Avila also interviewed Derrick Paul whose name appeared in the letter received by the police.  Derrick Paul also "mentioned the name Monteigo Jordan or Meco Jordan."  Tr. at 20:7-8.

[14]    The Court notes that the record carries no indication that Ms. Castillo suffered a sexual assault.

Cathey relies on two incompatible theories.  If the prosecution suppressed evidence, then trial counsel cannot be held liable to failing to act on that information.  Cathey could raise a viable ineffective-assistance-of-counsel claim only if the prosecution divulged evidence of Jordan's possible complicity in the kidnapping/murder.  A review of the record, however, indicates that habeas relief is unavailable for both arguments.

### A.     Suppression of Evidence

Cathey points to four items of information that the prosecution should have turned over to the defense, including: (1) Paul named Jordan as the murderer; (2) Jordan was related to one of Cathey's co-defendants; (3) Jordan was free on bond when the murder occurred; and (4) Jordan gave as his street address a location near where Ms. Castillo died.  The defense could find three of those facts in the police reports that chronicled the interviews with Paul and detailed the contents of the envelope received by Officer Guerrero.  The only information Cathey now relies upon which cannot be found in those police reports is the fact that Jordan's release from prison at the time of the crime would allow for his commission of the murder.  Cathey, however, in both state and federal court has conceded that trial counsel knew that Jordan was not in prison at the time of Ms. Castillo's murder.  (Doc. # 3 at 16; State Habeas Record at 16).  Moreover, the prosecution in Cathey's case never alleged that Jordan was in custody at the time of Ms. Castillo's murder.[15]  This Court must decide whether the prosecution suppressed the first three facts relating to Jordan.

---

[15]     Apparently, at DeLeon's subsequent prosecution for his involvement in the kidnapping/murder the prosecution discounted the theory that Jordan killed Ms. Castillo by claiming that he had been incarcerated at the time of the offense.  (Doc. # 3 at 16).

In his petition, Cathey admits that the prosecution turned over the "2-inch thi[c]k offense report" containing information about Jordan, but did so "only at trial." (Doc. # 3 at 18). Cathey contends that the information's late emergence deprived him of "the opportunity to find or respond to this exculpatory information." (Doc. # 3 at 18). The state habeas court rejected Cathey's claims, finding that trial counsel reviewed the offense report containing that information and that trial counsel's cross-examination of Officer Avila presupposed knowledge of Jordan. FFCL, at 9, ¶ 3.[16]

A review of the evidence suggests that trial counsel possessed the challenged information before trial. On state habeas review, prosecutor Kate Dolan provided an affidavit concerning the availability of the police reports to the defense:

> From the time that Kurt Wentz and Terry Gaiser were appointed to represent Eric Dewayne Cathey, the State's file was open and made available to them. Other than the work product portion of the file, Mr. Gaiser and Mr. Wentz had complete access to my file. I know both Mr. Gaiser and Mr. Wentz to be attorneys who pay great attention to detail and are thoroughly professional in their trial preparation. They took notes from the State's file on several occasions. There was never any secret that there had been many potential suspects at the beginning of the investigation of the murder of Christina Castillo as reflected in the offense report for this case. The letter found by the burned-out car near the murder scene listed some names. The letter mailed to

---

[16]   The state habeas court alternatively found that Cathey "fail[ed] to show that information about Monteigo Jordan is material such that there is a reasonable [probability] that the results of the proceeding would have been different if such information had been disclosed." FFCL, at 10, ¶ 4. As Cathey fails to meet his burden of showing that the prosecution suppressed evidence, this Court will not review *Brady*'s materiality prong with respect to that allegation. The Court notes, however, that the discussion of *Strickland* prejudice in the next section of this opinion applies with equal force to Cathey's associated *Brady* claim. *See Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir. 1995) ("The materiality standard under *Brady v. Maryland* is identical to the prejudice standard under *Strickland*."), *cert. denied*, 517 U.S. 1122 (1996).

the homicide detective named others.  The offense report further reflected that
X. E. Avila of the Houston Police Department found that the owner of the
burned-out car was Michael Wayne Paul, Jr., and when Avila interviewed
Paul, the name of Monteigo Jordan was provided by Paul as the killer.  All this
information became moot when James DeLeon was interviewed and provided
details and the names of the other parties to the murder.   Subsequent
interviews with Lionel Bonner and Sonny Baker corroborated DeLeon's
statement.  I am confident that both Mr. Gaiser and Mr. Wentz were aware of
all of the potential suspects who were listed at the beginning of the
investigation into Ms. Castillo's murder.  In fact, Mr. Gaiser handled the cross
examination of Investigator Avila and he brought up the name of Monteigo
Jordan in a question posed to Avila–that would not have been possible if Mr.
Gaiser had not read about Avila's interview with Michael Paul, Jr.

State Habeas Record at 257.  The prosecution provided the defense an opportunity to view

the evidence that Cathey claims trial counsel needed to argue that Jordan killed Ms. Castillo.

"When evidence is equally available to both the defense and the prosecution, the defendant

must bear the responsibility for failing to conduct a diligent investigation."  *Kutzner v.*

*Cockrell*, 303 F.3d 333, 336 (5th Cir.), *cert. denied*, 536 U.S. 978 (2002).  The record

indicates that, well before trial, the prosecutor's file contained the information relating to

Jordan.  Cathey had an adequate opportunity to uncover exculpatory information flowing

from Paul's conversation with the police.

The evidence suggests that the defense not only had an opportunity to view the police

reports, but actually evaluated their contents and used them at trial.  During the state habeas

proceedings, trial counsel (second chair) submitted an affidavit acknowledging that she knew

about the offense report containing Paul's reference to Jordan as the killer:

I was appointed to sit second chair in the capital murder case of Eric Dewayne
Cathey.  Kurt Wentz was first chair.  Kate Dolan was the prosecutor handling
this case and she made the State's file available to myself and Kurt Wentz
throughout the pendency of this case up to the time of trial.  I, along with Kurt

Wentz, reviewed all of the material in the State's file (except for work product), including the offense report, which we reviewed several times. I am familiar with the portion of the offense report that reflects Investigator Avila's interview with Michael Wayne Paul, Jr. and that is where the name Monteigo Jordan was first brought up.

State Habeas Record at 276.

The evidence in this case suggests that trial counsel had both access to the information potentially inculpating Jordan and actual knowledge of its contents. The state habeas court, therefore, was not unreasonable in finding no *Brady* violation with respect to information inculpating Jordan in the murder. *See* 28 U.S.C. § 2254(d)(1). Cathey fails to meet the AEDPA burden, and to demonstrate an underlying constitutional violation, in the disclosure of information relating to Jordan.

**B.     Ineffective Assistance of Counsel**

In the alternative, Cathey faults trial counsel for not effectively using the available information suggesting that Jordan was a suspect in this case. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Under the *Strickland* standard, a criminal defendant's Sixth Amendment rights are "denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003); *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "Failure to make the required showing of either deficient

performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700.

To establish deficient performance, an inmate must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins*, 539 U.S. at 521. Instead, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. In reviewing ineffectiveness claims "judicial scrutiny of counsel's performance must be highly deferential," and every effort must be made to eliminate "the distorting effect of hindsight." *Id.* at 689. An ineffective-assistance claim focuses on "counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct[,]" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence[.]" *Id.* at 689-90.

A petitioner must also show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694; *see also Wiggins*, 539 U.S. at 521. A reasonable probability is one that undermines confidence in the outcome. *See Strickland*, 466 U.S. at 689; *Wiggins*, 539 U.S. at 534. The Court does not consider prejudice in a vacuum; "[i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

Cathey provides only the following brief argument with respect to his *Strickland* claim:

> [I]f the Court believed trial counsel knew about the exculpatory facts as discussed, yet did not make the facts known to the jury to assist petitioner, then petitioner did not receive effective assistance of counsel at trial.  The fact that Michael Paul name[d] Monteigo Jordan as the murderer of Castillo was admissible to challenge the credibility of Bonner's testimony and also would cast doubt on the entire police investigation.  There would be no tactical decision to not present this information to the jury.

(Doc. # 3 at 20).  Cathey's claim focuses on trial counsel's failure to present the information contained in the offense report, namely that Paul accused Jordan of being the murderer.  Cathey, however, fails to meet both *Strickland*'s performance and prejudice prongs.  First, Cathey ignores the fact that, without mentioning Paul's statements, his counsel introduced Jordan, among others, as a possible suspect in this case.  Cathey fails to credit counsel for the attempts made to introduce testimony that Jordan killed Ms. Castillo.  Trial counsel submitted an affidavit in the state habeas court defending the effort to show that Jordan was a possible suspect:

> I did attempt to direct the jury's attention towards Monteigo Jordan when Investigator Avila was on cross examination.  However, the State correctly objected to hearsay and there was no other exception to use to bring further information about Jordan to the jury.  The name was presented to the jury as a possible suspect in this murder, which was my trial strategy.

State Habeas Record at 276.  Trial counsel attempted to allocate the blame for Ms. Castillo's murder on others, and used the police report to that end.  Trial counsel, however, could not substantiate those claims with anything other than hearsay testimony:

> Trial Counsel:        Did [Paul] refer to Monteigo Jordan?

| | |
|---|---|
| Officer Avila: | Yes, sir. |
| The State: | I object to this as hearsay. |
| Trial Court: | Sustained as to the form of the question. |
| Trial Counsel: | Well, you learned more about Monteigo Jordan based on that interview, didn't you? |
| Officer Avila: | Yes, sir. |
| Trial Counsel: | Did you learn anything as to whether or not Monteigo Jordan was a gang member? |
| The State: | Objection.  This calls for a hearsay response. |
| Trial Court: | Sustained. |

Tr. at 20:9.  The state habeas court properly found that counsel employed reasonable trial strategy in "choosing not to pursue an incredible line of cross-examination in an attempt to direct further blame on Jordan, in light of the evidence elicited at trial."  FFCL, at 10, ¶ 5.

Importantly, Cathey fails to meet *Strickland*'s prejudice prong.  While he faults counsel for not presenting testimony about Paul's statements, he fails to show that Paul's statements about Jordan alone, or evidence that may have resulted after investigating those statements, would have helped his defense in any measurable way.  The police reports alone do little to exculpate Cathey of Ms. Castillo's murder.  The police report from November 21, 1995, states both that "several times during the interview, [Paul] said that [Jordan] was the killer" and that "Paul denied any involvement or knowledge" of the murders.  State Habeas Record at 50-51.  The police report for November 25, 1995, clarifies Paul's intent in talking about Jordan.  Paul did not mean that Jordan was *the* killer of Ms. Castillo, but that he was

*a* killer–"someone that would snap and kill someone."  State Habeas Record at 55.  Paul

never attributed Ms. Castillo's death to Jordan.  In fact, Paul claimed not to know anything

at all about Ms. Castillo's kidnapping and murder.  Cathey does not show that any

investigation into Paul's statement would have led to other evidence exculpating him of the

murder.  In the end, Cathey has not shown a reasonable probability of a different result had

trial counsel been able to present before the jury the information contained in the police

report.

The state habeas court's rejection of this claim was not contrary to, or an

unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  This Court denies

Cathey's *Brady* and *Strickland* claims attributing Ms. Castillo's murder to Monteigo Jordan.

### III.   Texas' "10-12 Rule" (Claim Three)

Cathey argues that the trial court's confusing jury instructions made a death sentence

more likely in this case.  The trial court instructed the jury that any answer to Texas' special

issues that could result in Cathey receiving a death sentence must be unanimous, but that ten

or more jurors would have to agree to any answer supporting a life sentence.  Court of

Criminal Appeals File. Vol. I-A at 395-96.  The trial court fashioned those instructions after

then-effective TEX. CODE CRIM. PRO. art. 37.071.  "In Texas, this is commonly called the

'10-12 Rule.'"  *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000).  The trial court did

not inform the jury that a failure to reach the required consensus in answering the special

issues would automatically result in a life sentence.  Cathey contends that, by not informing

the jury of the effect of a single dissenting vote or of a single holdout juror, the instructions

predisposed the jurors to impose a death sentence, thus violating the Eighth Amendment.

Cathey argues that the trial court should have instead instructed the jury that, should any

juror refuse to answer the special issues in unanimity with the others, Cathey would receive

a life sentence.  At the time of trial, TEX. CODE CRIM. PRO. art. 37.071(g) prohibited the

parties and the trial court from providing the jury with that information.[17]

The non-retroactivity principle established in *Teague v. Lane* bars this Court from

granting relief on Cathey's "10-12 rule" claim.[18]  *Teague* precludes federal relief on claims

that impose a new obligation not "'dictated by precedent existing at the time the defendant's

conviction became final.'"  *Graham v. Collins*, 506 U.S. 461, 467 (1993) (quoting *Teague,*

---

[17]     Cathey tries to support this legal argument by showing that one juror answered the special issues in a manner ensuring a death sentence because she thought that a mistrial would result from her being the only holdout juror.  Cathey supports this allegation through a hearsay-filled affidavit prepared by an investigator who interviewed the trial jurors.  (Doc. #3,, Exhibit 13, Affidavit of Cynthia Patterson, dated Oct. 7, 2000).   Aside from the obvious hearsay problems associated with the affidavit, FED. R. EVID. 606(b) prevents any consideration of a juror's mental processes during deliberations.  Nevertheless, as discussed above, Cathey's "10-12 rule" claim fails on its legal merits without regard to the particular events surrounding the jury's deliberations in this case.

[18]     Cathey raised this claim both on direct review and on state habeas review.  The state habeas court found that Texas' contemporaneous-objection rule barred consideration of this claim because Cathey failed to lodge a trial objection to the jury's instructions.  Respondent urges this Court to find that the state habeas court imposed a procedural bar that forecloses federal consideration of Cathey's "10-12 rule" claim, notwithstanding the fact that the Court of Criminal Appeals considered its merits on direct review.  Federal district courts generally must decide whether a state procedural law bars federal consideration before proceeding to the merits of an inmate's claims.  However, "[j]udicial economy might counsel giving the *Teague* question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997).  As precedent unequivocally indicates that Cathey's "10-12 rule" claim would require the creation of a new constitutional rule, and also indicates that his claim lacks merit, this Court will not address Respondent's procedural-bar argument.  *Cf.* 28 U.S.C. § 2254(b)(2) (permitting a federal court to deny a habeas petition on the merits notwithstanding the inmate's failure to exhaust state remedies).

489 U.S. at 301). The Fifth Circuit has previously addressed virtually indistinguishable claims to the one before this Court and found them to violate *Teague*. *See Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 466 (5th Cir.), *cert. denied*, 516 U.S. 992 (1995); *Webb v. Collins*, 2 F.3d 93, 95-96 (5th Cir. 1993). The Fifth Circuit has found that nothing in Supreme Court precedent requires Texas to inform a capital jury about the effect of any non-unanimous or holdout jurors. *See Alexander*, 211 F.3d at 897; *Webb*, 2 F.3d at 95-96. Cathey does not show the applicability of any exception to the *Teague* doctrine or otherwise distinguish the Fifth Circuit's binding precedent. Accordingly, *Teague*'s non-retroactivity bar forecloses relief on Cathey's "10-12 rule" claim.

Furthermore, the Court of Criminal Appeals summarily rejected the merits of this claim on direct review. *Cathey*, 992 S.W.2d at 466. The Fifth Circuit has also expressly found similar claims to be without merit. *See Alexander*, 211 F.3d at 897 n.5; *Miller v. Johnson*, 200 F.3d 274, 288-89 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994), *cert. denied*, 513 U.S. 1067 (1995). Finding support in the Supreme Court case of *Jones v. United States*, 527 U.S. 373 (1999), the Fifth Circuit recognizes that the Constitution creates no right to instruct a jury on potential deadlock. *See Alexander*, 211 F.3d at 897 n.5. Cathey fails to distinguish the binding Fifth Circuit precedent rejecting the merits of this claim.

Cathey's "10-12 rule" claim is both *Teague*-barred and without merit under current Fifth Circuit law. The state court's rejection of this claim, therefore, was not contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

**IV.    Insufficient Evidence Supported an Accomplice Witness' Trial Testimony (Claim Four)**

Cathey claims that the United States Constitution required the prosecution to corroborate, beyond a reasonable doubt, Lionel Bonner's crucial trial testimony.  As an accomplice to Ms. Castillo's murder, Texas state law required the prosecution to substantiate Bonner's testimony with other evidence: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PRO. art. 38.14.  Thus, under state law, "a case may not be sent to the jury on the uncorroborated testimony of an accomplice." *Martin v. Estelle*, 691 F.2d 202, 204 (5th Cir. 1982), *cert. denied*, 460 U.S. 1024 (1983).  Cathey contends that other trial evidence and testimony insufficiently corroborated Bonner's testimony.  Accordingly, Cathey asks this Court to apply the federal insufficiency-of-the-evidence standard found in *Jackson v. Virginia*, 443 U.S. 307 (1979), to Bonner's testimony.

Federal habeas review does not recognize a constitutional claim based on the application of state law governing accomplice-witness testimony.  To obtain federal habeas relief, Cathey must show a "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); *see also Smith v. Phillips*, 455 U.S. 209, 221 (1982) ("A federally issued writ of habeas corpus, of course, reaches only convictions obtained in violation of some provision of the United States Constitution.").  State law required corroboration to validate Bonner's testimony.  However, the Fifth Circuit has held that "the Constitution imposes no requirement that the testimony of an accomplice-witness be

corroborated by independent evidence. Accordingly, the prosecution's failure to satisfy the requirements of the accomplice-witness sufficiency rule, and a state court's failure to enforce that purely state rule, simply [does] not warrant constitutional attention." *Brown v. Collins*, 937 F.2d 175, 182 n.12 (5th Cir. 1991).[19] *Jackson*, "which instructs us to look to the 'substantive elements of the criminal offense as defined by state law,' does not counsel to the contrary." *See Brown*, 937 F.2d at 182 (quoting *Jackson*, 443 U.S. at 324 n.16).[20] As "the proper interpretation of state law is *not* cognizable in federal habeas proceedings," *Beazley v. Johnson*, 242 F.3d 248, 261 (5th Cir.), *cert. denied*, 534 U.S. 945 (2001), this Court cannot grant relief on Cathey's claim that insufficient evidence supported Bonner's

---

[19]     On direct review, Cathey also asked the Court of Criminal Appeals to apply *Jackson* to Texas' requirement that the prosecution corroborate an accomplice witness' testimony. The Court of Criminal Appeals refused to impose the federal standard on that state-law question, noting that "[t]he accomplice witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards." *Cathey*, 992 S.W.2d at 462. The Court of Criminal Appeals instead relied on the statute's requirement that the prosecution adduce "evidence tending to connect the defendant with the offense." *Id.* at 463.

[20]     Respondent invites this Court to reject Cathey's insufficiency-of-the-evidence claim on the grounds that he failed to brief his state claim in the context of the federal due process clause, thus failing to exhaust this claim. Notwithstanding the potential lack of exhaustion, this Court denies that claim on its merits. *See* 28 U.S.C. § 2254 (b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

accomplice-witness testimony.[21]   This Court denies Cathey's insufficiency-of-the-corroborating-evidence claim.

---

[21]   The Court would note, however, that Bonner's account of the crime was not without support. The Court of Criminal Appeals found that sufficient evidence validated Bonner's testimony:

> Contrary to appellant's assertions, the record contains more than sufficient evidence to meet the corroboration requirement of Article 38.14.   One witness, Mark Young, testified that, one month after Castillo's murder, he encountered a stranger, whom he identified as appellant, at a gas station and that he acquired a gun from appellant.   Robert Baldwin, a criminologist with the Houston Police Department, testified that he analyzed the gun which Young took from appellant and compared it to the fired bullet and three spent casings found with the victim.   Baldwin testified that the bullet was fired from the gun and the cartridges came from the same gun.   Another witness, Pauline Blackshear, testified that appellant had told her before his arrest that he was "wanted for murdering some Spanish girl."   Finally, David Perro testified that appellant told him that he, P.B., Bonner, and DeLeon had been "together when the bitch got shot."

*Cathey*, 992 S.W.2d at 462.   Cathey attempts to call each corroborating fact into question.   However, the Court of Criminal Appeals found that evidence connected Cathey to the crime apart from Bonner's testimony.   This Court must defer to the state court's findings of fact.   *See, e.g.*, 28 U.S.C. § 2254(e).   Moreover, the Court cannot question the legal conclusion implicit in the state court's evaluation.   *See Fierro v. Lynaugh*, 879 F.2d 1276, 1278 (5th Cir. 1989) ("On a petition for writ of habeas corpus, a federal court defers to the state court's interpretation of state law.").

**V.    Consideration of Mitigating Evidence by the Jury, on Appellate Review, and on Federal Habeas Review (Claims Five and Six)**

Cathey challenges Texas' consideration of mitigation evidence, both at trial and on appeal. Cathey argues that Texas' capital sentencing scheme failed to assign a burden of proof on the prosecution with respect to the mitigation special issue, thus offending the Constitution. Cathey complains that the Court of Criminal Appeals compounded this constitutional violation by failing to make an appellate assessment of whether sufficient evidence supported the jury's negative answer to the mitigation special issue. Cathey also implicitly asks this Court to consider the weight of his mitigating evidence and reverse his death sentence after finding that sufficient mitigating circumstances required that he receive a life sentence.

**A.    Burden of Proof on the Mitigation Special Issue**

Cathey argues that the Supreme Court's reasoning in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny require Texas to prove, beyond a reasonable doubt, the absence of sufficient mitigating circumstances that warrant a life sentence. In *Apprendi*, the Supreme Court found that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The Supreme Court extended *Apprendi* to some state capital-sentencing schemes in *Ring v. Arizona*, 536 U.S. 584 (2002). Cathy argues that the Supreme Court's *Ring* and *Apprendi* decisions require the prosecution to prove a lack of adequate mitigating circumstances beyond a

reasonable doubt before a defendant receives a death sentence.  Cathey's claim based on *Apprendi* and *Ring* is both *Teague*-barred and without merit.

As a threshold consideration, *Apprendi* created a new constitutional rule that a reviewing court cannot apply retroactively on habeas review.  *See Schiro v. Summerlin*, ___ U.S. ___, 124 S. Ct. 2519, 2526 (2004) ("*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review."); *United States v. Brown*, 305 F.3d. 304, 310-11 (5th Cir. 2002) (finding that "*Apprendi* creates a new rule of criminal procedure which is not retroactively applicable . . ."), *cert. denied*, 538 U.S. 1007 (2003). Cathey's direct review concluded before the Supreme Court decided *Apprendi* or *Ring*.[22]  As Cathey fails to show that any exception to the *Teague* doctrine applies to his claims, *Teague*'s non-retroactivity principle bars any extension of *Apprendi* and *Ring* to Texas' capital murder procedure in this case.

Even if *Teague* did not prevent habeas relief on Cathey's claim, nothing in the Federal Constitution assigns a burden of proof to either party with respect to mitigating evidence. Texas' mitigating special issue asks the jury whether, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that the sentence of life imprisonment rather than a death sentence be imposed."  TEX. CODE CRIM. PRO. art. 37.0711 § 3(e). Texas

---

[22]    Cathey's direct review concluded when the Supreme Court denied his *certiorari* petition on January 10, 2000.  The Supreme Court decided *Apprendi* on June 26, 2000.

law does not explicitly apply a burden of proof on the mitigation special issue. "No burden of proof exists for either the state or the defendant to disprove or prove the mitigating evidence. Thus, each juror individually and subjectively determines what evidence, if any, is sufficient to mitigate against the imposition of the death penalty." *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002). Nevertheless, the second special issue *implicitly*, and logically, allocates a burden on the defendant to *produce* mitigating evidence and to convince the jury of its significance. *See Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995) ("[T]he burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case."), *cert. denied*, 519 U.S. 826 (1996).

Cathey argues that *Apprendi* and *Ring* require the prosecution to prove, beyond a reasonable doubt, that no sufficient mitigating circumstances exist which call for a negative answer to the mitigation special issue. Yet nothing in the *Apprendi* decision or its progeny place any burden on the State with respect to the jury's consideration of mitigating evidence. No Supreme Court authority requires a State to prove the absence of mitigating circumstances beyond a reasonable doubt. *See Mills v. Maryland*, 486 U.S. 367, 385-89 (1988) (approving jury instructions that allocated a burden on the defense to show mitigating evidence). *Apprendi* and its progeny recognize "the distinction . . . between facts in aggravation of punishment and facts in mitigation." *Apprendi*, 530 U.S. at 491 n.16.[23] With

---

[23]    In the *Apprendi* decision, the Supreme Court did not express any intention of placing a mitigation burden on the prosecution:

(continued...)

respect to the consideration of mitigating evidence, Supreme Court authority anticipates that "[s]o long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove . . . the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Walton v. Arizona*, 497 U.S. 639, 650 (1990).[24] The Supreme Court's subsequent consideration of the *Apprendi* case in *Ring* has not revised its opinion regarding the burden of proving mitigating circumstances. *See Ring*, 536 U.S. at 597 n.4 (noting that the defendant in that case made "no Sixth Amendment claim with respect to mitigating circumstances"). The Supreme Court has not even "hinted" that allocating the mitigation burden to the defense violates the Constitution. *Walton*, 497 U.S. at 651. As no Supreme Court authority requires the State to prove the absence of mitigating

---

[23]    (...continued)

> If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone. Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme.

*Apprendi*, 530 U.S. at 491, n.16.

[24]    The Supreme Court's recent *Ring* case reversed *Walton*'s holding that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." *Ring*, 536 U.S. at 598 (quoting Walton, 497 at 648). The Supreme Court, however, did not overrule *Walton*'s treatment of mitigating evidence. *See Ring*, 536 U.S. at 609 ("[W]e overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty.").

circumstances beyond a reasonable doubt, this Court could only rule otherwise by creating a new rule of constitutional law in violation of *Teague*.[25]

Even if this Court could create constitutional law on habeas corpus review, the logic behind *Apprendi* and *Ring* does not extend to mitigating evidence. *Apprendi* only requires that "any fact that *increases* the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (emphasis added). As noted by the Court of Criminal Appeals in another case,

> a jury's finding on mitigation occurs only after the State has proven the elements of capital murder, at the guilt stage, and the aggravating circumstances--evidence of the defendant's future dangerousness--beyond a reasonable doubt. By the time the jury reaches the mitigation issue, the State has already demonstrated the defendant's eligibility for a death sentence; a negative answer on mitigation cannot increase his authorized punishment.

*Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003), *cert. denied*, ___ U.S. ___, 125 S. Ct. 297 (2004). The logic behind *Apprendi* and *Ring* do not require the State to disprove the existence of mitigating circumstances beyond a reasonable doubt.

Cathey seeks refuge in *Walton*'s clarification that a State carries no burden in proving mitigating circumstances "[s]o long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove . . . the existence of aggravating circumstances." 497 U.S. at 650. Cathey argues that the mitigating special issue involves more than mere

---

[25]   The Fifth Circuit recently reached the same conclusion in two unpublished opinions. *See McWilliams v. Cockrell*, No. 03-20122, 2003 WL 21954206 (5th Cir. Aug. 15, 2003); *Lewis v. Cockrell*, No. 02-40985 (5th Cir. Jan. 22, 2003).

independent mitigating review, but additionally serves as a separate vehicle for the prosecution to adduce aggravating evidence.  Cathey correctly observes that the broad inquiry mandated by the mitigation issue includes a review of evidence unfavorable to the defense.  "By its plain language, the statute requires the jury to look at *all* of the evidence and not just evidence a juror might consider to be mitigating."  *Scheanette v. State*, 144 S.W.3d 503, 508 (Tex. Crim. App. 2004).  For example, the mitigation instruction allows the jury to consider the existence of victim-impact evidence, *see, e.g., Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1102 (2000), and other evidence that would encourage a death sentence.  Cathey, therefore, argues that Texas' failure to place a burden of proof on the mitigation special issue lessens the prosecution's obligation to prove aggravating circumstances beyond a reasonable doubt.

Texas law rejects the argument that the prosecution must prove beyond a reasonable doubt any prosecution-friendly evidence considered under the mitigation special issue.  The Court of Criminal Appeals has held that "[b]ecause Texas law imposes the burden of proof upon the State to prove certain prescribed aggravating elements, a burden of proof need not be prescribed for aggravating circumstances that might be considered in conjunction with Texas' open-ended mitigation issue."  *Williams v. State*, 937 S.W.2d 479, 491 (Tex. Crim. App. 1996); *see also Busby v. State*. 990 S.W.2d 263, 272 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1081 (2000).  Texas law differentiates between the allocation of proof in the *Walton* case and that operative in the Texas capital sentencing scheme.  The inmate in *Walton* received his death sentence in a "weighing" jurisdiction – the sentencer in the

punishment phase in that case measured statutorily defined aggravating circumstances against likewise-codified mitigating circumstances in deciding his ultimate sentence. *See Walton*, 497 U.S. at 645. In "weighing" jurisdictions, the constitutionally mandated narrowing of the class of defendants eligible for the death penalty takes place in the punishment phase. Texas, however, is a "non-weighing" jurisdiction because the mandated narrowing takes place in the guilt/innocence phase where the jury finds a defendant guilty of a death-eligible offense. *See Jurek v. Texas*, 428 U.S. 262, 270-71 (1976) (approving Texas' use of aggravating factors in the guilt/innocence phase to narrow the class of death-eligible defendants); *Woods v. Cockrell*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (same), 519 U.S. 854 (1996); *James v. Collins*, 987 F.2d 1116, 1119 (5th Cir.) (same), *cert. denied*, 509 U.S. 947 (1993). Once narrowing occurs in the guilt/innocence phase, no further narrowing in necessary in the punishment phase. *See Lowenfield v. Phelps*, 484 U.S. 231, 242-47 (1988); *see also Zant v. Stephens*, 462 U.S. 862, 875 (1983) (finding that a State may give "unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.").

True, Texas' special issues provide "a further narrowing mechanism" in the punishment phase, apparently including the broad mitigation inquiry. *James*, 987 F.2d at 1116. Nevertheless, since Texas performs the constitutionally required narrowing in the guilt/innocence phase, "[t]he fact that the sentencing jury is also required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing process[.]" *Lowenfield*, 484 U.S. at 246. Therefore, *Walton*'s discussion

of the burden of proof associated with aggravating circumstances is inapposite to any inquiry into Texas' punishment issues.  Texas' special issues "do not function as aggravating circumstances, but rather adequately 'guide and focus the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Woods*, 75 F.3d at 1034 (quoting *Lowenfield*, 484 U.S. at 271).  So long as Texas requires the jury to find a defendant guilty of a death-eligible offense beyond a reasonable doubt, the State has complied with *Walton* and no burden falls on the prosecution to prove the absence of mitigating circumstances by that same standard. *See Williams*, 937 S.W.2d at 491.

Texas' punishment-phase procedure that places no burden of proof on the prosecution complies with constitutional requirements.  Here, the jury instructions required the prosecution to prove Cathey's guilt of a capital offense beyond a reasonable doubt.  Court of Criminal Appeals File, Vol. I-A at 378.  The trial court's instructions also informed the jury that the State had the responsibility of proving the first two special issues beyond a reasonable doubt.  Court of Criminal Appeals File, Vol. I-A at 395.  Texas does not violate the Constitution by expecting the defense to present mitigating evidence in the punishment phase and by not assigning a burden of proof to that special issue.  Cathey's challenge to the jury's consideration of mitigating evidence is *Teague* barred and without merit.

**B.    Meaningful Appellate Review**

Cathey also challenges Texas' refusal to reevaluate mitigating evidence on appellate review. Cathey contends that the Constitution requires an appellate court to review an

inmate's mitigating evidence, presumably in much the same way that it can consider the sufficiency of the evidence supporting an inmate's conviction under *Jackson v. Virginia*, 443 U.S. 307 (1979).  Cathey argues that the Court of Criminal Appeals' refusal to reconsider and reweigh the mitigating evidence a capital defendant presented at trial violates the Constitution's guarantee to meaningful appellate review.

"[M]eaningful appellate review" in capital cases "serves as a check against the random or arbitrary imposition of the death penalty."  *Gregg v. Georgia*, 428 U.S. 153, 195, 206 (1976) (opinion of Stewart, Powell, and Stevens, JJ.).  The Fifth Circuit, however, has considered, and rejected, Cathey's claim that the right to meaningful appellate review includes appellate reconsideration of a jury's answer to the mitigation special issue.  *See Woods*, 307 F.3d at 359-60; *Beazley*, 242 F.3d at 261; *Moore v. Johnson*, 225 F.3d 495, 506-07 (5th Cir.), *cert. denied*, 532 U.S. 949 (2001); *Hughes v. Johnson*, 191 F.3d 607, 621-23 (5th Cir. 1999), *cert. denied*, 528 U.S. 1145 (2000).[26]  Cathey makes no attempt to distinguish the Fifth Circuit precedent that governs this claim.

No federal precedent anticipates that a capital defendant has a right to appellate *mitigation* review, though the Supreme Court has repeatedly emphasized that a State must provide meaningful appellate review of death sentences.  *See, e.g., Parker v. Dugger*, 498 U.S. 308, 321 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990).  Meaningful

---

[26]     The Fifth Circuit also has summarily dismissed similar claims in unpublished decisions. *See, e.g., Fuentes v. Dretke*, No. 03-20456, 2004 WL 256559 (5th Cir. Feb. 11, 2004); *Reneau v. Cockrell*, 01-50371 (5th Cir. Dec. 5, 2001); *Baker v. Cockrell*, No. 01-20308 (5th Cir. Oct. 19, 2001).

appellate review requires "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *see also Parker*, 498 U.S. at 321.  This appellate review, however, must give way to the Supreme Court's "much more explicit directives" that respect a jury's "narrowly cabined but unbridled discretion to consider any mitigating factors submitted by the defendants and weighed as the jury sees fit . . . ." *Moore*, 225 F.3d at 506-07.  The Court of Criminal Appeals allows the jury unbridled discretion in its evaluation of mitigating circumstances and refuses to review whether sufficient evidence supported the jury's answers to the mitigation special issue.  *See, e.g., McFarland v. State*, 928 S.W.2d 482, 498 (Tex. Crim. App. 1996) ("Because the weighing of 'mitigating evidence' is a subjective determination undertaken by each individual juror, we decline to review that evidence for 'sufficiency.'"), *cert. denied*, 519 U.S. 1119 (1997).  By bestowing narrowly cabined, but unbridled, discretion to consider mitigating evidence, Texas has "followed Supreme Court instructions to the letter." *Moore*, 225 F.3d at 506.  Accordingly, "[n]o court could find that Texas had acted contrary to federal law as explained by the Supreme Court, and no benefit will arise from further consideration of the obvious." *Id*; *see also Woods*, 307 F.3d at 360.[27]

No clearly established Supreme Court law creates a right to independent review of mitigating factors on direct or collateral review.  *See Beazley*, 242 F.3d at 260; *Hughes*, 191

---

[27]     Cathey also argues that a Texas statute, TEX. CRIM. PRO. art. 44.251, requires the Court of Criminal Appeals to perform an appellate mitigation review.  "[T]he proper interpretation of state law is not cognizable in federal habeas proceedings." *Beazley*, 242 F.3d at 261 (refusing to consider whether TEX. CRIM. PRO. art. 44.251 implicated federal constitutional concerns).

F.3d at 623.[28]  The state court's rejection of this claim withstands AEDPA review.  *See* 28

U.S.C. § 2254(d)(1).  The Court denies this claim.

### C.    Federal Habeas Review of Mitigating Evidence

Finally, Cathey's mitigation-evidence claims implicitly require this Court evaluate

whether the trial evidence sufficiently supported the jury's negative answer to the mitigation

special issue.  Cathey's petition describes the trial testimony as showing him to be "an

immature juvenile who, given his overall record, the inevitable maturation that comes with

age, and the controls which exist in our prison system, clearly deserved a life sentence which

would recognize these points of evidence, rather than a sentence of death."  (Doc. # 3 at 49).

Cathey's claim anticipates that this Court would find that the jury should have answered the

mitigating special issue in a way that would ensure that he did not receive a death sentence.

Cathey points to no constitutional authority or legal precedent that would require a

habeas court to reweigh the mitigating evidence presented at trial.[29]   Supreme Court

precedent, in fact, endows a jury with the ability to weigh the difficult questions raised by

mitigating evidence.  The Constitution gives a jury "unbridled discretion in determining

whether the death penalty should be imposed after it has found that the defendant is a

---

[28]    In addition, Cathey's meaningful-appellate-review claim anticipates the creation of a new rule that would violate *Teague*'s non-retroactivity principle.  *See Woods*, 307 F.3d at 360; *Beazley*, 242 F.3d at 263.

[29]    In fact, even when routinely engaging in a sufficiency-of-the-evidence review of the future-dangerousness special issue, the Fifth Circuit has not explicitly held that a federal court has authority to review any of the jury's punishment-phase determinations under *Jackson*'s sufficiency-of-the-evidence standard.  *See Hughes,* 191 F.3d at 619.

member of the class made eligible for that penalty." *Zant*, 462 U.S. at 875; *see also Tuilaepa v. California*, 512 U.S. 967, 974 (1994); *Moore*, 225 F.3d at 506.   Rather than provide judicial review of mitigating evidence, the Supreme Court has held that "complete jury discretion is constitutionally permissible." *Buchanan v. Angelone*, 522 U.S. 269, 276-77 (1998).   So long as the jury had an adequate vehicle to consider a defendant's mitigating evidence, nothing in Supreme Court precedent requires this Court to substitute the jury's evaluation of mitigating evidence with its own.   Cathey fails to point to any constitutional authority requiring a federal habeas court to review the strength of a capital prisoner's mitigating evidence.

Moreover, Cathey's argument that the jury should have found that his mitigating circumstances merited a life sentence ignores the significant evidence showing his violent and reckless criminal behavior.   Cathey now emphasizes mitigating testimony from his trial, including testimony concerning his good manners as a child, his few behavioral problems when young, the fact that he only began engaging in crime when his wife left him, and his easy transition to prison environment.   Importantly, the defense showed that Cathey grew up in a household where his father sold drugs and illegal activity was a way of life. Nonetheless, Cathey essentially asks this Court to ignore the weighty evidence of Cathey's past criminal behavior.   The mitigation special issue does not ask the jury to consider mitigating evidence in the abstract; rather the jury must consider a defendant's mitigating evidence in light of "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant."   The prosecution showed

that Cathey had repeatedly engaged in criminal behavior, often using firearms in an attempt to secure money or drugs.  Cathey violently assaulted others.  Cathey showed no reformation of character and failed to meet probation requirements.  Cathey's violent criminal acts culminated in the kidnapping and murder of Ms. Castillo.  The evidence in this case would not encourage the Court to view sympathetically Cathey's invitation to supercede the jury's evaluation of his life.  Even if federal habeas review allowed reexamination of mitigating evidence, this is not a case in which the jury's answer to the mitigation special issue departed drastically from the trial evidence.  This Court denies Cathey's claims relating to the consideration of mitigating evidence.

## VI.   Trial Court's Admonishment of a Witness Regarding the Privilege Against Self-Incrimination (Claim Six[30])

Cathey claims that the trial court violated the Sixth and Fourteenth Amendments by discussing with a defense witness his right not to give self-incriminatory testimony.  The trial evidence showed that DeLeon participated in the events leading up to Ms. Castillo's murder.  When the defense elected to call DeLeon as a witness, the trial court made the following statements on the record:

> The State having rested, Mr. Wentz, Mr. Geiser, you indicated that you intended to call, or at least attempt to call James DeLeon, who was a codefendant in this case.  And I would state for the record that Steve Morris has been appointed to represent Mr. DeLeon in this case.  Mr. Morris is not present at this time.

---

[30]   Cathey labels two separate claims as his sixth ground for relief.  The section that follows above addresses the last claim raised in his petition.

Jim Leitner, who is an associate–they are not in a partnership but share office space together–was asked by the Court to come over and talk to Mr. DeLeon. Mr. Leitner has conducted that conversation with Mr. DeLeon and then Mr. Leitner informed the Court that Mr. DeLeon would rather talk to Mr. Morris. So, this Court called Mr. Morris.  He is currently in Austin, Texas, on other legal business, and Mr. Morris and Mr. DeLeon had a conversation on the telephone and then Mr. Leitner and Mr. Morris have concluded that conversation.

Tr. at 21:8.  After swearing DeLeon in, the trial court engaged him in the following colloquy:

Trial Court:   Could you state your name for the Court?

Mr. DeLeon: James DeLeon.

Trial Court:   And you are currently charged with the offense of aggravated kidnapping in this case, is that correct?

Mr. DeLeon: Yes, sir.

Trial Court:   Your case is pending, is scheduled for trial March 24th, I believe?

Mr. DeLeon: Yes, sir.

Trial Court:   The Defense intended, or was requesting to call you as a witness in this case.  After talking with Mr. Morris, do you intend to testify in this trial?

Mr. DeLeon: Yes.

Trial Court:   All right.

Mr. Leitner:  May I have a moment, you Honor?

(Whereupon, Mr. Leitner speaks with Mr. Deleon.)

Trial Court:   All right.  Mr. DeLeon, you understand that any testimony that you give in this trial can be used against you in your pending trial?

Mr. DeLeon: Yes, sir, I understand that.

Trial Court:   And I will be honest, when I came out here I was under the impression that you were not going to testify, that you were going to claim the Fifth Amendment privilege.

Mr. DeLeon: Well, your Honor, I was, but you know, there's something that I have to get off my chest.

Trial Court:   I don't need to know the reasons as to why you're doing what you are doing.  I just need to know that you have counseled with your lawyer, that you understand that Mr. Morris is not going to be here, that even if he were, there's nothing that he could do other than sit there and watch you testify, that you don't have the right to have him come up and counsel you in regards to any questions that may be asked by either side in this case.

If you agree to testify, then you have no privilege anymore at that time.  So, anything, you're asked you would be required to answer.  And if you fail to answer, you will be subject to contempt of this court.

Now, having talked to Mr. Morris and having talked to Mr. L[ei]tner, do you now tell this Court and these lawyers that you intend to testify in this case?

Mr. DeLeon: Yes, sir.

(Whereupon, Mr. Leitner speaks with Mr. DeLeon)

Trial Court:   Do you have any questions of the Court?

Mr. DeLeon: No, Sir.

Trial Court:   All right.  You can put him up and we will get started later this morning.

Tr. at 21:8-11.

After a recess, DeLeon took the stand and exercised his privilege against self-incrimination:

Trial Court:   For the record, James DeLeon has taken the witness stand again.

                And Mr. DeLeon, have you come to a different conclusion in regards to your testimony at this time?

Mr. DeLeon:  Yes, I have.

Trial Court:   What is that conclusion now?

Mr. DeLeon:  I'm going to plead the Fifth.

Trial Court:   All right.  Is it your statement now that you do not wish to testify in this matter?

Mr. DeLeon:  Yes, sir.

Trial Court:   All right.  You may stand down.  And Mr. Leitner, you are excused.

Tr. at 21:11.  Before calling other witnesses, trial counsel tried to state on the record what DeLeon's testimony would have been had he chosen to testify.  Tr. at 21:13.  The trial court would not let trial counsel recite the details of DeLeon's proposed testimony.  Tr. at 21:13-15.  Nevertheless, trial counsel introduced into the record an affidavit made by DeLeon that attributed the murder to Jordan.  Tr. at 24:90.

On direct review, Cathey relied on *Webb v. Texas*, 409 U.S. 95 (1972), to argue that the trial court's admonition to DeLeon violated the due process clause.  In *Webb*, the Supreme Court held that a district judge's "threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand."  409 U.S. at 98.  The

Supreme Court found the trial judge denied the *Webb* defendant due process by gratuitously and unnecessarily singling out the defendant's only witness for a lengthy admonition on the dangers of perjury.  The language employed by the judge included the following warning: "If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [*sic*] is that you would get convicted of perjury[.]"  *Id.* at 96.  The *Webb* court condemned the trial judge's use of "'unnecessarily strong terms [that could] have exerted such duress on the witness' mind as to preclude [him] from making a free and voluntary choice whether or not to testify.'"  *Id.* at 98.

> The Court of Criminal Appeals held that the trial court's discussion with DeLeon was
>
> not comparable to those [comments] in *Webb* as they reveal neither "unnecessarily strong terms" nor "exertion of such duress" as to "preclude the witness from making a free and voluntary choice whether or not to testify." 409 U.S. at 98, 93 S.Ct. 351. To the contrary, the record reveals that the trial judge employed admirable caution in assuring that if the witness, who was a criminal defendant potentially facing the death penalty and whose attorney was not present, decided to waive his right not to incriminate himself, the waiver was made intelligently and voluntarily.

*Cathey*, 992 S.W.2d at 465.  The Court of Criminal Appeals did not distinguish the *Webb* case in a manner that was contrary to, or an unreasonable application of, federal law.  Here, rather than threaten a potential witness with a perjury prosecution that would be initiated and overseen by the trial judge, the trial court in this case informed DeLeon of relevant constitutional protections and assured that DeLeon made an informed and voluntary choice before waiving his constitutional rights.  Faced with a criminal defendant who appeared in

court without counsel physically present, the trial court helped DeLeon understand that his statements could be used against him in his upcoming trial.  Instead of using threats to compel testimony as in *Webb*, the trial court judiciously ensured that DeLeon came into court with a complete awareness of relevant constitutional safeguards.  The distinctions between the facts in the *Webb* case and in this one show that the trial court's application of constitutional law did not create any dissonance with Supreme Court precedent.  This Court will deny Cathey's claim based on DeLeon's refusal to testify.  *See* 28 U.S.C. § 2254(d)(1).

## CERTIFICATE OF APPEALABILITY

Under the AEDPA, a prisoner cannot seek appellate review from a lower court's judgment without receiving a Certificate of Appealability ("COA").  *See* 28 U.S.C. § 2253(c).  Cathey has not yet requested that this Court grant him a COA, though this Court can consider the issue *sua sponte*.  *See Alexander*, 211 F.3d at 898.  "The COA statute establishes procedural rules and requires a threshold inquiry into whether the circuit court may entertain an appeal."  *Slack v. McDaniel*, 529 U.S. 473, 482 (2000).  A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

The Fifth Circuit holds that the severity of an inmate's punishment, even a sentence of death, "does not, in and of itself, require the issuance of a COA."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000).  The Fifth Circuit, however, anticipates that a court will resolve any questions about the need for a COA in the death-row inmate's favor.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000). The Supreme Court has explained

the standard for evaluating the propriety of granting a COA on claims rejected on their merits as follows: "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  On the other hand, a district court that has denied habeas relief on procedural grounds should issue a COA "when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484; *Miller-El*, 537 U.S. at 336-38.  Unless the prisoner meets the COA standard, "no appeal would be warranted." *Slack*, 529 U.S. at 484.

Cathey petition raises several issues worthy of judicial review.  Nevertheless, having considered the merits of Cathey's petition, and in light of the AEDPA's standards and controlling precedent, this Court determines that a COA should not issue on any of Cathey's claims.

## CONCLUSION

"Though the penalty is great and our responsibility heavy, our duty is clear." *Rosenberg v. United States*, 346 U.S. 273, 296 (1953) (Clark, J.).  Based on the foregoing, the Court concludes that Cathey presents no issue requiring the issuance of a federal writ of habeas corpus.  As a result, this Court:

- **GRANTS** Respondent's Motion for Summary Judgment [Doc. # 7];

- **DENIES** Eric Dewayne Cathey's Petition for Writ of Habeas Corpus [Doc. # 3] and **DISMISSES** this case **WITH PREJUDICE**; and

- **DENIES** the issuance of a Certificate of Appealability as to all of Cathey's claims.

The Court will issue a separate final judgment.

**SIGNED** this **23d day of December, 2004**, at Houston, Texas.

Nancy F. Atlas
United States District Judge